**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MINNESOTA**

SHEA COAKLEY, an individual
and
JOSHUA GRAB, an individual,

Plaintiffs,

v.

VIREO GROWTH, INC.,
VIREO HEALTH, INC, and
HICOLOR LLC,

Defendants.

Court File No: 0:26-CV-02095 (PJS-JFD)

**AMENDED COMPLAINT**
**JURY TRIAL REQUESTED**

---

Plaintiffs Shea Coakley and Joshua Grab, both individuals, through their undersigned attorney, for their Complaint against Defendants Vireo Growth, Inc., Vireo Health Inc., and HiColor LLC allege as follows:

## PARTIES, JURISDICTION, AND VENUE

1. Plaintiff Shea Coakley ("Coakley") is an individual who resides in Massachusetts.

2. Plaintiff Joshua Grab ("Grab") is an individual who resides in Massachusetts.

3. Defendant Vireo Growth, Inc. ("Vireo Growth") is incorporated under the Business Corporations Act of Canada, with its head office located at 209 South 9th Street, Minneapolis, Minnesota 55402.

4. Defendant Vireo Health Inc. ("Vireo") is a Delaware corporation.

5. HiColor LLC ("HiColor") is a Minnesota Limited Liability Company.

6. Jurisdiction and venue are proper, because a substantial amount of the facts arising in the allegations in this complaint took place in Minneapolis, Minnesota, and because Vireo Growth and HiColor are based in Hennepin County.

## FACTUAL BACKGROUND

### *Growth of THC Market*

6. Many states that legalized the sale and use of cannabis, also legalized its commercial sale.

7. Prior to this point, recreational and medicinal cannabis products were sold in regulated dispensaries in only a few states including Minnesota, New York and Maryland.

8. In 2018, the Farm Bill was introduced and inadvertently legalized hemp which is defined as a cannabis with less than 0.3% delta-9 THC. The bill removed cannabis with low concentrations of THC from the Controlled Substances Act and called it hemp.

9. The difference between hemp and marijuana is the concentration of THC in the dry weight of the plant. Cannabis plants with concentrations higher than 0.3% are classified as marijuana which remains a federally controlled substance.

10. It took several years before companies realized the significance of the Farm Bill's loophole but once it became known, the sale of hemp products exploded.

11. Although some states still ban hemp products, legalize it only up to a certain dose, or specify where it can be sold, many states like Minnesota have codified laws that allow

for the legal sale of hemp products similar to the laws involving the sale of alcohol. As a result, there has been a huge explosion in products offered for sale in the hemp THC market.

12. The sale of hemp beverage products is currently a billion-dollar business.

13. According to an article featured in BevNet "Hemp-Derived Satisfied Consumer Thirst for THC Beverages" published April 9, 2024

> What started in Minnesota during summer 2022 has spawned a billion dollar industry in the last year as brands have realized that the most effective path to market for low-dose beverages (between 2mg and 5mg per serving) is not through recreational and medicinal cannabis dispensaries, but a mixture of traditional alcohol retailers, online sales, and even convenience stores and co-ops that don't traditionally sell booze.

16. Hemp beverages are competing with alcoholic beverages for consumers. For a period of time there were two factors that limited the sale of hemp beverages – multi-state operators who fought against the legalization of the products and big alcohol distributors. Once these groups gave up pushing against the legalization of hemp-based beverages, realizing that this market is worth millions of dollars in sales that can add to their profits, the hemp beverage industry has grown astronomically.

17. According to the BEVNET article, "Sales of hemp-derived THC drinks were up by 143% in 2023, according to data from the Brightfield Group."

18. According to the article "Alcohol use is declining. THC is swooping in" published on May 13, 2025 on the CNN Business website, states that the hemp THC market grew to $382 million in 2024 and it is estimated to be $571 million in 2025.

19. Analysts have determined that hemp sales increased 143% in 2023 and that the hemp market will "overtake the CBD drinks market by 2025" if not sooner.

20. As of May 1, 2025, half of the US states now permit the sale of hemp beverages.

***Coakley and Grab Capitalize on Sale of Cannabis Beverages***

21. Initially, Coakley and Grab operated in the regulated cannabis market selling cannabis beverages they had created under the name of HighTide.

22. In 2023, they decided to expand their business to take advantage of the growing hemp market and transition from the regulated cannabis market to the hemp market.

23. Coakley and Grab began developing a line of margarita THC beverages under the name of HiTide which came in several different flavors.

24. They raised $1.7 million from friends and family to create, market and sell their products.

25. Coakley and Grab were connecting with a variety of brands such as Drink Wynk to engage in collaborations.

***Coakley and Grab Reach Out to Vireo***

26. In early 2023, Coakley and Grab reached out to Josh Rosen ("Rosen"), former CEO of Vireo, about Vireo investing in their existing HighTide/HiTide business.

27. Vireo had two hemp brands - Hi*AF and Boundary Waters - each with three products – beverages, vapes and gummies that they were developing.

28. After numerous conversations, Coakley, Grab, Rosen, and Aaron Garrido ("Garrido"), former Chief Financial Officer of Vireo, agreed to merge the HiTide products developed by Coakley and Grab with the Hi*AF and Boundary Water products developed by Vireo to be sold by one entity called HiColor.

29. HiColor was a company Vireo formed but was not using for any business, so it made it easy to use as a start-up for the hemp-based THC beverages and products.

30. The parties agreed Coakley and Grab would use their expertise and experience to operate HiColor by developing, marketing, producing, and distributing the HiTide, Hi*AF, and Boundary Waters products with strategic support and an operating budget funding coming from Vireo.

31. Vireo agreed Coakley and Grab would have exclusivity on the sale of all hemp THC-related products, not just the beverage sales.

32. After some marketing sessions, Coakley and Grab decided to market the HiColor products under the name of Green Street Beverages ("GSB").

33. As early as March 2024, Coakley and Grab began arranging for a partnership between GSB and a distributor for the distribution and sale of HiTide, Hi*AF and Boundary Waters products.

34. By email dated March 13, 2024, an attorney with Arent, Fox, Schiff emailed Coakley, Grab, and Rosen a draft term sheet, addressing the formation of Green Street Beverages, LLC, the convertible note of financing, and other business terms.

35. By email dated March 14, 2024, Garrido tells two representatives of Johnson Brothers, a distribution company, about Vireo's partnership with the "High Tide group" (Coakley and Grab). Garrido explains Coakley and Grab "bring some serious bev alch/CPG experience to the table."

36. By email dated March 27, 2024 at 11:58 a.m., Garrido introduces Coakley and Grab to Jake Sauter and team, and acknowledges the significant benefit that Coakley and Grab bring to the joint venture between High Tide and Vireo:

> Allow me to introduce you to Shea and Josh, the founders of High Tide, a cannabis beverage brand from Massachusetts. High Tide started out in the cannabis dispensary system in Mass., but are looking to pivot to the hemp-derived space, starting with Minnesota. They bring a wealth of beverage experience to the table and have a great margarita product in three varieties . . .
>
> We've been exploring and are working towards formalizing a partnership with High Tide whereby we would form a joint venture to market our combined product portfolio and share copacking, distribution and sales resources. We think this makes a ton of sense as they bring the beverage experience, we bring the cannabis experience and from row seat to Minnesota, and we both bring great brands and products.
>
> Even though our agreement isn't finalized, we're starting to loop them into our decision making, and as such would love to introduce you to them.

37. In an email dated April 3, 2024, Coakley drafts a letter for Garrido to send to Johnson Brothers to explore a distribution partnership between GSB and Johnson Brothers for distribution of GSB's three beverage brands.

38. By email dated April 5, 2024, Garrido announces to the Johnson Brothers representatives that they have officially formed GSB:

We are thrilled to announce the official formation of Green Street Beverage, marking the beginning of an exciting journey in the THC beverage industry. Our launch will feature three distinct brands, each bringing something unique to the market:

1. **HiTide - Offering 3 SKUs of margarita mocktails in traditional, watermelon, and spicy diablo flavors. All 5MG**
2. **Boundary Waters - Introducing a refreshing hop water seltzer with a subtle flavor profile, available in one SKU at 3MG.**
3. **Hi*AF - Crafting two SKUs of premium sodas infused with 10MG, promising a truly elevated experience. Geared towards a 21-30 year old audience.**

Our strategy includes a swift and coordinated national rollout, with simultaneous launches planned in markets beyond Minnesota. With our team's extensive experience in the beverage and alcohol sectors, we are well-equipped to ensure a seamless and successful introduction of our brands.

***Coakley, Grab and Vireo Reach an Agreement on an Equity Partnership***

39. By email dated April 16, 2024, Diandra Molina of Arent Fox Schiff forward the drafts of the Green Street Beverages operating agreement ("GSB Agreement") and form of employment agreement to Rosen, Garrido, Coakley, and Grab.

40. The terms of the GSB Agreement provide for Coakley to receive 40,000 Class A Voting Units and Vireo Health and Grab to each receive 30,000 Class A Voting Units.

41. In an email dated May 21, 2024, Rosen wrote to Coakley and Grab about how he envisioned their partnership with the idea of providing Coakley and Grab with modest salaries to start, along with incentives for deliverables:

- Blank Paper Structure --> if "Hiring" Shea & Josh to run at this, the starting point would likely be structuring a bootstrapped operations with modest salaries and a vesting ownership in the business of approximately 20% with extra incentives attached to relationships, scale, monetization – focusing incentives on attributable performance and/or outcomes. How to define such incentives? Tied to relationships like Diageo, LiveNation, big distro wins, etc. delivering strategic capital or scaled revenue growth.

42. Coakley and Rosen discussed at length how the partnership would work.

43. By email dated May 22, 2024, Coakley responds to Rosen's proposal and Rosen responds to this proposal with his thoughts articulated in blue:

As I understand things, the desire is to use the available capital from the lender to get us moving into the space. We create a sub-llc that you are proposing is split 80/20. If, for whatever reason, we aren't able to attract outside capital and we do not see a path to a bigger vision, then Vireo is left with the majority of the rewards from the efforts and it just stays under Vireo. Hence, the equity split. Vireo would also support the normal operations of the business, short term, including legal, HR, some marketing, finance, etc. Josh and I are given the 20% (proposed) as a reward for our efforts in growing the beverage biz for Vireo. --> yes, or we could do in the entity we formed for this a while back for now, HiColor and move to a GSB entity when it's time – articulating the path in writing either way

44. Rosen responds to Coakley's suggestions stating, "without the history with you two, I think we'd probably be looking for a beverage business lead and a heavy dose of advisory help for relationships – yet love the hub business model as what's most needed and the plan of attack for GSB."

45. Discussions continued as to the specific terms of the equity partnership, but Coakley and Grab were already investing a significant amount of their time and expertise into developing Vireo's THC beverages for HiColor.

46. Coakley and Grab requested they get paid by Vireo for the work they were doing to establish the HiColor hemp product business.

47. The idea for an independent contractor agreement was designed to be a short-term option leading into a longer-term partnership with an equity spilt:

Big picture. I think we can live with some variation on the short-term structure you are proposing, but I really want to focus on what happens IF AND ONLY IF we find ourselves going bigger in 6 or 12 months. Does that make sense? --> definitely makes sense - you want to know what you're playing for - juxtaposed with the immediate challenges associated with legacy HighTide and frustrating capital constraints - for the ASAP, we can at least get an independent contractor agreement going with you, Shea and if we ultimately end up stuck, we can find a way to amicably move independently in a supportive fashion

48. In an email dated June 4, 2024 at 7:32 a.m. from Coakley to Garrido, Grab, and Rosen, Coakley sets forth the 'term sheet' for the short-term play." Rosen responds with comments in blue by email dated June 4, 2024 at 10:19 p.m.:

Basic Terms -

- We use GSB as the holdco name / DBA
- Use the LLC/sub structure already formed for HiColor.
- All delta 9 will flow through this company, with a keen focus on beverage.
- JR proposing 20%. SC proposing 30%. Shall we just meet in the middle? I don't want to go too nuts on anti-dilution language,
- Aligned on the idea that the equity cap table will be re-negotiated and altered if we enter into a new structure for the company c
are many ways to accomplish this. --> aligned per our discussions
- SC and JG to maintain equity rights unless there is a major breach of contract, etc.
- SC and JG to get at least one year of guaranteed consulting to the org. We can re-work after the first 12 months depending on
bigger obligations and don't want to count a longer liability against the near-term dollar commitment

49. In that email from Coakley to Garrido, Grab and Rosen, Coakley updates Garrido and Rosen on how things are successfully proceeding with this venture:

2. @Shea Coakley and @Josh Grab to coordinate with Johnson Bro's to get trip dates coming up to MN. We can pair this with a sort of, kick off meeting + some market visits for me and Josh. Maybe we can pull off the distro training session during this time as well. --> let me know; I've got more going on right now than I have in a while, so might be without me (preferably not)
3. @Josh Rosen and @Aaron Garrido to broker a discussion with the marketing group so we can start leading the bev/D9 efforts more broadly. --> yes, but also more broadly than this, Aaron and I want to do a kick-off introduction to Vireo leadership writ large (Aaron is working on this)

50. By email dated June 5, 2024, Garrido emails the "Vireo team" to notify them Vireo has a partnership with Coakley and Grab for the hemp beverages and gummy business:

Vireo team,

We have entered into a partnership with Shea Coakley and Josh Grab to lead our hemp-derived beverage and gummy business, which we will be calling Green Street Beverages. Shea and Josh founded a Massachusetts THC beverage company, HiTide, and bring a wealth of experience in the CPG and beverage alcohol industries. This meeting is to introduce you to them and to discuss near term priorities for the hemp-derived business. Please don't hesitate to reach out with any questions in the meantime.

51. As a first step with respect to the partnership, Coakley signed an Independent Contractor Agreement dated June 5, 2024. A copy is attached hereto as Exhibit A.

52. Grab then signed an Independent Contractor Agreement dated June 15, 2024. A copy is attached hereto as Exhibit B. (Coakley and Grab's independent contractor agreements shall collectively be referred to as the "IC Agreements").

53. Pursuant to paragraph 3 of the IC Agreements, Vireo agreed to pay Coakley and Grab the sum of $10,000 per month to coordinate activities with Johnson Brothers or another alcohol distributor to facilitate the wholesale launch of Vireo's Hi*AF and Boundary Waters beverages and the HiTide beverages, develop and execute a marketing strategy to launch the beverages, and coordinate production activities with Big Watt.

54. Rosen and Coakley continued discussions on the terms of the partnership equity agreement.

55. Eventually, in July 2024, the Vireo parties - Rosen, Garrido, and Shimpa - and the HiTide parties - Coakley and Grab – finalized their agreement.

56. Rosen, on behalf of Vireo, offered and Coakley and Grab agreed to operate the hemp arm of Vireo Growth's company through HiColor, with Vireo's strategic support

and funding. HiColor would have the mutually exclusive right to sell all of the hemp brands and products created and developed by Coakley and Grab (HiTide) and Vireo (Hi*AF and Boundary Waters) on the GSB Website and under the GSB name.

57. The parties agreed Vireo would own 75% and Coakley and Grab together would own 25% of HiColor, and Coakley and Grab would receive 25,000 profit interest units in HiColor.

58. In an email dated July 25, 2024, from Garrido to Coakley, Grab, and Rosen, Garrido states “See attached for the draft agreements to formalize the GSB arrangement that we’ve verbally agreed to.” The five attached agreements (collectively, the “Agreements”) include the Assignment and Assumption Agreement (the “Assignment”, a copy of which is attached hereto as Exhibit C), the Amended and Restated Operating Agreement for HiColor LLC (the “Operating Agreement”, a copy of which is attached hereto as Exhibit D), the Profit Interest Grant Agreement (the “PIGA”, a copy of which is attached hereto as Exhibit E), the License Agreement - Intellectual Property License Agreement (the “License Agreement”, a copy of which is attached hereto as Exhibit F), and the Supply Agreement (a copy of which is attached hereto as Exhibit G).

59. Under the terms of the Assignment Agreement, Vireo assigned the IC Agreements to HiColor.

60. The Operating Agreement named Coakley CEO and Grab CRO of HiColor and provided each of them with 12.5% of HiColor. Vireo was given 75% of HiColor and Rosen was named Executive Chairman.

61. Pursuant to the terms of the PIGA, Coakley and Grab received 12,500 profit interest units in HiColor.

62. Under the terms of the License Agreement between HiTide and HiColor, HiTide licensed rights to HiColor for the recipes/formulations for all HiTide products and all branding/imagery associated with the HiTide brand.

63. The Supply Agreement between HiColor, as seller, and Vireo, as buyer, provides for the sale of cannabis products to Vireo at seller's cost.

64. Although these documents were never signed, the parties performed in accordance with the terms of the Agreements.

66. Vireo executives informed Coakley and Grab they were looking for investors to fund HiColor and if a large investment occurred Vireo would fully fund HiColor. If they were unable to find obtain significant investors, HiColor would have to slowly develop and reinvest the funds.

67. Vireo in fact raised $100 million from investors so they agreed HiColor did not need to receive external funding – Vireo would be able to provide the necessary funding.

68. The parties also acknowledged this venture would be very profitable.

69. Garrido ran a financial analysis and valued HiColor at $20 million.

70. Garrido also calculated that gross profits from the sale of inventory by HiColor would initially be approximately $8.5-10 million per year, with $3 million in profit.

71. The parties anticipated growing the business over a span of about five years and then selling the established business to a larger company for a substantial amount.

***Coakley and Grab Operate HiColor and Sell GSB Products***

72. Coakley and Grab operated HiColor, doing business as GSB, with the full cooperation and knowledge of Vireo, who approved all major decisions, including budgets and operations.

73. Vireo frequently acknowledged their partnership with Coakley and Grab both internally and with third parties.

74. Coakley and Grab worked with third-party companies and employees of Vireo to develop and create the GSB website from an initial concept.

75. In addition, using their expertise and extensive experience, Coakley and Grab helped finalize the flavors of the Hi*AF and Boundary Waters beverages and created their can branding, product SKU and developed marketing strategies for the sale of these beverages.

76. Hi*AF is a high THC dose soda; Boundary Waters is a low THC dose seltzer and HiTide is a moderate THC dose margarita drink. Each brand comes in a variety of flavors.

77. HiColor's pricing shows it anticipated making a gross profit of over $40 for each SKU:

Green Street Bev:

1. Portfolio
   1. HiTide Cannabis infused Margarita (3 SKU)
   2. Hi*AF Soda (2 SKU)
   3. Boundary Waters (1 SKU)
2. Pricing

Magarita/Soda 5-10MG THC

| | | | |
|---|---|---|---|
| PTD | $55.92 | | |
| PTR | $80.00 | 30.10% | DISTRIBUTOR |
| PTC | $120.00 | 33.33% | RETAILER |

Boundry Waters 3MG THC

| | | | |
|---|---|---|---|
| PTD | $47.52 | | |
| PTR | $68.00 | 30.12% | DISTRIBUTOR |
| PTC | $102.00 | 33.33% | RETAILER |

78. In emails dated June 12, 2024, with the subject line of "Green Street Beverages/Vireo Marketing Kickoff", Garrido and Coakley expressed their ideas on getting designs, marketing and the GSB website going, with Vireo personnel working with Coakley and Grab to facilitate the project.

79. In an email dated June 18, 2024, Sarah Overby, the Director of Medical Education for Vireo Green Foods, tells Coakley "Looking forward to future meetings and our GSB partnership!"

80. By email dated June 18, 2024, Shimpa tells Nick Couturier, who was trying to introduce Sully Chaudhra to Vireo, that you should put your buddy, Sully in touch with our hemp-derived beverage team to amplify the brands and e-comm/DTC site which is under construction now. I've included Shea and Josh on this email. Please make the introduction at your convenience."

81. By email dated June 22, 2024 from Rosen to Coakley, Grab, and John Mazarakis ("Mazarakis") and Peter Sack ("Sack") of Chicago Atlantic, Rosen tells the Chicago Atlantic people Coakley and Grab "bring great experience, energy and focus to building a CPG/bevs business in what's a rapidly growing and changing industry, requiring great agility, in my opinion."

82. Chicago Atlantic previously lent money to Vireo and is one of the largest, if not the largest, capital providers.

83. Coakley and Grab were interested in collaborating with Chicago Atlantic in the THC beverage arena.

84. In response, Coakley responded to Rosen, Mazarakis, Sack, Garrido, and Grab explaining the expertise that he and Grab bring to the beverage industry:

As Josh Rosen alluded to, Josh Grab (my partner) and I have deep roots in the bev/alc and CPG spaces. I've personally been running venture-backed businesses for almost 15 years, while Josh has been with some of the fastest growing bev companies in the last ~22 years (including early Sam Adams days). As soon as we decided to get into this market, we started plotting out some macro ideas on various ways we can play within the growing tides.

It is my humble opinion that the market is ripe for placing various capital bets. We have our own playbook that has us as a "hub" for brands, marching towards becoming a "Diageo" or "Pernod" of the THC bev. In addition, given our connections and understanding of the market, we have a flow of outreach on things like debt lines, partnerships, equity investments, etc. that are all on the table. A prime example of that came across our desk this week, which is a brand looking for a debt line on some production *with the orders already spoken for with POs.* I think there is, and will continue to be, a tremendous amount of creative deal-making to be made.

85. By email dated June 27, 2024, Coakley reached out to the Vireo team regarding branding GSB, creating a "Green Street webpage for a holistic view of the company. A shopping experience that allows you to explore ALL hemp-based products," and creating a sub-market for each of the individual products. Rosen added some thoughts and ideas

to the marketing suggestions but was on board with the premise of creating GSB as the umbrella for selling all of the hemp-based products.

86. For example, in an email dated July 9, 2024, from Garrido to representatives of Drink Redy, a company seeking funding for a hemp beverage, Rosen, Coakley and Grab, he states "I'm looping in Shea and Josh as well, with whom we have partnered to run our beverage business."

87. In an email dated July 11, 2024, Shimpa connects Doug Dottis of D3mandable, a consultant for Vireo on email campaigns and assets, to Coakley and Grab, and explains that Coakley and Grab are "leading the hemp-derived bev and gummy project for us."

88. In an email dated July 22, 2024, Coakley told the "Team" that although the capital outlay for the inventory is large, it was anticipated that the money would come back quickly and become profitable fairly quickly. It was even anticipated that the project would become "VERY profitable."

89. Coakley and Grab were quickly making GSB a successful company, even necessitating the hiring of new employees and independent contractors.

90. By email dated July 29, 2024 at 4:48 p.m., Coakley notified the Vireo people that he and Grab will be meeting with Matt Colasanti who is as "high as it gets for THC bev and Johnson, overseeing all markets."

91. Coakley and Grab, on behalf of GSB, entered into a contract with Johnson Brothers, a big distributor of alcoholic beverages, who wished to expand into the rapidly growing THC beverage market.

92. In an email dated July 29, 2024, Coakley introduces Jordan Jarrod ("Jarrod") to Rosen, Shimpa and Garrido. GSB planned to hire Jarrod as an independent contractor to help with marketing and brand building for the beverages.

93. By email dated August 26, 2024, Rosen gave the "Team" of Garrido, Shimpa, Rosen, Grab, Kyle Kingsley (Vireo Health), Brendan Sweeny (Vireo Health), and Amy Deneson (Vireo Health) some action items including connecting with HR for payroll and onboarding Julia Amandola, connecting with the AP team to discuss contracts, sending out options for "all hands S&OP phone call" and that Coakley and Grab will be "taking the entire web presence over with GSB resources." He also indicated that High*AF was close to launch.

94. In response to Garrido's inquiry on when that launch would be, Coakley responded on August 26, 2024, that it would be "Next week pushing them hard."

95. Beginning in July, Coakley and Grab entered into production contracts with Surley and Big Watt to produce Hi*AF, Boundary Waters and HiTide beverages.

96. GSB ordered four runs of the inventory.

97. In an email dated August 30, 2024, Coakley updated the "Team" on the current state of the business. He explained great strides had been made as they neared the launch

date for the beverages and Coakley was optimistic about the future growth potential in additional states, as well as more products. Ultimately, Coakley believed this business could genuinely help people:

> We have been so focused on the nitty-gritty of the business operations that I think it is worth it to stop and remind myself/ourselves why it is that we do this. Josh and I have said from day 1 that we wanted to "bring cannabis to life". We believe that this plant, and particularly the beverage format, has the ability to improve people's lives, genuinely.
>
> In many ways, THC can be an antidote to many of the pains plaguing our society. Mental health issues. Lack of human connection. Anxiety. Over-consumption of alcohol. Mindfullness. Technology overload. If we do this the right way, we could not only build a great business, but do some good along the way. I never want to forget that.

98. In an email dated September 11, 2024, after a S&OP call, Coakley emailed the S&OP Team of Grab, Garrido, Shimpa, Deneson, Sweeny, Cindy Hupf (GreenGoods), Rosen, and Patrick Williams (Vireo Health) with some action items that include trying to get inventory out in Minnesota, leaving the current SKUs in place, creating a twelve pack of beverages, and talking to other supplies to get inventory ready for sale as quickly as possible.

99. In an email dated September 11, 2024, Coakley reached out to Shawn Sheehan from WH Beverage Co about working together as WH Beverage has strong production assets.

100. In an email dated September 13, 2024, to the "Team" of Grab, Amandola, Shimpa, Sweeny, Kingsley, Garrido, Deneson, Rosen, Hupf and Brandon Van Asten (Vireo Health), Coakley thanked "everyone who chipped in to get this going. Everyone on this thread put in some blood, sweat, and tears to get us launched. For that, Josh and I thank you."

101. Coakley then proceeded to update everyone on the successful launch and how they are uniquely positioned to be extremely successful going forward and the plans for creating new products and marketing ideas:

> Johnson Brothers has 8 sub-divisions of their company. Artison, their "craft beer division", has been carrying THC bevs for about the last year. We (GSB) are actually the first THC beverage that their "top tier" sales organization has ever carried. This group has statewide coverage on both retail and on-prem. The short version of the story is that they have the ability to do more damage in the market than anyone has done to date.
>
> We started the week by doing ride alongs with sales reps. Myself, @Josh Grab , @Julie Amandola and @Aaron Garrido spent Tuesday, Wednesday and Thursday with reps out in the field. We hit both on prem and off prem accounts and had a chance to really soak in the experience on the ground level. Many, many learning here. The cliff notes:
>
> 1. We need to operationalize 10MG for HT as soon as humanly possible for retail, given what is selling in the market. We are moving forward with a plan to get a 16 oz HT lineup, all at 10 MGs.
> 2. 3 and 5 MG will work better "on prem", of which JB has access to thousands of accounts.
> 3. Shelf space and market saturation are somewhat of a factor, but not as bad as I thought it might be. Some brands that launched early have just turned out to be dogs and, as such, shelf space is opening up for us. The timing is actually fairly good, given that it has gone through a full cycle of sorts.
> 4. There are many ways in which we can differentiate ourselves in the market, including some retail tactics that are quite simple. Cooler buys. Rack systems. Unique deals on first orders.
> 5. The general market is maturing and does not stand for poor flavors and half-assed branding. We can win in both of these categories.
> 6. There is an opening in the market to be one of the first brands pushing cases or 30 racks of affordable product. This might not be our "core", but we want to try and create the first "bud light" product that is affordable and sold in quantity.
>
> On Thursday, @Josh Grab and I gave a speech in front of the entire division of JB that we are working with. The team was incredibly engaged and excited to have a new line of revenue to bring to their customers. Their goal is to sell 3,000 cases in Septmeber. We feel that we are about as well positioned as we can be with that group.

102. With these successes, Coakley wanted GSB to expand operations in states outside of Minnesota but before that could happen, the rules in each state regarding product packaging etc. needed to be researched.

103. By email dated September 24, 2024, Brendan Sweeny, EVP of Operation for Vireo Health, reached out to Adam Koscielski, former Assistant General Counsel for Vireo, and Julie Amandola, head of the Business Operations for GSB, to connect Julie and Adam so they could coordinate on handling the research necessary to expand operations into additional states.

Adam
The low dose business is looking to get into distribution in states outside of MN (I believe South Dakota and Oklahoma? Are on the list – not positive). I think your support with Julie to double check rules in each state and confirming our packaging is compliant with individual state rules as new markets are opened up would be helpful. Please coordinate directly with Julie on it.

104. By email dated September 30, 2024, Coakley advised his team that he had landed a great long term production partner with Best Bev out of New York who could move quickly at a discounted price.

105. He also advised them that Johnson Brothers had already sold over 500 cases, with 300 cases going to distro by the end of September, with the goal of selling 3,000 cases by the end of October 2024 based upon a big promo that was centered around sober October.

106. In addition, having received banking approval, the GSB website was ready for a soft launch early in October 2024.

107. By email dated November 5, 2024, Coakley outlined his ideas for future growth and expansion to Shimpa and copied Josen and Garrido:

Great to hang last night. I'm excited about everything that is going on with you and, honestly, as optimistic as I've ever been about GSB.

As it relates to our conversation, I think we should collectively start thinking about what the next steps of GSB look like. Ahead of that, I'll say that nothing is stopping our forward momentum right now. We have the funding needed to do what we need to do. We have a plan for market roll out and enough human resources to handle the short term road ahead.

All this being said, I think we need to start planning for phase 2. We *will need more capital*, it's just a question of when. We will need capital for more human resources, more expansion with JB and other distros, marketing partnerships, DTC advertising, brand expansion (R&D, marketing). We can do a detailed deep dive on this, but gut tells me this is in the 5-10ml range depending on how fast or aggressive we want to be.

There is a phase 3 of this thing in my mind, which includes the ability to "roll-up" other brands in the space. At this point, you are talking serious capital. 40-50ml plus with some debt lines attached. We can cross this bridge when we get to it, but it is helpful to lay out a long-term vision of potential capital partners. I've been trying to hold off on this conversation, knowing that you have A TON going on with your own capital raise. But, I figure now is a good time to start planting a seed.

108. In a short period of time, Coakley and Grab established operations in twelve states and had two distributors who were selling the beverages.

109. Coakley and Grab also had another distributor ready to go.

110. All of these different beverages also began to be sold on the GSB website beginning in July of 2024.

111. The money from the sales of products on the GSB website went to Vireo.

112. By email dated December 10, 2024 at 11:57 a.m., Coakley reached out to Shimpa with updates on product development and production, prior to a scheduled working session call:

1. Notes on contract are over to you in an email. Primed for discussion next week. Happy to chat before next week if you want to do one go-round before.
2. Budget and Pro Forma - Working with Aaron on this as we speak. We have a ton of the inputs based on a capital infusion. Call scheduled tomorrow for a working session. Should have this in good shape for our meeting next week.
3. Stock at Vireo - cherry limeade, etc. are done and waiting test results. Should come back today. We are instructing Cindy to put in an order so they are ready to sell at the stores as soon as test results come back. Worth noting that these products were delayed from our payment to the co-packer. IE if we could have made payments faster we would have had less delay in product.
4. VIP - we are looping in Aaron to see if we can create some kind of urgency coming from another voice. They have everything they need from us and we have been pushing consistently to get this wrapped up.
5. Grape, tigers blood and huckleberry on on the road today heading to Minnesota and about 5-6 weeks ahead of original schedule.

113. In an email dated December 10, 2024, Coakley informed Garrido that Jordan, a fractional consultant, will be handling the pro-forma and forecast marketing for GSB.

114. Coakley, on behalf of GSB, entered into a Consulting Agreement with Jordan dated December 15, 2024, for consulting services related to creating an operational budget and various management strategies at a rate of $10,000 per month.

115. Vireo paid Jordan pursuant to the terms of the Consulting Agreement.

116. Coakley also entered into a Digital Marketing Consultant Agreement with BlueTickSocial, L.L.C. dated February 9, 2025, for digital media marketing services for $6,500/month.

117. Vireo paid BlueTickSocial pursuant to the terms of the agreement.

118. Coakley signed an agreement with Jacob Duhaime, a PR, influencer, and marketing services consultant, for a term of six months for $5,000/month, to assist with marketing the three brands – HiTide, Hi*AF and Boundary Waters.

119. Vireo paid Duhaime pursuant to the terms of his consultant agreement.

120. Vireo also purchased Hi*AF, Boundary Water, and HiTide beverages from HiColor at cost to sell in Vireo's dispensaries.

***Mazarakis Takes Over as Chairman/CEO of Vireo Growth***

121. On October 10, 2024, Mazarakis, who previously helped fund Vireo Growth, took over as Vireo Growth's co-executive Chairman and CEO shortly after GSB launched the operation of the GSB website and HiColor began distributing and selling the hemp products associated with GSB.

122. As Mazarakis was in the process of joining Vireo Growth, Shimpa promised Coakley and Grab that nothing would change with respect to HiColor and the GSB website.

123. However, when Mazarakis took over, he made some significant changes to Vireo's organization that significantly impacted Vireo and GSB.

124. Mazarakis replaced Rosen and named Shimpa CEO of Vireo.

125. After becoming CEO, Shimpa suggested she, Coakley and Grab have a call or a meeting with Mazarakis to discuss the GSB website and the hemp-based products that were created and marketed under the GSB name.

126. However, no call or meeting ever occurred.

127. Mazarakis continued firing other key people at Vireo Growth and Vireo who had assisted in working on the GSB website and the beverages sold under the GSB brand, including Garrido.

128. After terminating Garrido as CFO, Mazarakis hired Tyson Macdonald (“Macdonald") to replace him.

129. After Rosen and Garrido were terminated, Coakley and Grab’s main Vireo contact was Shimpa.

130. In early December 2024, GSB needed to hire a sales rep for Minnesota GSB activity. Prior to onboarding a salesperson, Coakley reached out to Tim Blum from Vireo Health to assist in the hiring process.

131. By email dated December 11, 2024, Blum responds to Coakley as follows:

> Let me know your thoughts, but I think the best approach would be to hire the new employee on through Vireo Health of MN. For our internal systems I would set them to report to Aaron (cc'd), but they would receive all direction from either you or Josh. Do you have a job description generated for the role? How about expectations for a wage/salary? I assume you would be looking to incorporate a sales commission or bonus eligibility structure for them. Do you have that component ready? I imagine if you haven't already done so Amber and Aaron would be beneficial to partner with on that component.

132. However, after receiving that response, Coakley’s requests to Blum, Garrido, and Shimpa for assistance in hiring the sales rep, Amandola, and finalizing a consulting contract with Jordan, as CMO, were all ignored.

133. By email dated January 21, 2025 at 10:14 a.m. Coakley expressed his concerns to Shimpa regarding the changes taking place with Vireo:

Hi Amber,

I hope this message finds you well. I completely understand how overwhelming your schedule must be, but I wanted to take a moment to share some observations that have raised a bit of concern on our end.

**Areas of Concern**

1. **Aaron's Departure**: Aaron served as an important liaison to the broader Vireo team. While his departure may not pose immediate issues, we were unaware this was coming, which left us feeling a bit out of the loop.
2. **MN Hire Delay**: We've been working to get collaboration or approval on a hire in Minnesota, but it's been 3-4 weeks without action. Unfortunately, the candidate is likely to pursue other opportunities if we can't move forward soon.
3. **Meeting Follow-Up**: I understood we were aiming to schedule a meeting with John on Thursday, but I haven't received any updates since then.

We're fully capable of handling the smaller day-to-day tasks, but I wanted to check in on the broader picture. Are these yellow flags something we should be concerned about?

We value this partnership deeply and want to ensure everything stays on track. Please let me know if there's a good time to connect, or if there's anything we can do to assist.

- Shea

--

Shea Coakley
CEO & Co-founder, Green Street Beverages
339-793-1294 | gsbevs.com | shea@gsbevs.com

134. In an email dated January 24, 2025, Coakley notified Shimpa that the lack of attention from Vireo on GSB "is now significantly impacting our operations and progress."

135. Coakley then outlined the positives regarding the GSB business:

Let's start with the positives:

- We've positioned the business for a rocket-ship year.
- We are currently active in 3 states with Johnson Brothers and have 13 states planned for 2026, with several already scheduled for launch.
- We're in final talks with two additional distributors that will close existing gaps, potentially allowing us to expand to more states in 2025.
- Our model demonstrates relatively low capital requirements unless we choose to pursue aggressive strategies (M&A, large partnerships, major DTC investments).
- We've brought on a world-class interim CMO and COO—both top-tier talents in the industry.

By all accounts, the business is on the right track.

136. Coakley expressed his concerns about the lack of communication, undefined point of contact now that almost everyone from the initial Vireo team had been terminated, and inquired how they were to proceed in the future.

137. A few months after Mazarakis took over, Shimpa told Coakley and Grab they would have to cut their salaries in half, cut every employee, and cut the GSB budget.

138. She told them Mazarakis would not honor the Agreements and Mazarakis refused to pay the HiColor bills from third-party contractors like the producers, distributors, and the marketing group.

139. By email dated March 5, 2025 at 8:37 a.m., Shimpa set forth new "general terms which would allow us to move forward":

I've outlined below the general terms which would allow us to move forward. Please reach out this week to connect once you have had a chance to review and reflect.

- Vireo owns 75% as 2x Participating Preferred with a 15% annual dividend (accrues)
  - Vireo receives credit for all dollars invested to date
- Josh/Shea own 25% common stock
- Josh/Shea contribute all IP to this entity (Hi-Tide, anything else?)
- Reduction in compensation by 50% for both Josh/Shea.
- We need a milestone-based budget where specific KPIs need to be met
  - Unlock additional committed capital
  - Potential restoration of original compensation, and perhaps bonus dollars on top of that (e.g., 200% of new base bonus potential ($100k base, ability to earn another $200k). The focus is on sales, so open to making this commission based.
- Non-compete in the hemp/thc beverage space outside of this venture

140. By email dated March 10, 2025, Coakley responded to Shimpa's terms by stating: "I can't state enough that we have been operating under a different set of guardrails, and the changes proposed have serious implications. Those changes include obligations we had to each other, as well as what we can reasonably accomplish in the [hemp] market."

141. By email dated March 14, 2025 at 10:59 a.m., Shimpa notified Grab and Coakley she had "identified the following resources that we need to terminate as we lean out and streamline the business."

I've identified the following resources that we need to terminate as we lean out and streamline the business. I've shared this in our conversations, but wanted to make it clear in writing. Please action and flag for me any perceived gaps that will result from this and who (Shea/Josh/ops/finance) resource will own which gap. Let's collaborate on filling the resourcing gaps.

- Jarrod Jordan - $10k monthly; 30-day term notice required
  - Send term notice today
- Matt Moffatt - $8k monthly; Agreement expired 1/31/25;
  - Confirm no additional engagement.
- David Sipes – $5k monthly retainer for Jan
  - Haven't seen the IC agreement; understand him to be an "ops consultant"
  - Confirm no further engagement
- Julie Amandola - $10k monthly; Engagement expired 12/31, don't see extension on file.
  - Need to receive copy of any extension, if in place. If not, no renewal of services approved.
- WECB Projects - $1,500 monthly; What is this?
- Blue Tick Social - $4,000 monthly through Jan 2025.
  - Feb invoice is for $6,500. Why?
  - If for social media only, move to cancel.
- The Industry Collective - $2,500 monthly
  - Advisory consulting from Taylor
  - Confirm no further engagement
- Sustainable Demand - $2,500 monthly;
  - CRM/Email campaign/SMS
  - Need access to customer list/data and justification to continue or term.

142. By email dated March 18, 2025, in response to Shimpa's request to align on overall expenses, Coakley explained they needed more information in order to determine what makes sense for a new compensation deal that includes the short-term salary and long-term equity waterfall for Coakley and Grab:

It's very difficult to respond to these things in a silo. All these things work together to get us an understanding of the package of a deal. So, if we are expected to lower our short-term compensation, having an understanding of

a) what resourcing will be put against this and

b) how the equity waterfall works becomes the most important thing for us to understand.

I'm stating the obvious, but a lowered salary + ~5 million investment and 25-30% of the company is much different than lowering our salaries + 500k in investment and all kinds of strings attached to the equity. Even in the short term, having the majority of our comp proposed as incentive comp but not understanding how those incentive comp works is difficult. We need to know what is likely to be put into the business to understand what we can reasonably accomplish and, therefore, tie comp to that expectation.

143. By email dated March 20, 2025, Coakley and Grab confirm to Shimpa they have terminated the contracts as requested by Shimpa in her March 14th email.

***<u>Coakley and Grab Suffer Significant Losses as a Result of Vireo's Withdrawal of the Promised Partnership</u>***

144. As a result of Vireo's refusal to honor the third-party contracts, Coakley and Grab lost valuable contracts with significant distributors.

145. For example, Surly Brewing, a significant producer of alcoholic and hemp beverages, requested payment of $130,000 for a production run.

146. In response, by email dated April 4, 2025 at 1:56 p.m., Macdonald emailed Tom Nienteimp from Surley Brewing, stating that:

> Strategically, as an investor in the beverage business who has been funding ongoing losses, we are looking to unwind our involvement, and are working with the operating partners, Josh and Shay, to develop a plan to transition the business to them or unwind it. Based on our understanding of the inventory of finished goods, the beverage business should have a path to move the inventory and satisfy its outstanding obligations.
>
> I have added Amber on as she is back from vacation and is in charge of developing the appropriate plan, and will reach out to discuss further with you.
>
> I know this is not the information you were hoping to hear, but for us, as an allocator of capital to various investments, it does not make sense for us to continue to fund the business.
> Hopefully we can work together during this transition period to find a way for the beverage business to fully satisfy its obligations.

147. Vireo did eventually pay Surley the $130,000 but Coakley and Grab no longer have the trust or respect of the producer and Surely has refused to continue doing business with them.

148. Coakley and Grab tried to work out an understanding with Vireo regarding the GSB Website, but they were issued a cease-and-desist order.

149. As a result, they are no longer able to sell any products on the GSB Website and have no access to any inventory, including the inventory of their HiTide products.

150. Vireo continues to sell the HiTide, Hi*AF and Boundary Water products, including the beverages created by Coakley and Grab, at their cannabis dispensaries.



151. By doing so, either Vireo Health is either acknowledging the License Agreement and the Supply Agreement, or it is wrongfully selling and profiting from products that it has no right to sell.

152. In particular, HiColor was granted a license to use the recipes/formulations for all HiTide Products, and all branding/imagery associated with the HiTide Brand pursuant to the terms of the License Agreement.

153. Under the Supply Agreement, HiColor sold Vireo its THC products, including the HiTide, Hi*AF and Boundary Waters brands – beverages, vapes and gummies. Vireo has no right to sell these products absent the agreement with HiColor.

154. Vireo has not compensated Coakley and Grab for the use of their IP, the sale of the inventory, the lost opportunities related to partnering with producers and distributors of the GSB brands or the lost future opportunities associated with the hemp market.

155. Coakley and Grab invested their time and resources to successfully grow and develop GSB/HiColor.

156. Legislation has been passed that will take effect a year from now restricting the sale of THC beverages.

157. As a result, Vireo and Vireo Growth's interference with Coakley and Grab's operation of HiColor and GSB has significant implications.

158. They are missing a crucial window to profit from the sale of THC beverages for the next year.

159. In addition, they are unable to use money they would have earned from the successes of GSB in the THC market to transition into other profitable ventures.

**COUNT I – UNJUST ENRICHMENT**

160. The foregoing paragraphs are incorporated by reference.

161. Defendants have been unjustly enriched by benefitting from Plaintiffs' expertise, experience, work, investment, and intellectual property related to THC beverages and related products, retaining the benefits of Plaintiffs' work, including but not limited to the branding, and marketing of the GSB and GSB Website and the hemp products sold on the GSB Website and elsewhere, under the names of HiTide, Hi*AF, and Boundary Waters, while failing to compensate plaintiffs as the parties envisioned in the Agreements.

162. Benefitting and retaining these benefits without compensating Plaintiffs is inequitable and unjust under the circumstances.

163. Plaintiffs are entitled to restitution for the damages they have and will suffer as a result of Defendants' unjust enrichment, plus interest and costs.

**COUNT II – BREACH OF IMPLIED CONTRACT**

164. The foregoing paragraphs are incorporated by reference.

165. Officers on behalf of Vireo Growth and Vireo orally agreed with Coakley and Grab to the terms of the Agreements and by their actions, demonstrated that they were bound by the terms of the Agreements.

166. As set forth above, Vireo and Vireo Growth have breached the terms of the implied Agreements.

167. As a direct and proximate result of Vireo Growth and Vireo's breach of the implied Agreements, Coakley and Grab have suffered economic damages in an amount to be proved at trial.

**COUNT III – PROMISSORY ESTOPPEL**

168. The foregoing paragraphs are incorporated by reference.

169. Vireo Growth and Vireo made clear and definite promises to Coakley and Grab to compensate them with a share of profits for their expertise and experience with respect to the THC beverage industry and the use of their intellectual property upon which Coakley and Grab reasonably relied.

170. Plaintiffs' reliance on Defendants' promises was to their detriment, and injustice can only be avoided by enforcing the promises set forth in the Agreements.

171. As a result of Defendants' breach of the promises made to Plaintiffs, Plaintiffs have suffered damages in an amount to be proven at trial.

**COUNT IV – BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING**

172. The foregoing paragraphs are incorporated by reference.

173. Defendants owed Plaintiffs an implied duty of good faith and fair dealing in their performance of the Agreements.

174. Defendants breached this duty by engaging in actions intended to prevent or frustrate the ability of plaintiffs to run HiColor and GSB.

175. As a result of Defendants' breach of the duty of good faith and fair dealing, Plaintiffs have suffered damages in an amount to be proven at trial, plus interest, costs, and attorney's fees.

## COUNT V – TORTIOUS INTERFERENCE WITH CONTRACT

176. The foregoing paragraphs are incorporated by reference.

177. GSB entered into contracts with producers and distributors for the THC beverages.

178. Vireo deliberately interfered with Plaintiffs' contractual rights with various distributors and producers.

179. Vireo Growth also deliberately interfered with Plaintiffs implied contractual rights with HiColor by preventing them from engaging in business as HiColor and sending them a cease-and-desist letter which prevented them from continuing to operate HiColor and GSB.

180. As a result of Defendants deliberate interference with plaintiffs' contracts, plaintiffs have suffered damages in the amounts to be proven at trial.

## COUNT VI – CONVERSION

181. The foregoing paragraphs are incorporated by reference.

182. Defendants have also deprived Plaintiffs of their property interest in the HiTide products that were developed independently by Plaintiffs. Defendants continue to sell the HiTide products in their dispensaries without right or legal justification.

183. Plaintiffs also hold and have the right to assert a property interest in HiColor and/or GSB.

184. Defendants have deprived Plaintiffs of their property interests and have robbed Plaintiffs of the value, goodwill and profits associated with their property interests.

185. Plaintiffs are entitled to damages for the value of the deprived property interest in an amount to be proven at trial.

**COUNT VII – MISAPPROPRIATION OF INTELLECTUAL PROPERTY**
**(In the Alternative)**

186. The foregoing paragraphs are incorporated by reference.

187. Plaintiffs are the owners of certain intellectual property, including but not limited to proprietary information, trade secrets, and other creative or commercially valuable works (collectively, the "Intellectual Property").

188. Plaintiffs developed and created the Intellectual Property through substantial investment of time, labor, creativity, and financial resources.

189. Plaintiffs took reasonable measures to maintain the secrecy, confidentiality, and exclusivity of the Intellectual Property, including restricting access and limiting disclosure to individuals with a legitimate need to know.

190. Plaintiffs licensed the Intellectual Property to HiColor under the terms of the Licensing Agreement.

191. If it is determined the Agreements, including the License Agreement, are not enforceable, defendants do not have a legal basis for using the Intellectual Property and Defendants, without authorization from Plaintiffs, knowingly exploited or otherwise appropriated the Intellectual Property for Defendants' own benefit.

192. Defendants knew Plaintiffs owned the Intellectual Property and Defendants did not have permission to use or disclose it absent the Licensing Agreement.

193. Defendants' acts were intentional, willful, malicious, and undertaken in conscious disregard of Plaintiffs' rights.

194. As a direct and proximate result of Defendants' misappropriation, Plaintiffs have suffered damages, including but not limited to loss of exclusive use, competitive harm, lost revenue, loss of business opportunities, diminished value of the Intellectual Property, and other economic and noneconomic losses.

195. Plaintiffs are further entitled to damages, injunctive relief to prevent Defendants continued use, disclosure, or exploitation of the Intellectual Property, plus interest, attorneys' fees, and costs.

## COUNT VIII – VIOLATION OF THE MINNESOTA UNIFORM TRADE SECRET ACT (MUTSA - § 325C
**(In the Alternative)**

196. The foregoing paragraphs are incorporated by reference.

197. Plaintiffs are the owners of certain intellectual property, including but not limited to, the formulations and/or recipes and the SKUs for HiTide.

198. Plaintiffs developed and created the formulations and/or recipes and the SKUs for HiTide through substantial investment of time, labor, creativity, and financial resources.

199. Plaintiffs took reasonable measures to maintain the secrecy, confidentiality, and exclusivity of the formulations and/or recipes and the SKUs for HiTide, including restricting access and limiting disclosure to individuals with a legitimate need to know.

200. Based upon the terms of the Agreements, Plaintiffs licensed the formulations and/or recipes and the SKUs for HiTide to HiColor under the terms of the Licensing Agreement.

201. If it is determined the Agreements are not enforceable, defendants do not have a legal basis for using the formulations and/or recipes and the SKUs for the HiTide. Defendants, without authorization from Plaintiffs, have knowingly exploited or otherwise appropriated the formulations and/or recipes and the SKUs for HiTide for Defendants' own benefit.

202. Defendants knew Plaintiffs owned the formulations and/or recipes and the SKUs for HiTide and Defendants did not have permission to use or disclose it absent the Licensing Agreement.

203. Defendants' acts were intentional, willful, malicious, and undertaken in conscious disregard of Plaintiffs' rights.

204. As a direct and proximate result of Defendants' misappropriation, Plaintiffs have suffered damages, including but not limited to loss of exclusive use, competitive harm, lost revenue, loss of business opportunities, diminished value of the Intellectual Property, and other economic and noneconomic losses.

205. Plaintiffs are further entitled to damages, injunctive relief to prevent Defendants continued use, disclosure, or exploitation of the Intellectual Property, plus interest, attorneys' fees, and costs.

## COUNT X – BREACH OF CONTRACT

196. The foregoing paragraphs are incorporated by reference

197. Defendants breached the terms of the IC Agreements by failing to pay Coakley and Grab..

198. As a result of the breach of the IC Agreements, Coakley and Grab have suffered damages in an amount to be determined at trial, plus costs and attorney's fees.

## COUNT IX – TORIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

201. The foregoing paragraphs are incorporated by reference.

202. Plaintiffs had a reasonable expectation of prospective economic advantage in continuing to operate HiColor and/or GSB to sell the products under the HiTide, Hi*AF and Boundary Water brands.

203. Defendants had knowledge of plaintiffs' expectations to operate HiColor and/or GSB to sell the products under the HiTide, Hi*AF and Boundary Water brands and receive a share of the profits from the sale of these products.

204. Defendants wrongfully interfered with plaintiffs' reasonable expectation of prospective economic advantage by wrongfully withdrawing the promised financial support and/or issuing a cease-and-desist letter preventing plaintiffs from continuing to operate HiColor and/or GSB while seizing control of the existing inventory and business records and/or by preventing plaintiffs from obtaining their HiTide inventory.

205. In the absence of Defendants wrongful acts, it is reasonably probable plaintiffs would have successfully realized a substantial economic advantage or benefit by continuing to operate HiColor and/or GSB to sell the products under the HiTide, Hi*AF and Boundary Water brands and/or to sell their HiTide products.

206. As a direct and proximate result of Defendants' tortious interference with plaintiffs' economic advantage, Plaintiffs have suffered damages in an amount to be proved at trial

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment in their favor and against Defendants and for an order of the Court as follows:

1. Adjudge that Defendants are liable to Plaintiffs for actual or compensatory damages in an amount that will be proven at trial;

2. Award Plaintiffs their costs, attorney's fees, interest, and any other relief permitted by law; and
3. Such other relief as the Court may deem just and equitable, including injunctive relief prohibiting Defendants from using the Intellectual Property.

Date: April 28, 2026

**GILBERT ALDEN PLLC**

By: /s/ Charlie R. Alden
Charlie R. Alden, Reg. No. 0389896
2801 Cliff Rd E
Suite 200
Burnsville, MN 55337
Charlie@GilbertAlden.com
612-990-2484 | Office & Cell
612-806-0585 | Fax

**ATTORNEYS FOR PLAINTIFFS**

## ACKNOWLEDGMENT

That sanctions, including costs, disbursements, and reasonable attorney's fees, may be awarded pursuant to Minn. Stat. § 549.211 to the party against whom the allegations in this pleading are asserted.

Date: April 28, 2026

/s/ Charlie R. Alden
Charlie R. Alden

EXHIBIT A

COAKLEY'S INDEPENDENT CONTRACTOR AGREEMENT

EXHIBIT B
GRAB'S INDEPENDENT CONTRACTOR AGREEMENT

EXHIBIT C
ASSIGNMENT AND ASSUMPTION AGREEMENT

EXHIBIT D
AMENDED AND RESTATED OPERATING AGREEMENT FOR HICOLOR LLC

EXHIBIT E
PROFIT INTEREST GRANT AGREEMENT

EXHIBIT F

LICENSE AGREEMENT - INTELLECTUAL PROPERTY LICENSE AGREEMENT

EXHIBIT G
SUPPLY AGREEMENT