# INDEPENDENT CONTRACTOR AGREEMENT

This Independent Agreement ("***Agreement***") dated as of this 5th day of June, 2024 (the "***Effective Date***"), is between Vireo Health, Inc., a Delaware corporation (the "***Company***") and Shea Coakley, an individual ("***Contractor***").

## Recitals

WHEREAS, Company desires to engage Contractor to perform certain Services (as defined below) for Company on an independent contractor basis.

WHEREAS, the parties wish to set forth in writing the terms and conditions of this independent contractor engagement.

## Agreement

NOW THEREFORE, in consideration of the promises contained in this Agreement, and intending to be legally bound, the parties agree as follows:

**1.** **Term**. Company hereby engages Contractor in the capacity set forth in this Agreement, and Contractor hereby accepts this engagement, for the term that begins on June 5, 2024 and shall continue month to month unless terminated in writing (the "***Term***"). This Agreement shall not have any automatic renewals. Either party may terminate this Agreement immediately for failure to perform Services or other breach after notice and reasonable opportunity to cure. All obligations under Sections 6, 8, 9, 10, 12, 15, 16, and 19 of this Agreement shall survive termination or expiration of this Agreement.

**2.** **Services**. During the Term, Contractor shall provide the services described in Exhibit A hereto to Company on an as-needed basis (the "***Services***"). Exhibit A may be amended from time to time during the Term by written consent of both parties. Company will designate a principal liaison to approve or reject Contractor's work under this Agreement, who shall initially be the Company's CEO, Josh Rosen (the "***Company Representative***"). To the extent of a conflict between the terms of this Agreement and Exhibit A, the terms of this Agreement shall supersede and be controlling. The Services shall be performed at times and places as shall be mutually convenient for Company and Contractor, and Contractor shall exercise independent judgment as to the method for accomplishing the Services. The nature, extent, period of performance, and limitations of the Services provided will be mutually agreed to by Company and Contractor. Contractor shall: (i) devote whatever time, effort and resources may be reasonably necessary or required to provide Services hereunder in a professional manner; (ii) at all times in the performance of the Services, comply with all applicable laws, codes and regulations and other instructions, standards of conduct, policies and procedures established and/or promulgated by Company, orally or in written or electronic form, which may be amended from time to time; (iii) provide its own materials, supplies, equipment and tools in the performance of the Services; and (iv) have sole and complete control over the method and means to be used in the performance of the Services. Company does not control the manner or means of Contractor's transportation to any worksite. In performing the Services, Contractor shall: (i) maintain all licenses and permits necessary to perform the Services and (ii) perform the Services in a timely and satisfactory manner.

**3.** **Compensation**.

A. Fees. Company agrees to pay Contractor the sum of ten thousand dollars ($10,000.00) per month during the term of this Agreement for the Services. Company will issue an IRS Form 1099-MISC for all payments made and other compensation given, if required by applicable law.

B. Payment. Contractor will submit invoices for the performance of Services for Company on a monthly basis, in arrears. Payment will be processed within thirty (30) days of Company's receipt of Contractor's undisputed invoice.

**4. Expenses**. Contractor shall be responsible for paying all expenses incurred by Contractor in performing this Agreement, including but not limited to travel, food, lodging, office space, furniture, equipment, tools, secretarial, telephone and other expenses. Company will reimburse Contractor only for expenses related to the Company's business. Approved expenses will be reimbursed within thirty (30) days of submittal of Contractor's expense report approved by the Company Representative.

**5. Assignment**. This is a contract for personal services by Contractor, and this Agreement may not be assigned by Contractor to any party without the prior written consent of Company.

**6. Independent Contractor**. Contractor shall be for all purposes an independent contractor of Company and not, solely by reason of the existence of this Agreement, an employee, partner, or owner of Company and shall not participate in any employee benefit program of Company by reason of this Agreement. Except as required by law, Company shall not withhold any sums from the compensation payments to be pursuant to Section 3 for Social Security, FICA, unemployment, employment, or other federal, state, or local tax liabilities or contributions, and all withholdings, liabilities, and contributions shall be solely the responsibility of Contractor. Neither Contractor nor employees of an entity for which Contractor serves as an employee, partner or other type of owner, shall be entitled to receive any benefits which employees of Company receive and shall not be entitled to receive from Company workers' compensation, unemployment compensation, medical insurance, life insurance, paid vacations, paid holidays, pension, profit sharing, or Social Security on account of and work or Services provided to Company. Contractor shall be solely responsible for paying: (i) its employees, if any, and all taxes, FICA, workers' compensation, unemployment compensation, medical insurance, life insurance, paid vacations, paid holidays, pension, profit sharing and other benefits for Contractor and its employees, servants and agents; and (ii) any employees of a business entity for whom Contractor serves as an employee, partner or other type of owner. Contractor will defend, indemnify, and hold harmless Company from any and all loss or liability, including attorney's fees, arising from its failure to make these payments, withholdings, or benefits, if any. Contractor shall: (i) be totally and solely responsible for the timely reporting and payment of all income or other taxes and other governmental liabilities resulting from the performance of its Services hereunder, (ii) pay all self-employment and other taxes, including income taxes and estimates thereof, as shall be required by the Internal Revenue Code and the laws, rules, and regulations of any other government entity having jurisdiction over Contractor, and (iii) indemnify, defend and hold Company harmless for any tax or other liability arising from or related to Contractor's failure to timely report and pay all income or other taxes or other governmental liabilities relating to compensation received from Company or otherwise relating to the Services.

**7. [Intentionally Omitted]**

**8. Confidential Information.**

A. Defined. For the purposes of this Agreement, the term "Confidential Information" means all information in whatever form (whether oral, written, electronic, paper, or other medium), concerning Company, furnished by or on behalf of Company to Contractor, or learned by Contractor as a result of the Services, at any time (whether before or after the date of this Agreement) and in each case, regardless of the manner in which the medium in or on which such information is furnished, stored or displayed, including without limitation: (i) the occurrence and subject matter of the Services; (ii) all information, products, plans, methods, ideas, intellectual property, trade secrets, compensation data, financial information, marketing strategies and information, programs and services, inventions, processes, designs, sketches, drawings, business opportunities, projections, developments, know-how, formulae, computer software and programs, (including all code) and intellectual property, prospects, pending projects and proposals, pricing information, technical data, customer and supplier lists, customer prospect lists, product and equipment designs or enhancements, concepts, inventions and ideas, and other developments and techniques, other trade secrets or confidential or proprietary information, whether patentable or copyrightable or not, and other information that is not generally known or readily ascertainable by other persons. Written information supplied to Contractor may be marked

"CONFIDENTIAL" when feasible, but the failure to so mark such information shall not be deemed a waiver by Company of confidentiality.

B. Exclusion. "Confidential Information" shall not include any information which: (i) was in the possession of Contractor at the time it was first disclosed by or on behalf of Company as evidenced by written or tangible evidence; (ii) was in the public domain at the time it was disclosed to Contractor; (iii) enters the public domain through sources independent of Contractor and through no act or omission of Contractor; or (iv) was lawfully obtained by Contractor from a third party not under an obligation of confidentiality to Company.

C. Use of Confidential Information**.** Contractor agrees that Confidential Information shall be used solely for the purposes of performing the Services ("***Permitted Purposes***"). Contractor agrees: (i) not to disclose (or permit disclosure of) any Confidential Information (or any portion thereof) to any person or entity; (ii) not use the Confidential Information for its own purposes, or any other purposes other than Permitted Purposes; and (iii) to keep all such Confidential Information confidential and shall exercise all responsible care to prevent disclosure of such Confidential Information to any third party, except as authorized in writing by Company or where required to provide the Services contemplated hereunder. Dissemination of Confidential Information by Contractor shall be limited to those who are directly involved in the Services and whose duties justify their need to know such information, provided that Contractor shall restrict the use of such Confidential Information solely for Permitted Purposes. Contractor shall immediately notify Company in writing of any unauthorized use or disclosure of Confidential Information which may come to its attention.

D. Ownership. Contractor agrees that: (i) Confidential Information and all goodwill associated with or symbolized by such Confidential Information are and shall remain the sole property of Company; (ii) no action by Company shall be deemed to constitute or result in an assignment of any Confidential Information to Contractor or the creation of any equitable or other interest herein or to grant Contractor the right to use the Confidential Information except as contemplated herein; (iii) all legal rights in the Confidential Information, including the right to patent any technology arising therefrom, shall belong exclusively to Company; and (iv) this Agreement does not constitute a license of any Confidential Information.

E. Mandatory Disclosure**.** In the event Contractor is legally compelled to disclose any Confidential Information, to the extent permitted under applicable law or regulation, Contractor shall promptly give notice to Company so that Company may seek to quash such compulsion or to obtain an appropriate protective order. In the event Company does not (or seek to) quash such compulsion, and regardless of whether a protective order is obtained, Contractor shall disclose only such limited portion of the Confidential Information as is required to avoid sanction by the court having jurisdiction of such matter.

F. Return of Documents / Cessation of Use. Where permitted under applicable law or regulation, in the event the Agreement is terminated for any reason, or at any time within five (5) days following Company's request, Contractor shall: (i) promptly return (or upon Company's written direction, destroy) all documentation (whether original or copies whether electronic or other medium) and other materials (whether tangible or stored in any storage medium, and whether prepared by Company or Contractor from information supplied by Company) containing any Confidential Information to Company without retaining any copies thereof; and (ii) immediately cease any use of the Confidential Information.

**9. Intellectual Property.**

A. Definitions.

(i) **"*Intellectual Property*"** means any idea, trademark, logo, brand, domain name, data, invention, discovery (whether or not patentable, whether or not put into writing, and whether or not reduced to practice), trade secret, suggestion, works of authorship (within the purview of the copyright laws of the United States of America, whether or not they can be patented or copyrighted) or similar materials, design, process, technique, system, algorithm, source code, technology, software (whether or not they are in writing or reduced to practice), improvement, modification, innovation, formula, or shop right (whether or not patentable, whether

or not put into writing, and whether or not put into practice) made, generated, or conceived by Contractor (whether alone or with others).

(ii) "***Company's Intellectual Property***" means all Intellectual Property that Contractor generates during Contractor's engagement with Company and for one (1) year thereafter, whether alone or in collaboration with others, related directly to the Company's businesses. Company's Intellectual Property includes ideas or concepts that are not embodied in any tangible form. The tangible work product that Contractor creates during Contractor's engagement with Company, such as product specifications and product documentation, will be Company's Intellectual Property, and the ideas and concepts incorporated in that tangible work product will also be Company's Intellectual Property. Contractor specifically agrees that any Intellectual Property that Contractor makes, generates, conceives or discloses during Contractor's engagement with Company will be deemed Company's Intellectual Property unless Contractor specifically identifies with clear detail that Intellectual Property on Schedule 1 attached to this Agreement as previously made, generated or accessed by Contractor. For purposes of this Agreement, any Company's Intellectual Property relating directly to the business of Company or to Company's actual or demonstrably anticipated research or development with respect to which Contractor files a patent or copyright or trademark application during the term of Contractor's engagement with Company and within one (1) year after termination of engagement with Company shall be presumed to be Company's Intellectual Property conceived by Contractor during the period of its engagement with Company, rebuttable only by accurate, written and duly corroborated evidence that such Invention was not first conceived by Contractor until after the termination of its engagement with Company.

B. Documentation and Disclosure of Company's Intellectual Property. During Contractor's engagement with Company, Contractor will promptly and fully disclose (including a description of the nature of) or otherwise make available to Company any information about and/or the existence of, Company's Intellectual Property, whether or not requested by Company. Contractor will also keep current, accurate, and complete notes, data and records (collectively, "***Records***") of all Company's Intellectual Property, in the manner and form provided in Company's policies and procedures, or as otherwise requested by Company. All Records will be deemed Company's Intellectual Property, and Contractor will promptly provide all Records to Company upon termination of Contractor's engagement with Company, or such earlier time as Company requests; notwithstanding the foregoing, Contractor shall be permitted to retain copies of such Records to the extent required under applicable law and regulation and for the period of time mandated by such law or regulation.

C. Ownership and Assignment of Company's Intellectual Property. Contractor agrees that all of Company's Intellectual Property, including any original works of authorship made by Contractor or in collaboration with others within the scope of Contractor's engagement and which are protectable by copyright are "works made for hire," as that term is defined in the United States Copyright Act (17 U.S.C. § 101, et seq.), and thus the exclusive property of Company. Contractor hereby irrevocably assigns and transfers to Company all of Contractor's right, title and interest in any original works of authorship and any and all Company's Intellectual Property (to the extent not deemed a "work made for hire"), whether currently subsisting or subsequently created. During the term of Contractor's engagement with Company and at any time thereafter, Contractor will:

(i) execute any additional documents reasonably requested by Company to evidence or give effect to that assignment, and otherwise to vest the entire right and title to any of Company's Intellectual Property in Company; and

(ii) render such additional assistance as Company may reasonably request to perfect all such assignments and to protect such Company's Intellectual Property, including performing any other reasonable acts necessary in Company's opinion and at its expense to preserve property rights in Company's Intellectual Property against forfeiture, abandonment, or loss and to obtain and maintain letters patent and / or copyrights

on Company's Intellectual Property. At Company's option, such additional efforts will include the preparation and execution of the documents, in a form satisfactory to Company, that are necessary to register any copyright, or to obtain patent protection in any patent office. Company will reimburse Contractor for Contractor's reasonable costs if Company requires Contractor assistance after termination of Contractor's engagement with Company.

Contractor hereby designates and appoints Company and its duly authorized officers and agents, as Contractor's agents and attorneys-in-fact, with full power of substitution, to act for and in Contractor's behalf and instead of Contractor, to execute and file any documents and to do all other lawfully permitted acts to further the above purposes with the same legal force and effect as if executed by Contractor.

**10. Remedies**. The parties agree that: Contractor's obligations in Sections 8 and 9 of this Agreement are necessary and reasonable in order to protect Company and Company's business. Contractor agrees that the remedy at law for any breach of the provisions of this Agreement will be adequate as defined by the Court.

**11. Notices**. All notices and other communications shall be in writing and shall be deemed to have been duly given if delivered via: (i) personal delivery; (ii) expedited delivery service with proof of delivery; (i) registered or certified United States mail, postage prepaid; or (iv) upon delivery by email, addressed to the appropriate party as follows:

| | | | |
|---|---|---|---|
| To Company: | Vireo Health, Inc.<br>207 South Ninth Street<br>Minneapolis, MN 55402<br>Attn: CEO<br>E-mail:<br>joshrosen@vireohealth.com | To Contractor: | ______________<br>______________<br>______________<br>Attn: Shea Coakley<br>Email:<br>shea@backbayventures.com |

or to any other address as the person to whom notice is to be given may have previously furnished to the other in writing as set forth above, provided that notice of an address change shall be deemed given only upon receipt.

**12. Warranties**. Contractor will perform the Services diligently and in accordance with accepted and sound professional practices and procedures. Contractor represents and warrants that: (i) Contractor is free of any obligation or restriction that would prevent Contractor from entering into this Agreement or impede Contractor's ability to perform the Services; and (ii) Contractor's performance of the Services will not involve the use or disclosure of any trade secret information of any third party or the infringement of any patent or copyright of any third party.

**13. Entire Agreement and Amendment**. This Agreement: (i) constitutes the entire agreement between the parties relating to this independent contractor engagement and supersedes all prior agreements or understandings between Contractor and Company or their agents with regard to the same subject; and (ii) may be changed, modified, or terminated only by an agreement in writing signed by the parties hereto.

**14. Severability**. Each provision, section, sentence, clause, phrase, and word of this Agreement is intended to be severable. If any provision, section, sentence, clause, phrase, and word hereof is illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the validity of the remainder of this Agreement, provided that: (i) each party receives the substantial benefit of its bargain with respect to the transaction contemplated hereby; and (ii) the ineffectiveness of such provision would not result in such a material change as to cause completion of the transactions contemplated hereby to be unreasonable.

**15. Indemnification**. Contractor and Company shall mutually indemnify, defend and hold the other parties officers, directors, and employees harmless from and against any and all liabilities, claims, demands,

proceedings, obligations, assessments, losses, costs, damages, or expense, of any nature whatsoever, contingent or otherwise (including, without limitation, any and all judgments, degrees, equitable relief, extraordinary relief, settlements, awards, attorneys' fees, court cost, including arbitrators' fees) (collectively, "***Claims***") that are incurred, sustained, suffered, or assessed against the indemnified party, arising out of, relating to, or as a result of alleged or actual disregard or breach of this Agreement or any policies, principles, or guidelines, any action, inaction, negligence, misconduct, error or omission and any activity, or request of additional scope of work.

**16. Remedies.** In the event of any breach by Contractor or Company of any of the provisions of this Agreement, each party, in addition to any other rights, remedies or damages available at law or in equity, will be entitled to recover all costs and expenses, including without limitation attorneys' fees, incurred by either party, its successors and assigns as a consequence of any such breach.

**17. Non-Exclusivity.** The work performed for Company under this Agreement is not exclusive. Company and Contractor each retain the right to contract for similar services with other individuals and businesses. Contractor shall be free to undertake additional activities for another party provided that such activities do not unreasonably interfere with execution of the Services under this Agreement or otherwise violate this Agreement, including Sections 8, and 9.

**18. [Intentionally Omitted.]**

**19. General Terms.**

A. Governing Law; Venue. The validity, construction and performance of this Agreement shall be governed by and construed in accordance with the law of the state of Minnesota applicable to contracts executed in and performed entirely within such state, without reference to any choice of law principals thereof, but the specific performance provisions and right of Company to seek injunctive relief for Contractor's breach of the covenants contained herein may also be enforced in any other state or country or nation wherever such breach occurs, and in accordance with the laws of such other state, country or nation, to the extent necessary to secure enforcement in such other jurisdiction. Each party: (i) agrees that all actions, claims or proceedings related to this Agreement shall be commenced and maintained exclusively in the State of Minnesota; and (ii) irrevocably consents to submit to the personal jurisdiction and venue of such Minnesota courts and waives, to the fullest extent permitted by law, any objection which it may now or hereafter have to the laying of venue in any such court or that any such proceeding which is brought in accordance with this Section has been brought in an inconvenient forum.

B. Waiver. The failure of any party to insist upon strict compliance with any of the terms, covenants, or conditions hereof shall not be deemed a waiver of such term, covenant, or condition, nor shall any waiver or relinquishment of any right, power or privilege hereunder at any one or more times be deemed a waiver or relinquishment of such right, power or privilege at any other time or times.

C. Counterparts. This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original, but all of which, when taken together, will be deemed to constitute one and the same agreement.

D. Captions. The captions stated herein are for convenience only and are not intended to alter any of the provisions of this Agreement.

IN WITNESS WHEREOF, this Agreement has been duly executed by the parties as of the date first above written.

**Company: VIREO HEALTH, INC.**

DocuSigned by:

Signature: Josh Rosen

0F14A543F7E4427...

Print Name: Josh Rosen

Title: CEO

**Contractor: ________________**

DocuSigned by:

Signature: ______________________________

418E1AA7D8024E7...

Print Name: Shea Coakley

Title: ________________________________

**EXHIBIT A**
**to**
**Independent Contractor Agreement**

1. Contractor will:
   - Coordinate all activities with Johnson Brothers (or other alcohol distributor agreed upon by Vireo) to facilitate the wholesale launch of Vireo's Hi*AF and Boundary Waters beverages, and HiTide beverages if an agreement is reached for Vireo to facilitate such launch, (collectively, "the beverages") in Minnesota as soon as commercially feasible
   - Continue to craft and execute a strategy to launch the beverages in other markets through Johnson Brothers and other alcohol distributors
   - Develop and execute a marketing strategy to support the launch of the beverages including, but not limited to, pricing, trade activation, building a sales force, and overseeing the development of visual marketing media
   - Coordinate all production activities with Big Watt (or other copacker agreed upon by Vireo)

2. Other mutually agreed upon duties as may be assigned by the Company Representative.

# SCHEDULE 1

# INDEPENDENT CONTRACTOR AGREEMENT

This Independent Agreement ("***Agreement***") dated as of this 16th_ day of May, 2024 (the "***Effective Date***"), is between Vireo Health, Inc., a Delaware corporation (the "***Company***") and Josh Grab, an individual ("***Contractor***").

## Recitals

WHEREAS, Company desires to engage Contractor to perform certain Services (as defined below) for Company on an independent contractor basis.

WHEREAS, the parties wish to set forth in writing the terms and conditions of this independent contractor engagement.

## Agreement

NOW THEREFORE, in consideration of the promises contained in this Agreement, and intending to be legally bound, the parties agree as follows:

**1. Term**. Company hereby engages Contractor in the capacity set forth in this Agreement, and Contractor hereby accepts this engagement, for the term that begins on May 16, 2024 and shall continue month to month unless terminated in writing (the "***Term***"). This Agreement shall not have any automatic renewals. Either party may terminate this Agreement immediately for failure to perform Services or other breach after notice and reasonable opportunity to cure. All obligations under Sections 6, 8, 9, 10, 12, 15, 16, and 19 of this Agreement shall survive termination or expiration of this Agreement.

**2. Services**. During the Term, Contractor shall provide the services described in Exhibit A hereto to Company on an as-needed basis (the "***Services***"). Exhibit A may be amended from time to time during the Term by written consent of both parties. Company will designate a principal liaison to approve or reject Contractor's work under this Agreement, who shall initially be the Company's CEO, Josh Rosen (the "***Company Representative***"). To the extent of a conflict between the terms of this Agreement and Exhibit A, the terms of this Agreement shall supersede and be controlling. The Services shall be performed at times and places as shall be mutually convenient for Company and Contractor, and Contractor shall exercise independent judgment as to the method for accomplishing the Services. The nature, extent, period of performance, and limitations of the Services provided will be mutually agreed to by Company and Contractor. Contractor shall: (i) devote whatever time, effort and resources may be reasonably necessary or required to provide Services hereunder in a professional manner; (ii) at all times in the performance of the Services, comply with all applicable laws, codes and regulations and other instructions, standards of conduct, policies and procedures established and/or promulgated by Company, orally or in written or electronic form, which may be amended from time to time; (iii) provide its own materials, supplies, equipment and tools in the performance of the Services; and (iv) have sole and complete control over the method and means to be used in the performance of the Services. Company does not control the manner or means of Contractor's transportation to any worksite. In performing the Services, Contractor shall: (i) maintain all licenses and permits necessary to perform the Services and (ii) perform the Services in a timely and satisfactory manner.

**3. Compensation**.

A. Fees. Company agrees to pay Contractor the sum of ten thousand dollars ($10,000.00) per month during the term of this Agreement for the Services. Company will issue an IRS Form 1099-MISC for all payments made and other compensation given, if required by applicable law.

B. Payment. Contractor will submit invoices for the performance of Services for Company on a monthly basis, in arrears. Payment will be processed within thirty (30) days of Company's receipt of Contractor's undisputed invoice.

**4. Expenses**. Contractor shall be responsible for paying all expenses incurred by Contractor in performing this Agreement, including but not limited to travel, food, lodging, office space, furniture, equipment, tools, secretarial, telephone and other expenses. Company will reimburse Contractor only for expenses related to the Company's business. Approved expenses will be reimbursed within thirty (30) days of submittal of Contractor's expense report approved by the Company Representative.

**5. Assignment**. This is a contract for personal services by Contractor, and this Agreement may not be assigned by Contractor to any party without the prior written consent of Company.

**6. Independent Contractor**. Contractor shall be for all purposes an independent contractor of Company and not, solely by reason of the existence of this Agreement, an employee, partner, or owner of Company and shall not participate in any employee benefit program of Company by reason of this Agreement. Except as required by law, Company shall not withhold any sums from the compensation payments to be pursuant to Section 3 for Social Security, FICA, unemployment, employment, or other federal, state, or local tax liabilities or contributions, and all withholdings, liabilities, and contributions shall be solely the responsibility of Contractor. Neither Contractor nor employees of an entity for which Contractor serves as an employee, partner or other type of owner, shall be entitled to receive any benefits which employees of Company receive and shall not be entitled to receive from Company workers' compensation, unemployment compensation, medical insurance, life insurance, paid vacations, paid holidays, pension, profit sharing, or Social Security on account of and work or Services provided to Company. Contractor shall be solely responsible for paying: (i) its employees, if any, and all taxes, FICA, workers' compensation, unemployment compensation, medical insurance, life insurance, paid vacations, paid holidays, pension, profit sharing and other benefits for Contractor and its employees, servants and agents; and (ii) any employees of a business entity for whom Contractor serves as an employee, partner or other type of owner. Contractor will defend, indemnify, and hold harmless Company from any and all loss or liability, including attorney's fees, arising from its failure to make these payments, withholdings, or benefits, if any. Contractor shall: (i) be totally and solely responsible for the timely reporting and payment of all income or other taxes and other governmental liabilities resulting from the performance of its Services hereunder, (ii) pay all self-employment and other taxes, including income taxes and estimates thereof, as shall be required by the Internal Revenue Code and the laws, rules, and regulations of any other government entity having jurisdiction over Contractor, and (iii) indemnify, defend and hold Company harmless for any tax or other liability arising from or related to Contractor's failure to timely report and pay all income or other taxes or other governmental liabilities relating to compensation received from Company or otherwise relating to the Services.

**7. [Intentionally Omitted]**

**8. Confidential Information.**

A. Defined. For the purposes of this Agreement, the term "Confidential Information" means all information in whatever form (whether oral, written, electronic, paper, or other medium), concerning Company, furnished by or on behalf of Company to Contractor, or learned by Contractor as a result of the Services, at any time (whether before or after the date of this Agreement) and in each case, regardless of the manner in which the medium in or on which such information is furnished, stored or displayed, including without limitation: (i) the occurrence and subject matter of the Services; (ii) all information, products, plans, methods, ideas, intellectual property, trade secrets, compensation data, financial information, marketing strategies and information, programs and services, inventions, processes, designs, sketches, drawings, business opportunities, projections, developments, know-how, formulae, computer software and programs, (including all code) and intellectual property, prospects, pending projects and proposals, pricing information, technical data, customer and supplier lists, customer prospect lists, product and equipment designs or enhancements, concepts, inventions and ideas, and other developments and techniques, other trade secrets or confidential or proprietary information, whether patentable or copyrightable or not, and other information that is not generally known or readily ascertainable by other persons. Written information supplied to Contractor may be marked

"CONFIDENTIAL" when feasible, but the failure to so mark such information shall not be deemed a waiver by Company of confidentiality.

B. Exclusion. "Confidential Information" shall not include any information which: (i) was in the possession of Contractor at the time it was first disclosed by or on behalf of Company as evidenced by written or tangible evidence; (ii) was in the public domain at the time it was disclosed to Contractor; (iii) enters the public domain through sources independent of Contractor and through no act or omission of Contractor; or (iv) was lawfully obtained by Contractor from a third party not under an obligation of confidentiality to Company.

C. Use of Confidential Information**.** Contractor agrees that Confidential Information shall be used solely for the purposes of performing the Services ("***Permitted Purposes***"). Contractor agrees: (i) not to disclose (or permit disclosure of) any Confidential Information (or any portion thereof) to any person or entity; (ii) not use the Confidential Information for its own purposes, or any other purposes other than Permitted Purposes; and (iii) to keep all such Confidential Information confidential and shall exercise all responsible care to prevent disclosure of such Confidential Information to any third party, except as authorized in writing by Company or where required to provide the Services contemplated hereunder. Dissemination of Confidential Information by Contractor shall be limited to those who are directly involved in the Services and whose duties justify their need to know such information, provided that Contractor shall restrict the use of such Confidential Information solely for Permitted Purposes. Contractor shall immediately notify Company in writing of any unauthorized use or disclosure of Confidential Information which may come to its attention.

D. Ownership. Contractor agrees that: (i) Confidential Information and all goodwill associated with or symbolized by such Confidential Information are and shall remain the sole property of Company; (ii) no action by Company shall be deemed to constitute or result in an assignment of any Confidential Information to Contractor or the creation of any equitable or other interest herein or to grant Contractor the right to use the Confidential Information except as contemplated herein; (iii) all legal rights in the Confidential Information, including the right to patent any technology arising therefrom, shall belong exclusively to Company; and (iv) this Agreement does not constitute a license of any Confidential Information.

E. Mandatory Disclosure**.** In the event Contractor is legally compelled to disclose any Confidential Information, to the extent permitted under applicable law or regulation, Contractor shall promptly give notice to Company so that Company may seek to quash such compulsion or to obtain an appropriate protective order. In the event Company does not (or seek to) quash such compulsion, and regardless of whether a protective order is obtained, Contractor shall disclose only such limited portion of the Confidential Information as is required to avoid sanction by the court having jurisdiction of such matter.

F. Return of Documents / Cessation of Use. Where permitted under applicable law or regulation, in the event the Agreement is terminated for any reason, or at any time within five (5) days following Company's request, Contractor shall: (i) promptly return (or upon Company's written direction, destroy) all documentation (whether original or copies whether electronic or other medium) and other materials (whether tangible or stored in any storage medium, and whether prepared by Company or Contractor from information supplied by Company) containing any Confidential Information to Company without retaining any copies thereof; and (ii) immediately cease any use of the Confidential Information.

**9. Intellectual Property.**

A. Definitions.

(i) "***Intellectual Property***" means any idea, trademark, logo, brand, domain name, data, invention, discovery (whether or not patentable, whether or not put into writing, and whether or not reduced to practice), trade secret, suggestion, works of authorship (within the purview of the copyright laws of the United States of America, whether or not they can be patented or copyrighted) or similar materials, design, process, technique, system, algorithm, source code, technology, software (whether or not they are in writing or reduced to practice), improvement, modification, innovation, formula, or shop right (whether or not patentable, whether

or not put into writing, and whether or not put into practice) made, generated, or conceived by Contractor (whether alone or with others).

(ii) "***Company's Intellectual Property***" means all Intellectual Property that Contractor generates during Contractor's engagement with Company and for one (1) year thereafter, whether alone or in collaboration with others, related directly to the Company's businesses. Company's Intellectual Property includes ideas or concepts that are not embodied in any tangible form. The tangible work product that Contractor creates during Contractor's engagement with Company, such as product specifications and product documentation, will be Company's Intellectual Property, and the ideas and concepts incorporated in that tangible work product will also be Company's Intellectual Property. Contractor specifically agrees that any Intellectual Property that Contractor makes, generates, conceives or discloses during Contractor's engagement with Company will be deemed Company's Intellectual Property unless Contractor specifically identifies with clear detail that Intellectual Property on Schedule 1 attached to this Agreement as previously made, generated or accessed by Contractor. For purposes of this Agreement, any Company's Intellectual Property relating directly to the business of Company or to Company's actual or demonstrably anticipated research or development with respect to which Contractor files a patent or copyright or trademark application during the term of Contractor's engagement with Company and within one (1) year after termination of engagement with Company shall be presumed to be Company's Intellectual Property conceived by Contractor during the period of its engagement with Company, rebuttable only by accurate, written and duly corroborated evidence that such Invention was not first conceived by Contractor until after the termination of its engagement with Company.

B. Documentation and Disclosure of Company's Intellectual Property. During Contractor's engagement with Company, Contractor will promptly and fully disclose (including a description of the nature of) or otherwise make available to Company any information about and/or the existence of, Company's Intellectual Property, whether or not requested by Company. Contractor will also keep current, accurate, and complete notes, data and records (collectively, "***Records***") of all Company's Intellectual Property, in the manner and form provided in Company's policies and procedures, or as otherwise requested by Company. All Records will be deemed Company's Intellectual Property, and Contractor will promptly provide all Records to Company upon termination of Contractor's engagement with Company, or such earlier time as Company requests; notwithstanding the foregoing, Contractor shall be permitted to retain copies of such Records to the extent required under applicable law and regulation and for the period of time mandated by such law or regulation.

C. Ownership and Assignment of Company's Intellectual Property. Contractor agrees that all of Company's Intellectual Property, including any original works of authorship made by Contractor or in collaboration with others within the scope of Contractor's engagement and which are protectable by copyright are "works made for hire," as that term is defined in the United States Copyright Act (17 U.S.C. § 101, et seq.), and thus the exclusive property of Company. Contractor hereby irrevocably assigns and transfers to Company all of Contractor's right, title and interest in any original works of authorship and any and all Company's Intellectual Property (to the extent not deemed a "work made for hire"), whether currently subsisting or subsequently created. During the term of Contractor's engagement with Company and at any time thereafter, Contractor will:

(i) execute any additional documents reasonably requested by Company to evidence or give effect to that assignment, and otherwise to vest the entire right and title to any of Company's Intellectual Property in Company; and

(ii) render such additional assistance as Company may reasonably request to perfect all such assignments and to protect such Company's Intellectual Property, including performing any other reasonable acts necessary in Company's opinion and at its expense to preserve property rights in Company's Intellectual Property against forfeiture, abandonment, or loss and to obtain and maintain letters patent and / or copyrights

on Company's Intellectual Property. At Company's option, such additional efforts will include the preparation and execution of the documents, in a form satisfactory to Company, that are necessary to register any copyright, or to obtain patent protection in any patent office. Company will reimburse Contractor for Contractor's reasonable costs if Company requires Contractor assistance after termination of Contractor's engagement with Company.

Contractor hereby designates and appoints Company and its duly authorized officers and agents, as Contractor's agents and attorneys-in-fact, with full power of substitution, to act for and in Contractor's behalf and instead of Contractor, to execute and file any documents and to do all other lawfully permitted acts to further the above purposes with the same legal force and effect as if executed by Contractor.

**10. Remedies**. The parties agree that: Contractor's obligations in Sections 8 and 9 of this Agreement are necessary and reasonable in order to protect Company and Company's business. Contractor agrees that the remedy at law for any breach of the provisions of this Agreement will be adequate as defined by the Court.

**11. Notices**. All notices and other communications shall be in writing and shall be deemed to have been duly given if delivered via: (i) personal delivery; (ii) expedited delivery service with proof of delivery; (i) registered or certified United States mail, postage prepaid; or (iv) upon delivery by email, addressed to the appropriate party as follows:

| | | | |
|---|---|---|---|
| To Company: | Vireo Health, Inc.<br>207 South Ninth Street<br>Minneapolis, MN 55402<br>Attn: CEO<br>E-mail:<br>joshrosen@vireohealth.com | To Contractor: | ______________<br>_______________<br>________________<br>Attn: Josh Grab<br>Email: josh@gethightide.com |

or to any other address as the person to whom notice is to be given may have previously furnished to the other in writing as set forth above, provided that notice of an address change shall be deemed given only upon receipt.

**12. Warranties**. Contractor will perform the Services diligently and in accordance with accepted and sound professional practices and procedures. Contractor represents and warrants that: (i) Contractor is free of any obligation or restriction that would prevent Contractor from entering into this Agreement or impede Contractor's ability to perform the Services; and (ii) Contractor's performance of the Services will not involve the use or disclosure of any trade secret information of any third party or the infringement of any patent or copyright of any third party.

**13. Entire Agreement and Amendment**. This Agreement: (i) constitutes the entire agreement between the parties relating to this independent contractor engagement and supersedes all prior agreements or understandings between Contractor and Company or their agents with regard to the same subject; and (ii) may be changed, modified, or terminated only by an agreement in writing signed by the parties hereto.

**14. Severability**. Each provision, section, sentence, clause, phrase, and word of this Agreement is intended to be severable. If any provision, section, sentence, clause, phrase, and word hereof is illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the validity of the remainder of this Agreement, provided that: (i) each party receives the substantial benefit of its bargain with respect to the transaction contemplated hereby; and (ii) the ineffectiveness of such provision would not result in such a material change as to cause completion of the transactions contemplated hereby to be unreasonable.

**15. Indemnification**. Contractor and Company shall mutually indemnify, defend and hold the other parties officers, directors, and employees harmless from and against any and all liabilities, claims, demands,

proceedings, obligations, assessments, losses, costs, damages, or expense, of any nature whatsoever, contingent or otherwise (including, without limitation, any and all judgments, degrees, equitable relief, extraordinary relief, settlements, awards, attorneys' fees, court cost, including arbitrators' fees) (collectively, "***Claims***") that are incurred, sustained, suffered, or assessed against the indemnified party, arising out of, relating to, or as a result of alleged or actual disregard or breach of this Agreement or any policies, principles, or guidelines, any action, inaction, negligence, misconduct, error or omission and any activity, or request of additional scope of work.

**16. Remedies.** In the event of any breach by Contractor or Company of any of the provisions of this Agreement, each party, in addition to any other rights, remedies or damages available at law or in equity, will be entitled to recover all costs and expenses, including without limitation attorneys' fees, incurred by either party, its successors and assigns as a consequence of any such breach.

**17. Non-Exclusivity.** The work performed for Company under this Agreement is not exclusive. Company and Contractor each retain the right to contract for similar services with other individuals and businesses. Contractor shall be free to undertake additional activities for another party provided that such activities do not unreasonably interfere with execution of the Services under this Agreement or otherwise violate this Agreement, including Sections 8, and 9.

**18. [Intentionally Omitted.]**

**19. General Terms.**

A. Governing Law; Venue. The validity, construction and performance of this Agreement shall be governed by and construed in accordance with the law of the state of Minnesota applicable to contracts executed in and performed entirely within such state, without reference to any choice of law principals thereof, but the specific performance provisions and right of Company to seek injunctive relief for Contractor's breach of the covenants contained herein may also be enforced in any other state or country or nation wherever such breach occurs, and in accordance with the laws of such other state, country or nation, to the extent necessary to secure enforcement in such other jurisdiction. Each party: (i) agrees that all actions, claims or proceedings related to this Agreement shall be commenced and maintained exclusively in the State of Minnesota; and (ii) irrevocably consents to submit to the personal jurisdiction and venue of such Minnesota courts and waives, to the fullest extent permitted by law, any objection which it may now or hereafter have to the laying of venue in any such court or that any such proceeding which is brought in accordance with this Section has been brought in an inconvenient forum.

B. Waiver. The failure of any party to insist upon strict compliance with any of the terms, covenants, or conditions hereof shall not be deemed a waiver of such term, covenant, or condition, nor shall any waiver or relinquishment of any right, power or privilege hereunder at any one or more times be deemed a waiver or relinquishment of such right, power or privilege at any other time or times.

C. Counterparts. This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original, but all of which, when taken together, will be deemed to constitute one and the same agreement.

D. Captions. The captions stated herein are for convenience only and are not intended to alter any of the provisions of this Agreement.

IN WITNESS WHEREOF, this Agreement has been duly executed by the parties as of the date first above written.

**Company: VIREO HEALTH, INC.**

Signature: DocuSigned by: Josh Rosen
0F14A543F7E4427...

Print Name: Josh Rosen

Title: CEO

**Contractor: JOSH GRAB**

Signature: DocuSigned by:
F1E264B58BCE4BB...

Print Name: Josh Grab

Title: ________________________________

**EXHIBIT A**
**to**
**Independent Contractor Agreement**

1. Contractor will:
   - Coordinate all activities with Johnson Brothers (or other alcohol distributor agreed upon by Vireo) to facilitate the wholesale launch of Vireo's Hi*AF and Boundary Waters beverages, and HiTide beverages if an agreement is reached for Vireo to facilitate such launch, (collectively, "the beverages") in Minnesota as soon as commercially feasible
   - Continue to craft and execute a strategy to launch the beverages in other markets through Johnson Brothers and other alcohol distributors
   - Develop and execute a marketing strategy to support the launch of the beverages including, but not limited to, pricing, trade activation, building a sales force, and overseeing the development of visual marketing media
   - Coordinate all production activities with Big Watt (or other co-packer agreed upon by Vireo)

2. Other mutually agreed upon duties as may be assigned by the Company Representative.

**SCHEDULE 1**

# ASSIGNMENT AND ASSUMPTION
# OF
# INDEPENDENT CONTRACTOR AGREEMENT

This Assignment and Assumption of Independent Contractor Agreement (this "*Assignment*") effective as of July [__], 2024 ("*Effective Date*") is entered into by and among Vireo Health, Inc., a Delaware corporation ("*Assignor*") and HiColor, LLC, a Minnesota limited liability company ("*Assignee*"). Capitalized terms used in this Assignment and not otherwise defined shall have the meanings set forth in the Contractor Agreement (as defined herein).

**W I T N E S S E T H**

WHEREAS, Assignor and [Josh Grab/Shea Coakley] ("*Contractor*") entered into that certain Independent Contractor Agreement, dated as of [__], 2024 (the "*Contractor Agreement*"), a copy of which is attached to this Assignment as Exhibit A, pursuant to which, among other things, Contractor develops and executes marketing strategies and oversees the development of visual marketing media (the "*Services*");

WHEREAS, the parties intended the Services to be provided to the Assignee;

WHEREAS, the parties now desire to assign and assume the Independent Contractor Agreement from Assignor to Assignee, and Contractor desires to provide the Services to Assignee.

NOW, THEREFORE, in consideration of the promises and conditions contained herein, the parties hereby agree as follows:

1. Effective as of the Effective Date, Assignor hereby assigns to Assignee all of Assignor's right, title and interest in and to the Independent Contractor Agreement, and Assignee hereby assumes all of the Assignor's obligations under the Independent Contractor Agreement.

2. This Assignment shall be binding on and inure to the benefit of the parties hereto, their heirs, executors, administrators, successors in interest and assigns.

3. This Assignment shall be governed by and construed in accordance with the laws of the State of Minnesota.

4. This Assignment may be executed in any number of counterparts, each of which shall be deemed an original, and all of which, when taken together, shall constitute one and the same document.

[*Signature page follows*]

IN WITNESS WHEREOF, parties have executed this Assignment as of the Effective Date.

**ASSIGNOR**:

**Vireo Health, Inc.**

By: ______________________________
Name: ______________________________
Title: ______________________________

**ASSIGNEE**:

**HiColor, LLC**

By: ______________________________
Name: ______________________________
Title: ______________________________

**CONTRACTOR**:

By: ______________________________
Name: ______________________________
Title: ______________________________

# <u>**EXHIBIT A**</u>

**Independent Contractor Agreement**

(*attached*)

**AMENDED & RESTATED**

**OPERATING AGREEMENT**

**OF**

**HICOLOR, LLC**

**Effective June __, 2024**

**Table of Contents**

Article I. General ........ 1
1.1. Limited Liability Company Agreement ........ 1
1.2. Articles of Organization ........ 1
1.3. Name ........ 1
1.4. Nature of Business ........ 1
1.5. Principal Office ........ 1
1.6. Term ........ 2
Article II. Definitions ........ 2
Article III. Members; Meetings; Acts ........ 9
3.1. Names of Members ........ 9
3.2. Admission of New Members ........ 9
3.3. Duties of Members ........ 9
3.4. Liability of Members ........ 9
3.5. Other Ventures ........ 9
3.6. Employment of Members ........ 10
3.7. Authority of Members ........ 10
3.8. Voting ........ 10
3.9. Written Action ........ 10
3.10. Place and Time of Meetings ........ 11
3.11. Regular Meetings ........ 11
3.12. Special Meetings ........ 11
3.13. Notices of Meetings ........ 11
3.14. Waiver of Notice ........ 11
3.15. Proxies ........ 11

3.16. Conference Communications ........ 11

3.17. Organization ........ 11

3.18. Order of Business ........ 11

Article IV. Management and Operation of Company Business ........ 12

4.1. Authority of the Board ........ 12

4.2. Number; Election; Term of Office; Vote ........ 12

4.3. Board ........ 12

4.4. Duties of Managers ........ 12

4.5. Liabilities of Managers ........ 12

4.6. Other Ventures ........ 12

4.7. Compensation ........ 13

4.8. Committees ........ 13

4.9. Delegation of Duties and Powers ........ 13

4.10. Place and Time of Meetings ........ 13

4.11. Regular Meetings ........ 13

4.12. Special Meetings ........ 13

4.13. Notice of Meetings ........ 13

4.14. Waiver of Notice ........ 13

4.15. Proxies ........ 13

4.16. Absent Managers ........ 14

4.17. Conference Communication ........ 14

4.18. Written Action ........ 14

Article V. Officers ........ 14

5.1. Number ........ 14

5.2. Election; Term of Office and Qualifications ........ 14

5.3. Removal and Vacancies ....... 14

5.4. Chief Executive Officer ....... 14

5.5. President ....... 15

5.6. Vice President ....... 15

5.7. Secretary ....... 15

5.8. Treasurer ....... 15

5.9. Duties of Other Officers ....... 16

5.10. Compensation ....... 16

Article VI. Indemnification ....... 16

6.1. General ....... 16

6.2. Advances ....... 17

6.3. No Member Liability ....... 17

6.4. Settlements ....... 17

6.5. Insurance ....... 17

6.6. Non-Exclusivity; Indemnification Agreements ....... 17

6.7. Amendments ....... 17

Article VII. Transfers ....... 18

7.1. Restriction on Transfers ....... 18

7.2. Transfer by Legal Process ....... 18

7.3. Conditions to Permitted Transfers ....... 18

7.4. Rights of First Offer ....... 19

7.5. Option Incident to Liquidity Event. ....... 20

7.6. Purchase Options ....... 23

Article VIII. Books; Financial and Tax Information ....... 26

8.1. Books; Ownership Records; Place; Access ....... 26

8.2. Tax Information ..... 27

8.3. Tax Elections and Accounting ..... 27

8.4. Partnership Representative ..... 27

Article IX. Units and Capital Contributions ..... 28

9.1. Initial Capital Contributions ..... 28

9.2. Units ..... 28

9.3. No Certificates for Units ..... 28

9.4. Profits Interests ..... 29

9.5. Additional Capital Contributions ..... 30

9.6. Capital Accounts ..... 30

9.7. Loans to the Company; No Interest on Capital ..... 30

9.8. No Right to Return of Contribution ..... 30

9.9. Creditor's Interest in the Company ..... 30

Article X. Allocation of Profits and Losses ..... 30

10.1. Capital Account Allocations ..... 30

10.2. Special Allocations ..... 31

10.3. Loss Limitation ..... 32

10.4. Curative Allocations ..... 32

10.5. Tax Allocations ..... 32

10.6. Varying Interests During Fiscal Year ..... 33

Article XI. Distributions ..... 33

11.1. Operating Distributions ..... 33

11.2. Distributions for Tax Liabilities ..... 34

11.3. Profits Interest Unit Distributions ..... 34

11.4. No Distribution on Resignation ..... 34

11.5. Limitations on Distributions ........ 34

Article XII. Dissolution and Liquidation ........ 35

12.1. Events Causing Dissolution ........ 35

12.2. Liquidation and Winding Up ........ 35

12.3. No Deficit Restoration Obligation ........ 35

Article XIII. Amendment ........ 35

Article XIV. Representations and Warranties of the Members ........ 36

14.1. Representations and Warranties of the Members ........ 36

Article XV. Miscellaneous Provisions ........ 37

15.1. Information; Corporate Transparency Act Compliance ........ 37

15.2. Entire Agreement ........ 38

15.3. Signatures; Counterparts ........ 38

15.4. Headings ........ 38

15.5. Severability ........ 38

15.6. Notices ........ 38

15.7. Governing Law ........ 39

15.8. Third-Party Benefit ........ 39

15.9. Additional Actions and Documents ........ 39

15.10. Specific Performance; Remedies Cumulative ........ 39

15.11. No Implied Waiver ........ 40

15.12. Waiver of Partition ........ 40

15.13. Representation ........ 40

**AMENDED AND RESTATED**
**OPERATING AGREEMENT**
**OF**
**HICOLOR, LLC**

This Amended and Restated Limited Liability Company Operating Agreement ("*Agreement*") is made and entered into as of the Effective Date (defined below) by and among the Members executing this Agreement (as set forth on Schedule A attached hereto) of HiColor, LLC, a Minnesota limited liability company (the "*Company*"). Capitalized terms used in this Agreement and not otherwise defined in the text of this Agreement are defined in Article II and shall have the meanings set forth therein.

**WHEREAS**, the Articles of Organization of the Company were filed with the Secretary of State of the State of Minnesota on January 12, 2024 in accordance with the provisions of the Act;

**WHEREAS**, immediately prior to the Effective Date, the company was governed by that certain Operating Agreement of the Company, dated as of January 12, 2024 (the "*Existing Agreement*"), and the Members desire to amend and restate the Existing Agreement in its entirety.

**NOW, THEREFORE**, in consideration of the premises, the mutual covenants and agreements set forth in this Agreement, and other good and valuable consideration, the receipt and adequacy of which the Members acknowledge, the Members hereby amend and restate the Existing Agreement in its entirety as follows:

**ARTICLE I.**
**GENERAL**

**1.1. Limited Liability Company Agreement**. The Members agree that this Agreement constitutes the "operating agreement" of the Company within the meaning of the Act, is effective as of July [__], 2024 (the "*Effective Date*"), and that it governs the affairs of the Company and the conduct of its business, except as otherwise required by the Act.

**1.2. Articles of Organization**. The Articles of Organization were filed with the Secretary of State of the State of Minnesota on January 12, 2024 as contemplated by the Act (the "*Articles of Organization*").

**1.3. Name**. The name of the Company is as stated in the Articles of Organization, and the business of the Company may be conducted under that name or under such other name or names as the Board may determine.

**1.4. Nature of Business**. The Company may undertake and carry on any lawful business, purpose, or activity permitted under the Act and approved by the Board.

**1.5. Principal Office**. The location of the principal place of business of the Company shall be such place as the Board may from time to time determine (the "*Principal Office*"). The

Company may maintain offices and places of business at such other place or places within or outside the State of Minnesota, as the Board deems advisable. The Board is authorized and directed to execute and deliver or file such documents and to take such actions as it may consider advisable to permit the Company to conduct its business in such states.

**1.6. Term**. The term of the Company is perpetual, unless the Company is dissolved in accordance with this Agreement.

## ARTICLE II.
## DEFINITIONS

Unless the context otherwise specifies or requires, the following terms have the following definitions. Certain other capitalized terms are defined elsewhere in this Agreement. All defined terms may be used in the singular or the plural, as the context requires.

"*Act*" means the Minnesota Revised Uniform Limited Liability Company Act, as amended.

"*Adjusted Capital Account Deficit*" means with respect to any Capital Account as of the end of any Fiscal Year, the amount by which the balance in the Capital Account is less than zero. For this purpose, the Member's Capital Account balance shall be:

(a) reduced for any items described in Treasury Regulations Section 1.704-1(b)(2)(ii)(*d*)(*4*), (*5*), and (*6*), and

(b) increased for any amount the Member is obligated to contribute or is treated as being obligated to contribute to the Company pursuant to Treasury Regulations Section 1.704-1(b)(2)(ii)(*c*), 1.704-2(g)(1) or 1.704-2(i).

"*Affiliate*" means, when used with reference to a specified Person, (a) any Person that directly or indirectly through one or more intermediaries controls or is controlled by or is under common control with the specified Person, (b) any Person that, directly or indirectly, is the beneficial owner of ten percent or more of any class of equity securities of, or otherwise has a substantial beneficial interest in, the specified Person or of which the specified Person has a substantial beneficial interest, and (c) any relative or spouse of the specified Person.

"*Agreement*" is defined in the preamble.

"*Board*" means the Board of Managers of the Company established pursuant to Article IV.

"*Book Value*" of any Company asset means its fair market value as of the date it is acquired by or contributed to the Company, as adjusted consistently with any revaluations of Company assets pursuant to Section 9.6 and as appropriate to reflect any depreciation and amortization.

"*Business Day*" means any day except a Saturday, Sunday, or other day on which commercial banks in Minneapolis, Minnesota are authorized or required by law to close.

"*Capital Account*" is defined in Section 9.6.

"*Capital Contribution*" means the amount of money or the fair market value of any property (as agreed by the Members as of the date of contribution) contributed to the Company by any Member.

"*Articles of Organization*" is defined in Section 1.2.

"*Change in Control*" means: (a) the acquisition of securities of a Member representing more than 50% of the combined voting power of the Member's then outstanding securities by any person or group of persons; (b) the consummation of a merger or consolidation of a Member with or into another entity other than a consolidation or merger of the Member in which a majority of the voting power of the capital stock of the continuing or surviving entity will be owned by the persons who were the Member's equity owners immediately prior to such merger or consolidation in substantially the same proportions as their ownership immediately prior to such merger or consolidation; (c) the dissolution, liquidation or winding up of the Member; or (iv) any transaction or event that causes the Control Person to no longer possess the power and authority to directly control the operations and decisions of such Member.

"*Code*" means the Internal Revenue Code of 1986, as amended. Any reference in this Agreement to a Section of the Code shall be considered also to include any subsequent amendment or replacement of that Section.

"*Common Units*" is defined in Section 9.2(b).

"*Company*" is defined in the preamble.

"*Company Option*" is defined in Section 7.6(b)iii.

"*Company Right of First Offer*" is defined in Section 7.4(b).

"*Controlling Member*" means the group consisting of one or more Persons acting in concert whose aggregate number of Units equal or exceed a majority of the voting Units issued and outstanding.

"*Control Block*" means at least a majority of the voting Units outstanding.

"*Control Person*" means, with respect to a Member that is an entity, the controlling shareholder, partner, member or trustee of such Member set forth on Schedule A, and with respect to a Member that is a trust and Permitted Transferee of a former Member, the former Member.

"*Co-Sale Member*" is defined in Section 7.5(h).

"*Co-Sale Notice*" is defined in Section 7.5(h)ii.

"*Co-Sale Period*" is defined in Section 7.5(h)ii.

"*CTA*" means the Corporate Transparency Act (31 U.S.C. § 5336), enacted as part of the National Defense Authorization Act for Fiscal Year 2021, as amended, and the rules and regulations promulgated thereunder.

"*Distribution Threshold*" is defined in Section 9.4(b).

"*Drag-along Member*" is defined in Section 7.5(a).

"*Drag-along Notice*" is defined in Section 7.5(c).

"*Drag-along Sale*" is defined in Section 7.5(a).

"*Dragging Members*" is defined in Section 7.5(a).

"*Effective Date*" is defined in Section 1.1.

"*Electronic Transmission*" means any form of communication, not directly involving the physical transmission of paper, that creates a record that may be retained, retrieved, and reviewed by its recipient, and that may be directly reproduced in paper form by its recipient through an automated process.

"*Fair Market Value*" means the price at which such Units would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having knowledge of the relevant facts, [and taking into consideration any minority interest discount, lack of marketability discount, discount for lack of control and any other discounts or adjustments that may be applicable]. When calculating the Deemed Value of any Profits Interests Units, the Board may in its reasonable discretion make equitable adjustments to the Deemed Value to account for the Distribution Threshold associated with such Profits Interest Units.

"*Fiscal Year*" means the 12-month accounting period of the Company used for federal income tax purposes ending on December 31 of each year, or such other date as the Board may determine from time to time subject to the requirements of Code Section 706; it being understood that the Board may establish other "fiscal years" for financial reporting or any purpose other than federal income tax reporting.

"*Fully Diluted Basis*" shall mean, as of any date of determination, (a) with respect to all the Units, all issued and outstanding Units of the Company and all Units issuable upon the exercise of any outstanding Unit Equivalents as of such date, whether or not such Unit Equivalent is at the time exercisable, or (b) with respect to any specified type, class or series of Units, all issued and outstanding Units designated as such type, class or series and all such designated Units issuable upon the exercise of any outstanding Unit Equivalents as of such date, whether or not such Unit Equivalent is at the time exercisable.

"*Grant Agreement*" is defined in Section 9.4(b).

"*Indemnitee*" is defined in Section 6.1(a).

"*Initiating Member*" is defined in Section 7.4(a).

"*Insolvency*" means with respect to any Person (a) bankruptcy or insolvency, (b) the filing or commencement of a voluntary or involuntary proceeding in bankruptcy, insolvency, receivership or other similar law now or hereafter in effect in a court of competent jurisdiction, or an action to appoint a trustee, receiver, or similar Person, which continues for a period of 90 days without dismissal, or (c) the entry into any arrangement, composition or reorganization for the benefit of creditors.

"*Liquidity Event*" means the occurrence of one of the following events:

(a) a transaction or series of related transactions in which a Person, or a group of related Persons, acquires from Members Units representing a majority of the outstanding voting power of the Company; *provided* that a purchase of such Units by the Company or the Members under Sections 7.4 or 7.6 shall not constitute a Liquidity Event;

(b) a merger or consolidation in which either

i. the Company is a constituent party, or

ii. a subsidiary of the Company is a constituent party and the Company issues Units pursuant to such merger or consolidation;

except that any such merger or consolidation involving the Company or a subsidiary in which the Units of the Company outstanding immediately prior to such merger or consolidation continue to represent, or are converted into or exchanged for Units that represent, immediately following such merger at least a majority of the voting securities of (A) the surviving or resulting corporation; or (B) if the surviving or resulting corporation is a wholly owned subsidiary of another corporation immediately following such merger or consolidation, the parent corporation of such surviving or resulting corporation will not be considered a Liquidity Event; or

(c) the sale, lease, transfer, exclusive license or other disposition, in a single transaction or series of related transactions, by the Company or any subsidiary of the Company of all or substantially all the assets of the Company and its subsidiaries taken as a whole or the sale or disposition (whether by merger, consolidation or otherwise) of one or more subsidiaries of the Company if substantially all of the assets of the Company and its subsidiaries taken as a whole are held by such subsidiary or subsidiaries, except where such sale, lease, transfer, exclusive license or other disposition is to a wholly owned subsidiary of the Company.

"*Manager*" means a Person serving on the Board pursuant to Article IV.

"*Member Option*" is defined Section 7.6(b)iii).

"*Member Right of First Offer*" is defined in Section 7.4(b).

"*Members*" means the Persons executing this Agreement and the Persons that are hereafter admitted to the Company as Members in accordance with this Agreement, in each case until they cease to be Members in accordance with this Agreement.

"*Minimum Gain*" means the partnership minimum gain determined pursuant to Treasury Regulations Section 1.704-2(d).

"*New Securities*" shall mean any authorized but unissued Units and any Unit Equivalents convertible into Units, exchangeable or exercisable for Units, or providing a right to subscribe for, purchase or acquire Units; *provided*, that the term "*New Securities*" shall not include Units or Unit Equivalents issued or sold by the Company in connection with any of the following that are approved by the Board of Managers: (a) a grant to any existing or prospective Managers, officers, employees or other service providers pursuant to any incentive plan or similar equity-based plans or other compensation agreement; (b) the conversion or exchange of any securities of the Company into Units, or the exercise of any warrants, options or other rights to acquire Units; (c) any acquisition by the Company or any of its subsidiaries of any equity interests, assets, properties or business of any Person; (d) any merger, consolidation or other business combination involving the Company or any of its subsidiaries; (e) any subdivision of Units (by a split of Units or otherwise), payment of distributions or any similar recapitalization; (f) any private placement of warrants to purchase Units to lenders or other institutional investors (excluding the Members) in any arm's length transaction in which such lenders or investors provide debt financing to the Company or any of its subsidiaries; (g) a joint venture, strategic alliance or other commercial relationship with any Person (including Persons that are customers, suppliers and strategic partners of the Company or any of its subsidiaries) relating to the operation of the Company's or any of its subsidiaries' business and not for the primary purpose of raising equity capital; (h) any office lease or equipment lease or similar equipment financing transaction in which the Company or any its subsidiaries obtains from a lessor or vendor the use of such office space or equipment for its business; or (i) an initial public offering.

"*Offer Price and Terms*" is defined in Section 7.4(a).

"*Offered Units*" is defined in Section 7.6(b).

"*Option Event*" means, with respect to a Member:[1] (a) the death of that Member or its Control Person; (b) the Insolvency of that Member or its Control Person; (c) a Transfer by legal process or other involuntary Transfer described in Section 7.2 with respect to any Units of that Member; (d) the entry of a charging order against that Member's Units or its transferee's transferrable interest; (e) the commission of a felony by that Member or its Control Person or any other legal judgment against that Member or its Control Person that can reasonably be expected (as reasonably determined by the Board) to bring the business or societal reputation of the Company, its affiliates or subsidiaries into disrepute; or (f) the termination of that Member's services to the Company.

**Commented [AG1]:** Vireo is the only non-Profit Interest Holder Member, correct? If so, most of these would not apply anyway

**Commented [AG2R1]:** Agreed to email response, I like that approach

[1] Note to Company: Please confirm whether the Option Event should apply to any Member or the Profits Interest Holders only. Email response: To better protect Vireo, we wil only have the option event apply to the Profit Interest holders. ADD DEFINED TERM "MEMBER HOLDING ONLY PROFITS INTEREST UNITS"

"*Option Notice*" is defined in Section 7.6(a).

"*Partnership Audit Provisions*" is defined in Section 8.4(a).

"*Partnership Representative*" is defined in Section 8.4(a).

"*Permitted Transferee*" means with respect to a Member (a) the trustee or trustees of a trust created by such Member, alone or with others, for the primary benefit of such Member (who was the named Member prior to the Transfer) or such Member's immediate family members and controlled by such Member (who was named Member prior to the Transfer), (b) an entity created and controlled by such Member solely for estate planning purposes, or (c) the Company.

"*Person*" means a natural person, partnership, limited liability company, trust, estate, association, corporation, government, custodian, nominee, or any other individual or entity, in its own or any representative capacity.

"*Principal Office*" is defined in Section 1.5.

"*Profits*" or "*Losses*" mean, for each Fiscal Year, an amount equal to the Company's taxable income or loss for the Fiscal Year, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(a) Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits and Losses pursuant to this paragraph shall be added to the taxable income or loss;

(b) Any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(*i*), and not otherwise taken into account in computing Profits and Losses pursuant to this paragraph shall be subtracted from the taxable income or loss;

(c) If the value of any Company asset is adjusted in compliance with Treasury Regulations Section 1.704-1(b)(2)(iv)(*e*) or (*f*), the amount of the adjustment shall be taken into account as gain or loss from the disposition of the asset for purposes of computing Profits and Losses;

(d) Gain or loss resulting from any disposition of Company property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the value of the property for Capital Account purposes notwithstanding that the adjusted tax basis of the property differs from that value;

(e) If the value of an asset for Capital Account purposes differs from its adjusted tax basis for federal income tax purposes, depreciation, amortization and other cost recovery deductions shall be taken into account in accordance with applicable Treasury Regulations, including Treasury Regulations Section 1.704-1(b)(2)(iv)(*g*), in

lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing taxable income or loss;

(f) To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734 is required pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(*m*)(*4*) to be taken into account in determining Capital Accounts as a result of a distribution other than in liquidation of a Member's interest in the Company, the amount of the adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from the disposition of the asset and shall be taken into account for purposes of computing Profits and Losses; and

(g) Any items that are specially allocated by the Board to the Members' Capital Accounts pursuant to the provisions of Section 10.2 in order to cause the allocation of the items to be respected for federal income tax purposes shall not be taken into account in computing Profits and Losses.

"*Profits Interests Units*" is defined in Section 9.4(a).

"*Qualified Accountant*" means an independent accountant designated by the Board that is experienced in the valuation of closely-held businesses.

"*Reporting Person*" means (a) each Member, (b) each Manager (c) each Named Officer, and (d) any other Person that the Company determines is required to provide any information required by the CTA to the Company in connection with the Company's or any of its subsidiaries' reporting obligations under the CTA.

"*Right of First Offer Notice*" is defined in Section 7.4(a).

"*Rights Holders*" is defined in Section 7.4(a).

"*Securities Act*" means the Securities Act of 1933, as such has and may be amended from time to time.

"*Senior Indebtedness*" shall mean, unless expressly subordinated to or made on a parity with the amounts due under a promissory note contemplated by Section 7.6(d)iv, the principal of (and premium, if any), unpaid interest on and amounts reimbursable, fees, expenses, costs of enforcement and other amounts due in connection with, (a) indebtedness for borrowed money (or guarantee obligations) of the Company to banks, commercial finance lenders or other lending institutions regularly engaged in the business of lending money (excluding indebtedness in connection with capital leases or operating leases used solely for the purchase, finance or acquisition of equipment where such indebtedness is secured solely by such equipment); and (b) any amendment, extension, refinance, renewal, replacement, substitution, consolidation, defeasance or refunding of any indebtedness described in clause (a).

"*Transfer*" means, with respect to any Unit, whether the word is capitalized or not, the sale, assignment, transfer, withdrawal, mortgage, pledge, hypothecation, exchange, or other disposition of all or any part of the Unit, whether for value and whether the disposition is

voluntary, involuntary, by operation of law, or otherwise. A Transfer also includes a Change in Control of a Member.

"*Transferring Person*" is defined in Section 7.6(a).

"*Treasury Regulations*" means the regulations promulgated by the United States Treasury Department under the Code. Any reference in this Agreement to a Section of the Treasury Regulations shall be considered also to include any subsequent amendment or replacement of that Section.

"*Unit*" means a unit evidencing a membership interest in the Company, including all Common Units, Profits Interests Units and all of the rights to which a Member or assignee holding Units is entitled as provided in this Agreement and under law, together with all of the obligations of the Member or assignee to comply with all of the terms and provisions set forth in this Agreement and under law.

"*Unit Equivalents*" means any security or obligation that is by its terms, directly or indirectly, convertible into, exchangeable or exercisable for Units, and any option, warrant or other right to subscribe for, purchase or acquire Units.

"*Valuation Date*" is defined in Section 7.6(e)iv.

## ARTICLE III.
## MEMBERS; MEETINGS; ACTS

**3.1. Names of Members**. The names of the Members are as shown on Schedule A.

**3.2. Admission of New Members**. The Company may admit new Members under (a) Article VII in connection with a Transfer of Units or (b) Section 9.2(c) in connection with an issuance of Units.

**3.3. Duties of Members**. Except as otherwise provided in this Agreement or required by law, no Member owes any express or implied duties (including fiduciary duties) to the Company or to the other Members.

**3.4. Liability of Members**. Except as otherwise provided by the Act, the debts, obligations, and liabilities of the Company, whether arising in contract, tort, or otherwise, are solely the debts, obligations, and liabilities of the Company, and no Member is obligated personally for any such debt, obligation, or liability of the Company solely by reason of being a Member.

**3.5. Other Ventures**. The Company and the Members acknowledge and agree that the Members and Managers may invest in other businesses and nothing herein shall be deemed to limit the ability of the Members and Managers to make investments, participate on boards or in decision-making capacities or exercise their rights in other entities, and no such investment or involvement with other entities shall be deemed a breach by the Managers of any fiduciary duties to the Company or the other Members, statutory or otherwise. The Members and Managers may, during the term of the Company, make investment in and possess an interest for their respective accounts in other business ventures of every nature and description, independently or with

others, and neither the Company nor any other Member shall have any right in or to said independent ventures or any income or profits derived from said independent ventures. The Managers shall not be obligated to present any investment opportunity to the Company, and the Members and Managers shall have a right to take for their own account or recommend to others any such investment opportunity. The Managers may take actions solely for the benefit of and with a view to the interests of the Members when making any decision as Managers of the Company and are not required to provide information to any other Member regarding such interests.

**3.6. Employment of Members**. If a Member is an employee of the Company, the Member's ownership of Units and status as a Member does not constitute an express or implied promise by the Company of continued employment and does not affect any right of the Company to terminate such employment.

**3.7. Authority of Members**. No Member, in that Member's capacity as a Member, has any authority to act for, transact any business in the name of, assume any obligations on behalf of, or bind the Company unless authorized by the Board. Members may take action in their capacities as Members only at a meeting of the Members or by written action as provided in this Article III.

**3.8. Voting**.

(a) Each Member has one vote for each vested Unit registered in that Member's name on the books of the Company, and, for the avoidance of doubt, unvested Profits Interest Units shall have no voting rights on any matters. Except as otherwise required by a non-waivable provision of the Act or this Agreement, all questions at a meeting of the Members will be decided by Members who hold a majority of the number of voting Units.

(b) Persons who hold Units in a fiduciary capacity are entitled to vote those Units. If Units are held in the names of two or more Persons, or if two or more Persons have the same fiduciary relationship respecting the same Units, unless the Secretary has been given written notice to the contrary and a copy of the instrument or order so providing, their votes have the following effect: (i) if only one votes, that act binds all; (ii) if more than one votes, the act of the majority voting binds all; and (iii) if more than one votes, but the votes are evenly split on any particular matter, then, except as otherwise required by law, each Person may vote the Units in question proportionately.

**3.9. Written Action**. Any action that may be taken at a meeting of the Members may be taken without a meeting if done in writing and signed by Members who hold at least the number of voting Units that could approve the action at a meeting of the Members. In any action taken by written consent where fewer than all Members consented to such action taken, the Company shall provide prompt notice to all Members who failed to consent to the action so taken; provided that the Company's failure to provide such notice to the non-consenting Members shall not affect the validity of the action taken without consent. Any Electronic Transmission consenting to an action and transmitted by a Member, or by a Person authorized to act for a Member, is deemed to be written for purposes of this Section 3.9, *provided* if the Electronic Transmission includes information from which the Board can determine that the Electronic Transmission was

transmitted by the Member or a Person authorized to act for the Member. The date on which the Electronic Transmission is transmitted is deemed to be the date on which the consent was signed.

**3.10. Place and Time of Meetings**. Meetings of the Members may be held at such place and at such time as designated by the Board. In the absence of a designation of place, meetings shall be held at the Principal Office.

**3.11. Regular Meetings**. Regular meetings of the Members may be held on an annual or less frequent basis as determined by the Board.

**3.12. Special Meetings**. Special meetings of the Members will be held for any purpose at the written demand of (a) any Manager, or (b) one or more Members holding at least 10% of the voting Units outstanding. Such demand must state the purpose of the special meeting and be delivered to the Company. The special meeting must be held not more than 60 days after the date the Company receives a proper demand. Business transacted at any special meeting is limited to the purpose stated in the demand.

**3.13. Notices of Meetings**. The Board shall determine the date of each regular and special meeting of the Members and shall give written notice of each regular and special meeting of the Members to each Member at least 10 but no more than 60 days before the date of the meeting. Every notice of a meeting of the Members must state the place, date, and time of the meeting and the purpose for which the meeting is called.

**3.14. Waiver of Notice**. Any Member may waive in writing notice of any regular or special meeting of the Members. Attendance by a Member at a meeting constitutes a waiver of notice of the meeting, unless the Member objects at the beginning of the meeting to the transaction of business because the meeting is not lawfully called or convened and does not participate in the meeting after the objection.

**3.15. Proxies**. Each Member may authorize one or more Persons to vote or otherwise act for that Member by proxy by delivering a signed authorization to the Secretary. If the authorization designates two or more Persons to act as proxies, any one of the proxies may exercise all of the powers conferred by the authorization unless the authorization otherwise provides.

**3.16. Conference Communications**. Members may conduct meetings by any method of communication through which all Members participating may simultaneously hear each other.

**3.17. Organization**. At each meeting of the Members, the Chief Executive Officer or, in the Chief Executive Officer's absence, the individual chosen by Members who hold a majority of the Units held by the Members who are present shall act as chair. The Secretary or, in his or her absence, any Person whom the chair of the meeting appoints will act as secretary of the meeting.

**3.18. Order of Business**. The chair of any meeting of the Members shall determine the order of business at the meeting, but the order of business may be changed by Members who hold a majority of the Units held by the Members who are present.

## ARTICLE IV.
## MANAGEMENT AND OPERATION OF COMPANY BUSINESS

**4.1. Authority of the Board**. Except as otherwise required by the Act or this Agreement, the business and affairs of the Company will be manager managed by or under the authority of the Board, which Board shall vote in accordance with Section 4.2. The Board has the power and authority to execute and deliver or file such documents and take such actions as it may consider advisable to carry out the purposes and objectives of the Company under this Agreement. The Board shall take action only at a meeting of the Board or by written action as provided in this Article IV.

**4.2. Number; Election; Term of Office; Vote**.

(a) The initial number of Managers on the Board is [one]. Subject to the right of certain Managers to retain a seat on the Board as set forth in this Section 4.2, the number of Managers may be changed by the Members holding at least sixty percent (60%) of the outstanding voting Units of the Company.

(b) The Manager will be elected by the vote of the Members holding a majority of the voting Units outstanding and will hold office until the earlier death, resignation, removal, or disqualification of that Manager. Any Manager may be removed from office at any time, with or without cause, only by the vote of the Members who have the power to appoint such Manager.

(c) If any Manager ceases to be a Manager, the Members who have the power to appoint such Manager may appoint a replacement Manager.

(d) Each Manager has one vote in all matters to come before the Board. The Board will take action at a meeting by a majority vote of the Managers, and any such act is deemed the action of the Board for purposes of this Agreement and the Act.

**4.3. Board**. The initial Board shall consist of the individuals identified on Schedule B hereto. The Board may update Schedule B from time to time to reflect any changes in the members of the Board made in accordance with Section 4.2 without any further consent of the Members.

**4.4. Duties of Managers**. Except as otherwise specifically provided in this Agreement (including Section 3.5 hereof) or required by the Act, Managers owe the same fiduciary duties to the Company and the Members as directors of a Minnesota corporation owe to the corporation and its stockholders.

**4.5. Liabilities of Managers**. The personal liability of a Manager to the Company or the Members for monetary damages for breach of fiduciary duty as a Manager is eliminated to the fullest extent permitted by the Act. The amendment of this Agreement or the Articles of Organization will not adversely affect the elimination of the personal liability of a Manager with respect to any act or omission that occurred before the amendment.

**4.6. Other Ventures**. No Manager is required to devote such Manager's full time and attention to the affairs of the Company, unless the Manager expressly agrees otherwise in

another written agreement. The Managers may be engaged in other ventures as provided for in Section 3.5.

**4.7. Compensation**. Managers will not be compensated for serving as a Manager unless such compensation is expressly agreed to by the Board. The Company shall bear the expenses, if any, incurred by each Manager's attendance at meetings of the Board and shall reimburse Managers for reasonable out-of-pocket expenses incurred in the course of providing services for the Company.

**4.8. Committees**. The Board may establish committees having the authority of the Board. A committee may consist of one or more Persons, who need not be Managers. Committees are subject to the direction and control of the Board. Subject the first sentence of this Section 4.8, the Board may fill vacancies in committee membership.

**4.9. Delegation of Duties and Powers**. The Board may delegate such part its duties as it may deem reasonable or necessary in the conduct of the business of the Company to one or more agents or employees of the Company or to officers named by the Board, who shall each have such duties and authority as is determined from time to time by the Board or as may be set forth in any agreement between such Person and the Company.

**4.10. Place and Time of Meetings**. Meetings of the Board will be held at such place and at such time as designated by the Board. In the absence of a designation of place, meetings shall be held at the Principal Office.

**4.11. Regular Meetings**. Regular meetings of the Board may be held on an annual or less frequent basis as determined by the Board.

**4.12. Special Meetings**. Special meetings of the Board will be held for any purpose at the written demand of any Manager. Such demand must state the purpose of the special meeting and be delivered to the Company. The special meeting must be held not more than 10 Business Days after the date the Company receives a proper demand.

**4.13. Notice of Meetings**. The Board shall determine the date of each regular and special meeting of the Board and shall give written notice of each regular and special meeting of the Board to each Manager at least forty-eight hours before the meeting. Every notice of a meeting of the Board must state the place, date, and time of the meeting and the purpose for which the meeting is called.

**4.14. Waiver of Notice**. Any Manager may waive, in writing, notice of any regular or special meeting of the Board. Attendance by a Manager at a meeting constitutes a waiver of notice of that meeting, unless the Manager objects at the beginning of the meeting to the transaction of business because the meeting is not lawfully called or convened.

**4.15. Proxies**. Each Manager may authorize one or more Persons to vote or otherwise act for that Manager by proxy by delivering a signed authorization to the Secretary. If the authorization designates two or more Persons to act as proxies, any one of the proxies may exercise all of the powers conferred by the authorization unless the authorization otherwise provides.

**4.16. Absent Managers**. A Manager may give advance written consent or opposition to a proposal to be acted on at a meeting of the Board.

**4.17. Conference Communication**. Managers may conduct meetings by any method of communication through which all Managers participating may simultaneously hear each other.

**4.18. Written Action**. Any action that may be taken at a meeting of the Board, or any committee, may be taken without a meeting if done in writing and signed by all of the Managers. Any Electronic Transmission consenting to an action and transmitted by a Manager, or committee member, or by a Person authorized to act for a Manager or committee member, is deemed to be written for purposes of this Section 4.18, *provided* if the Electronic Transmission includes information from which the Board can determine that the Electronic Transmission was transmitted by the Manager or committee member, or a Person authorized to act for the Manager or committee member. The date on which the Electronic Transmission is transmitted is deemed to be the date on which the consent was signed.

## ARTICLE V.
## OFFICERS

**5.1. Number**. The officers of the Company, all of whom shall be natural persons, may consist of a Chief Executive Officer, President, one or more Vice Presidents, Secretary and a Treasurer, and any other officers and agents as the Board may designate from time to time (each a "*Named Officer*"). Any Person may hold two or more offices. The Company is not required to have officers. In the event that the Company does not have officers, then subject to the direction of the Board, each Manager may sign and deliver any agreement in the name of the Company and otherwise obligate the Company in any respect relating to matters of the business of the Company.

**5.2. Election; Term of Office and Qualifications**. The Board may elect officers from time to time as it deems appropriate. Such officers shall hold office until their successors are elected and qualified or until removed pursuant to Section 5.3. An officer who is a Manager shall hold office until the election and qualification of his or her successor or until removed pursuant to Section 5.3 even though he or she may cease to be a Manager. The initial officers of the Company, if any, are set forth on Schedule B. The Board may update Schedule B from time to time to reflect any changes in the officers of the Company without consent of the Members.

**5.3. Removal and Vacancies**. Any officer may be removed from his or her office with or without cause upon a vote of the Board. Such removal shall be without prejudice to the contract rights of the Person so removed. A vacancy among the officers by death, resignation, removal or otherwise shall be filled by the Board, unless such office is eliminated.

**5.4. Chief Executive Officer**.

(a) If a Chief Executive Officer has been elected, the Board delegates to the Chief Executive Officer the authority to oversee and supervise all questions relating to the day-to-day conduct, operation and management of the business of the Company. The Chief Executive Officer is subject to the direction of and directly responsible to the Board. He or she shall perform such other duties and be bound by any restrictions as may

from time to time be prescribed by the Board. The Chief Executive Officer shall have the power to sign and deliver any agreement in the name of the Company and to otherwise obligate the Company in any respect relating to matters of the business of the Company, within budgets approved by the Board of the Company, and to delegate such authority in his or her discretion.

(b) The Chief Executive Officer may delegate such part of his or her duties as he or she may deem reasonable or necessary in the conduct of the business of the Company to one or more employees of the Company, who shall each have such duties and authority as is determined from time to time by the Chief Executive Officer or as may be set forth in any agreement between such employee and the Company.

**5.5. President**. The President, if any, shall be subject to the direction and control of the Chief Executive Officer and the Board and shall have general active management of the business, affairs and policies of the Company. The President shall have the power to sign and deliver any agreement in the name of the Company and to otherwise obligate the Company in any respect relating to matters of the business of the Company, within budgets approved by the Board of the Company, and to delegate such authority in his or her discretion. If the Board has not elected a Chief Executive Officer, the President shall be the Chief Executive Officer. If the Board has elected a Chief Executive Officer and that officer is absent, disqualified from acting, unable to act or refuses to act, then the President shall have the powers of, and shall perform the duties, of the Chief Executive Officer.

**5.6. Vice President**. Each Vice President shall, subject to the direction of the Chief Executive Officer, have authority to conduct day-to-day business of the Company.

**5.7. Secretary**. The Secretary, if elected, shall be secretary of and shall attend all meetings of the Members and Board and shall record or cause to be recorded all proceedings of such meetings in the minute book of the Company. He or she shall give proper notice of meetings of Members and the Board. He or she shall perform such other duties as may from time to time be prescribed by the Board or the Chief Executive Officer. In the absence of a Secretary, the Board may designate a Secretary for a meeting of the Members or Board, who shall have the responsibilities set forth herein.

**5.8. Treasurer**. The Treasurer, if elected, shall keep or cause to be kept accurate accounts of all moneys of the Company received or disbursed. He or she shall deposit or cause to be deposited all moneys, drafts and checks in the name of and to the credit of the Company in such banks and depositaries as the Board or the Chief Executive Officer shall from time to time designate. He or she shall have power to endorse or cause to be endorsed for deposit or collection all notes, checks and drafts received by the Company. He or she shall disburse or cause to be disbursed the funds of the Company as ordered by the Chief Executive Officer. He or she shall render to the Board and the Chief Executive Officer whenever required an account of all his or her transactions as Treasurer and of the financial condition of the Company and shall perform such other duties as set forth in Article VIII and as may from time to time be prescribed by the Board or the Chief Executive Officer

**5.9. Duties of Other Officers**. The duties of other officers and agents will be stated in the resolution creating the office or agency or by subsequent resolution.

**5.10. Compensation**. The officers, agents, and employees of the Company will receive such compensation for their services as the Board may determine or as may be described in a written agreement with the Company.

## ARTICLE VI.
## INDEMNIFICATION

**6.1. General**.

(a) To the fullest extent permitted by law, the Company shall indemnify each Manager and Named Officer and their respective Affiliates, directors, officers, employees, members, managers, partners, shareholders, assigns, representatives and agents (individually, an "*Indemnitee*") against all losses, claims, damages, liabilities, expenses (including legal fees and expenses), and other amounts paid in settlement, incurred, or suffered by the Indemnitee, in connection with any claim or proceeding arising out of the business or the operation of the Company if the Indemnitee's conduct:

i. did not involve acts or omissions not in good faith or that involved intentional misconduct or a knowing violation of law, and

ii. did not involve any transaction from which the Indemnitee derived an improper personal benefit.

For purposes of this Agreement, no action permitted to be taken by Section 3.5 shall be deemed a breach of any Manager's fiduciary duties to the Company or the other Members.

(b) An Indemnitee will have the right to employ separate counsel in any proceeding for which indemnification may be sought under any provision of this Agreement and to participate in defending the proceeding, but the Indemnitee will be required to pay the legal fees and expenses related to the Indemnitee's separate counsel unless:

i. the Company has agreed in writing to pay the legal fees and expenses,

ii. the Company has failed to employ counsel and defend the proceeding within a reasonable period of time after being given notice of the proceeding, or

iii. the Indemnitee has been advised by its counsel that representation of that Indemnitee and other parties by the same counsel would be inappropriate under applicable standards of professional conduct (whether or not such representation by the same counsel has been proposed) due to actual or potential differing interests between them.

(c) Notwithstanding Section 6.1(b), the Company will be liable for the reasonable legal fees and expenses of only one separate firm of attorneys for all Indemnitees having actual or potential differing interests with the Company (whether in connection with one proceeding or separate but substantially similar or related proceedings in the same jurisdiction arising out of the same general allegations or circumstances), unless the Indemnitees have actual or potential differing interests with each other.

(d) The Company will not deny indemnification under this Article VI merely because the Indemnitee had an interest in the transaction with respect to which the indemnification applies, if (i) the transaction was not otherwise prohibited under this Agreement, and (ii) the conduct of the Indemnitee satisfied the conditions of this Agreement, if any.

**6.2. Advances**. To the fullest extent permitted by law and subject to Section 6.1(b) and 6.1(c), the Company will periodically advance expenses an Indemnitee incurs in defending any claim or proceeding subject to this Article VI before the final disposition of the claim or proceeding, upon receipt by the Company of a written undertaking by the Indemnitee to repay the expenses advanced if the criteria for indemnification under this Article VI have not been satisfied.

**6.3. No Member Liability**. Any indemnification provided under this Article VI will be satisfied solely out of the assets of the Company. No Member will be personally liable for any amount payable under this Article VI.

**6.4. Settlements**. The Company will not be liable for the settlement of any proceeding effected without its written consent, but if the proceeding is settled with the Company's written consent, or if there is a final judgment against the Indemnitee in the proceeding, the Company agrees to indemnify the Indemnitee to the extent provided above.

**6.5. Insurance**. The Company may obtain, and may cause its subsidiaries to obtain, Directors and Officers liability insurance in an amount and on terms and conditions reasonably satisfactory to the Board, and will cause such insurance policy to be maintained until such time as the Board determines that such insurance should be discontinued. The Company shall have power to purchase and maintain insurance on behalf of any Indemnitee, agent, or employee against any liability or cost incurred by such person in any such capacity or arising out of its status as such, whether or not the Company would have power to indemnify against such liability or cost.

**6.6. Non-Exclusivity; Indemnification Agreements**. The provisions of this Article VI shall not be construed to limit the power of the Company to indemnify its Managers, Named Officers, employees, or agents to the fullest extent permitted by law or to enter into specific agreements, commitments, or arrangements for indemnification permitted by law. The absence of any express provision for indemnification herein shall not limit any right of indemnification existing independently of this Article VI.

**6.7. Amendments**. Any amendment of this Article VI will not adversely affect any right or protection of an Indemnitee who was serving at the time of the amendment, and any right or

protection of that Indemnitee will survive amendment with respect to events that occurred before the amendment.

## ARTICLE VII.
## TRANSFERS

**7.1. Restriction on Transfers**.

(a) In addition to any restrictions imposed by securities laws and subject to Section 7.2, a Member may not Transfer all or any part of any Unit, and any attempt to Transfer all or any part of a Unit will be null and void, unless (i)(A) the Board approves such Transfer, (B) the transferee is a Permitted Transferee, or (C) the Transfer is made pursuant to Section 7.5, or 7.6, and (ii) the transferor and the transferee comply with the provisions of Section 7.3.

(b) Subject to compliance with Section 7.3, a transferee receiving Units in a Transfer permitted under Section 7.1(a) shall become a Member without any further action on the part of the Company or the Members.

(c) Any certificates representing the Units shall bear a legend reflecting the restrictions on Transfer provided in this Section 7.1.

(d) No Member or assignee may Transfer any rights in or obligations to the Company as a Member or assignee except pursuant to a Transfer of Units.

**7.2. Transfer by Legal Process**. Upon any involuntary Transfer of any Unit pursuant to a levy of execution, foreclosure of pledge, garnishment, attachment, divorce decree, bankruptcy, or other legal process, or by operation of law resulting from the death, disability, liquidation, dissolution, or winding-up of a Member or upon a Change in Control of a Member occurring in contravention of the restrictions of Section 7.1, (a) that Member will cease to be a Member with respect to any Unit so Transferred, (b) the transferee will be merely an assignee with the rights of a transferrable interest described in the Act, and (c) such event will constitute an Option Event and subject the Units Transferred to the provisions of Section 7.6.

**7.3. Conditions to Permitted Transfers**. No Transfer otherwise permitted by any provisions of this Agreement shall be valid unless the following conditions are satisfied (any of which may be waived by the Board in its discretion):

(a) The transferor and transferee execute and deliver to the Company documents as necessary or appropriate in the opinion of counsel to the Company to effect the Transfer and to confirm the agreement of the transferee to be bound by this Agreement by executing a joinder hereto; *provided*, *however*, that a Transfer described in Section 7.2 shall be confirmed by delivery to the Company of legal evidence of the Transfer.

(b) If requested by the Board, the transferor shall furnish to the Company an opinion of counsel, satisfactory to the Company, as to some or all of the following:

i. The Transfer will not cause the Company to be treated as a "publicly traded partnership" within the meaning of Code Section 7704;

ii. The Transfer is exempt from all applicable registration requirements and the Transfer will not violate any applicable federal or state laws regulating the Transfer of securities; and/or

iii. The Transfer will not cause the Company to be deemed to be an "investment company" under the Investment Company Act of 1940.

(c) The transferor and transferee shall furnish the Company with the transferee's taxpayer identification number, sufficient information to determine the transferee's initial tax basis in the Units Transferred, and any other information reasonably necessary to permit the Company to file all required federal and state tax returns and other legally required information statements or returns, including any information relating to a basis adjustment under Code Section 743. The Company is not required to make any distribution otherwise provided for in this Agreement with respect to any Transferred Units until it has received such information.

(d) The transferee shall reimburse the Company for all costs and expenses reasonably incurred by the Company in connection with the Transfer.

**7.4. Rights of First Offer**.

(a) If a Member (the "*Initiating Member*"), desires to sell or Transfer (other than a Transfer to a Permitted Transferee or any Transfer by Controlling Member that is subject to Section 7.5) all or any portion of her Units (the "*Subject Units*"), the Initiating Member shall promptly give notice (the "*Right of First Offer Notice*") to that effect to the Company and the other Members (the "*Rights Holders*"). The Right of First Offer Notice shall set forth (i) the name and address of the proposed transferee, (ii) a complete description of the consideration to be paid to the Initiating Member with respect to the bona fide offer to purchase and the manner in which such consideration is to be paid, and (iii) a copy of the written proposal, if any, of the proposed transferee relating to the transfer (collectively, the "*Offer Price and Terms*"), pursuant to which such Initiating Member proposes to sell the Subject Units. Further, the Initiating Member shall deliver to the Company an executed certificate that the offer was made in good faith, that the Initiating Member desires to accept the offer and that the proposed transferee has been notified in writing of the rights of the Company and the Members under this Agreement including, without limitation, the rights under this Section 7.4.

(b) The Company shall have the first option to purchase the Subject Units in accordance with the Offer Price and Terms (the "*Company Right of First Offer*"), and in the event the Company either waives or fails to exercise such right, the Rights Holders shall have the second option to purchase the Subject Units in accordance with the Offer Price and Terms (the "*Member Right of First Offer*").

(c) The Company shall, within 30 days after receipt of the Right of First Offer Notice, give written notice of its intent to either exercise or waive its right to exercise the

Company Right of First Offer to the Initiating Member and concurrently give the same notice to the Rights Holders. The sale of the Subject Units shall be closed within 60 days after the expiration of such 30-day period (which 60-day period may be extended for a reasonable time not to exceed 120 days to the extent reasonably necessary to obtain required approvals or consents from any governmental authority) by tendering the purchase price to the Initiating Member in accordance with the Offer Price and Terms. The Company's decision regarding the exercise of the Company Right of First Offer shall be made by the Board.

(d) If the Company waives its Company Right of First Offer or fails to exercise the Company Right of First Offer with respect to all of the Subject Units within the 30-day period referred to in Section 7.4(c), the Rights Holders shall have 30 days from and after the last day of the 30-day period referred to in Section 7.4(c) to exercise the Member Right of First Offer. If any Rights Holder elects to exercise the Member Right of First Offer, that Rights Holder shall, within such 30-day period, give written notice to the Initiating Member of election to purchase up to all of the remaining Subject Units and concurrently give the same notice to the other Rights Holders. If more than one Rights Holder elects to exercise the Member Right of First Offer, then each Rights Holder who has so elected shall be entitled to purchase a pro rata portion (based on the Units held by the electing Rights Holders) of the Subject Units of the Initiating Member. The sale of the Subject Units shall be closed within 60 days after the expiration of such 30-day period (which 60-day period may be extended for a reasonable time not to exceed 120 days to the extent reasonably necessary to obtain required approvals or consents from any governmental authority) by tendering the purchase price to the Initiating Member in in accordance with the Offer Price and Terms.

(e) If no Rights Holder gives timely written notice of his or her election to exercise the Member Right of First Offer, then the Initiating Member may have the right to Transfer the Subject Units to the proposed purchaser or transferee upon identical terms and conditions to those outlined in the Offer Price and Terms if such Transfer is approved pursuant to Section 7.1(a). If the Initiating Member has not Transferred all of the Subject Units to the proposed transferee or the transferee has failed to comply with the terms of Section 7.3 within the allowed 90-day period, the Subject Units shall remain subject to this Agreement and any proposed Transfer after the allowed 90-day period must comply again with the provisions of this Section 7.4.

**7.5. Option Incident to Liquidity Event.**

(a) Participation. In the event the Controlling Member (the "*Dragging Members*"), proposes to effect a Liquidity Event (a "*Drag-along Sale*"), the Dragging Members shall have the right, after delivering the Drag-along Notice in accordance with Section 7.5(b) and subject to compliance with Section 7.5(c) to require that each other Member (each, a "*Drag-along Member*") participate in or approve such sale, as applicable, in the manner set forth in Section 7.5(b).

(b) Sale of Units. Subject to compliance with Section 7.5(c): (i) if the Drag-along Sale is structured as a sale outlined in subsection (a) of the definition of Liquidity

Event, then each Drag-along Member shall sell, with respect to the Units proposed by the Dragging Members to be included in the Drag-along Sale, the number of Units equal to the product obtained by multiplying (A) the number of Units on a Fully Diluted Basis held by such a Drag-along Member by (B) a fraction (x) the numerator of which is equal to the number of Units on a Fully Diluted Basis that the Dragging Members propose to sell in the Drag-along Sale and (y) the denominator of which is equal to the number of Units on a Fully Diluted Basis held by the Dragging Members at such time; and (ii) if the Drag-along Sale is structured as a sale outlined in subsection (b) or (c) of the definition of Liquidity Event, then notwithstanding anything to the contrary in this Agreement, each Drag-along Member shall vote in favor of the transaction and otherwise consent to and raise no objection to such transaction, and shall take all actions to waive any dissenters', appraisal or other similar rights that it may have in connection with such transaction. The distribution of the aggregate consideration of such transaction shall be made in accordance with Section 12.2(c).

(c) Sale Notice. The Dragging Members shall deliver written notice (the "*Drag-along Notice*") to the Company and each Drag-along Member no more than 20 Business Days after the execution and delivery by all of the parties thereto of the definitive agreement entered into with respect to the Drag-along Sale and, in any event, no later than 20 Business Days prior to the closing date of such Drag-along Sale in which the Dragging Members are exercising their rights hereunder; provided that in the event the Drag-along Member is not exercising its dragging rights hereunder, it shall deliver the Drag-along Notice no later than 20 Business Days prior to the execution of the definitive agreement relating to the Drag-along Sale to enable Co-Sale Members to exercise their rights under Section 7.5(h). The Drag-along Notice shall make reference to the Dragging Members' rights and obligations hereunder and shall describe in reasonable detail: (i) the name of the person or entity to whom such Units are proposed to be sold; (ii) the proposed date, time and location of the closing of the sale; (iii) the number of Units to be sold by the Dragging Members, the number of Units held by the Dragging Members; (iv) the proposed amount of consideration for the Drag-along Sale; (v) other material terms and conditions of the Drag-along Sale, including a description of any non-cash consideration in sufficient detail to permit the valuation thereof and including, if available, the purchase price per Unit; and (vi) a copy of any form of agreement proposed to be executed in connection therewith.

(d) Conditions of Sale. The obligation of the Drag-along Members in respect of a Drag-along Sale under this Section 7.5 are subject to the satisfaction of the following conditions: (i) the terms and conditions of such sale shall, except as otherwise provided in this Section 7.5(d), be the same as those upon which the Dragging Members sells their Units; (ii) if the Dragging Members are or any Dragging Member is given an option as to the form and amount of consideration to be received, the same option shall be given to all Drag-along Members; and (iii) each Drag-along Member shall execute the applicable purchase agreement, if applicable, and make or provide the same representations, warranties, covenants, indemnities and agreements as the Company and the Dragging Members make or provide in connection with the Drag-along Sale; *provided, however,* that each Drag-along Member shall only be obligated to make individual representations and warranties with respect to its title to and ownership of Units, authorization, execution

and delivery of relevant documents, enforceability of such documents against the Drag-along Member, and other matters relating to such Drag-along Member, but not with respect to any of the foregoing with respect to any other Members of their Units. Notwithstanding anything to the contrary in the foregoing, any Drag-along Member who the Company or the Dragging Member determines is not an accredited investor under applicable securities laws may be required to receive cash or other consideration in lieu of any rollover equity in a Drag-along Sale.

(e) Cooperation. Each Drag-along Member shall take all actions as may be reasonably necessary to consummate the Drag-along Sale, including, without limitation, entering into agreements and delivering certificates and instruments, in each case, consistent with the agreements being entered into and the certificates being delivered by the Dragging Members and the provisions of this Section 7.5.

(f) Expenses. The fees and expenses of the Dragging Members incurred in connection with a Drag-along Sale and for the benefit of all Drag-along Members (it being understood that costs incurred by or on behalf of the Dragging Members for their sole benefit will not be considered to be for the benefit of all Drag-along Members), to the extent not paid or reimbursed by the Company or the third-party purchaser, shall be shared by the Dragging Members and all the Drag-along Members on a pro rata basis, based on the consideration received by each such Member; *provided, however,* that no Drag-along Member shall be obligated to make any out-of-pocket expenditure prior to the consummation of the Drag-along Sale.

(g) Consummation of Sale. The Dragging Members shall have 60 days following the date of the Drag-along Notice in which to consummate the Drag-along Sale, on terms set forth in the Drag-along Notice (which 60-day period may be extended for a reasonable time not to exceed 120 days to the extent reasonably necessary to obtain required approvals or consents from any governmental authority). If at the end of such period the Dragging Members have not completed the Drag-along Sale, the Dragging Members may not then exercise their rights under this Section 7.5 without again complying with all the requirements contained herein.

(h) Right of Co-Sale. In the event a Drag-along Sale consists of a sale of Control Block where a Dragging Member does not exercise its rights pursuant to this Section 7.5, each other Member (each, a "*Co-Sale Member*") shall have the right to participate in such Drag-along Sale in the manner otherwise set forth in Section 7.5, subject to the following:

i. Each Co-Sale Member, in its sole discretion, may sell up to a number of its Units equal to the product obtained by multiplying (A) the number of Units on a Fully Diluted Basis held by such Co-Sale Member by (B) a fraction (x) the numerator of which is equal to the number of Units on a Fully Diluted Basis that the Dragging Member proposes to sell in the Drag-along Sale and (y) the denominator of which is equal to the number of Units on a Fully Diluted Basis held by the Dragging Member at such time.

ii. Each Co-Sale Member, shall exercise its right to participate in such Drag-along Sale by delivering to the Dragging Member a written notice ("*Co-Sale Notice*") stating its election to do so and specifying the number of Units to be Transferred by it no later than 15 days after receipt of the Drag-along Notice (the "*Co-Sale Period*").

iii. The offer of each Co-Sale Member set forth in a Co-Sale Notice shall be irrevocable, and, to the extent such offer is accepted, such Co-Sale Member shall be bound and obligated to consummate the Transfer on the terms and conditions set forth in this Section 7.5.

iv. Each Co-Sale Member who does not deliver a written Co-Sale Notice in compliance with Section 7.5(h)ii shall be deemed to have waived all of such Co-Sale Member's rights to participate in the applicable Drag-along Sale with respect to the Units owned by such Co-Sale Member, and the Dragging Member shall (subject to the rights of any other participating Co-Sale Members) thereafter be free to sell to the proposed transferee the Units identified in the Drag-along Notice at a per Unit price that is no greater than the applicable per Unit price set forth in the Drag-along Notice and on other terms and conditions which are not materially more favorable to the Dragging Member that those set forth in the Drag-along Notice, without any further obligation to the non-accepting Co-Sale Members.

v. The Dragging Member shall have 60 days following the end of the Co-Sale Period in which to consummate the Drag-along Sale, on the terms set forth in the Drag-along Notice (which 60-day period may be extended for a reasonable time not to exceed 120 days to the extent reasonably necessary to obtain required approvals or consents from any governmental authority).

**7.6. Purchase Options**.

(a) Upon the occurrence of an Option Event, that Member, or his or her legal representative, as the case may be (a "*Transferring Person*"), shall give written notice to the Company and to the other Members of the occurrence of the Option Event (the "*Option Notice*"), and the Company shall have the first option to purchase some or all of the Units then held by such Member (the "*Offered Units*") and if the Company fails to exercise such option as to all of the Offered Units, the other Members shall have the second option to purchase such Offered Units.

(b) The Option Notice shall:

i. specify the total number and class of the Units held by such Transferring Person,

ii. specify the date of the occurrence of the Option Event, and

iii. contain the Transferring Person's offer to sell all, but not less than all, such Units first to (x) the Company (the "*Company Option*") and second to

(y) the other Members (the "*Member Option*") pursuant to the provisions of this Section 7.6.

(c) If the Transferring Person fails to give the notice required by Section 7.6(b), such notice shall be deemed to be given on the date the Company first has actual knowledge of the occurrence of the Option Event, and the Units held by the Transferring Person shall remain subject to all of the terms and conditions of this Agreement; notwithstanding the above, the fact that the notice has been deemed to have been given shall not relieve the Transferring Person from liability for breaching their obligation to provide such notice and all the information required thereby.

(d) Upon the occurrence of an Option Event, the purchase price for the Offered Units and the terms of payment, shall be determined as follows:

i. All unvested Profits Interest Units shall be forfeited and no additional consideration shall be given for such Profits Interest Units;

ii. If the Option Event is the commission of a felony by that Member or its Control Person or any other legal judgment against that Member or its Control Person that can reasonably be expected to bring the business or societal reputation of the Company, its affiliates or subsidiaries into disrepute, the purchase price for the Offered Units shall be 70% of the Fair Market Value of the Offered Units; and

iii. Subject to Section 7.6(d)i or Section 7.6(d)ii the purchase price of the Offered Units shall be the Fair Market Value of the Offered Units determined pursuant to the procedure set forth in Section 7.6(e).

iv. Except as set forth in Section 7.6(d)v, unless the parties mutually agree otherwise, the purchase price shall be paid by delivery of 10% of the purchase price in cash, by wire transfer or certified check at the closing and an unsecured promissory note for the balance, which promissory note shall be payable in 12 equal quarterly installments of principal together with accrued interest computed at a rate equal to the lowest permissible "Applicable Federal Rate," under Section 1274 of the Internal Revenue Code, compounded annually or upon such other terms as shall be agreed to by the parties. Such promissory note may be prepaid, in whole or in part, at any time or from time to time without payment of any penalty or premium and, if the Company is the payers, will be subject to subordination to any Senior Indebtedness of the Company that is then existing or thereafter arising. By execution of this Agreement, each Member agrees in advance to execute any customary subordination agreement as may be requested from the issuer(s) of Senior Indebtedness from time to time in the event such Member becomes a holder of a promissory note referenced herein for which the Company is the payor.

v. Notwithstanding anything to the contrary in this Agreement, if at any time prior to the Company's payment in full of any and all amounts owed to a

Transferring Person under this Section 7.6, such Transferring Person owes any amounts to the Company, the Company may offset such amounts from amounts they may owe to such Transferring Person under Section 7.6(d)iv. In furtherance of the foregoing, the Transferring Person agrees to take such action and sign such documents, including without limitation, an amendment of any applicable promissory notes, to evidence any change in the amount owning thereunder and such Transferring Person agrees that it shall not take any action to contest the validity or enforceability of this Section 7.6(d)v.

(e) The Board shall, in its reasonable discretion, determine the Fair Market Value of the Offered Units as of the date of the occurrence of the Option Event and deliver notice of its determination to the Transferring Person within 30 days after the Company's receipt of the Option Notice. Within 20 days after the date of the notice from the Board, the Transferring Person may deliver a written notice to the Board indicating that the Transferring Person objects to the Fair Market Value of the Offered Units as determined by the Board. If the Transferring Person fails to deliver the notice within the allowed time, the Transferring Person shall be deemed to have accepted the Fair Market Value of the Offered Units as determined by the Board. If the Transferring Person timely objects to the calculation of the Fair Market Value as determined by the Board, the Fair Market Value of the Offered Units shall be determined by a Qualified Accountant as set forth below.

i. The Board shall notify the Transferring Person of the identity of the Qualified Accountant promptly following receipt of the Transferring Person's notice of objection. The Fair Market Value shall be determined by the Qualified Accountant, which shall be binding upon all parties.

ii. The Qualified Accountant shall be instructed to promptly make a determination of the Fair Market Value of the Offered Units, and shall certify the same in writing to the Board and the Transferring Person.

iii. The costs of the Qualified Accountant under this Agreement shall be paid for by the Transferring Person.

iv. The date on which (A) the Transferring Person accepts the Board's determination of the Fair Market Value of the Offered Units or (B) the date on which the Fair Market Value of the Offered Units is finally determined pursuant to Section 7.6(e) is referred to as the "*Valuation Date.*"

(f) The Company shall, within 30 days after the Valuation Date, give written notice to the Transferring Person and concurrently give the same notice to the other Members stating whether or not the Company is exercising the Company Option. If the Company exercises its Company Option, the sale of the Transferring Person's Units shall be closed within 60 days after the expiration of such 30-day period by tendering the purchase price to the Transferring Person in the same manner as set forth in Section 7.6(d)iv. The Company's decision regarding the exercise of the Company Option shall be made by the Board.

(g) If the Company waives its Company Option or otherwise fails to exercise the Company Option within the 30-day period referred to in Section 7.6(f), the Members shall have 30 days from and after the last day of the 30-day period referred to in Section 7.6(f) to exercise the Member Option. If any Member elects to exercise the Member Option, that Member shall, within such 30 day period, give written notice to the Transferring Person of its election to purchase all of such Units and concurrently give the same notice to the other Members. If more than one Member elects to exercise the Member Option, then each Member who has so elected shall be entitled to purchase a pro rata portion (based on the Units held by such electing Members) of the Offered Units of the Transferring Person. The sale of the Transferring Person's Offered Units shall be closed within 60 days after the expiration of such 30-day period by tendering the purchase price to the Transferring Person in the manner set forth in Section 7.6(d)iv.

(h) If no Member gives timely written notice of his or her election to exercise the Member Option the Transferring Person shall have the right to retain the Offered Units subject to all of the terms and conditions of this Agreement, and any transferee by legal or other process described in Section 7.2 will not be admitted as a Member except as set forth in Section 7.2.

## ARTICLE VIII.
## BOOKS; FINANCIAL AND TAX INFORMATION

**8.1. Books; Ownership Records; Place; Access.**

(a) The Board shall maintain at the Principal Office the information and records that the Members are entitled to obtain from the Company pursuant to the Act. Each Member shall have the absolute right, upon written demand, to examine and copy the documents described in this Section 8.1(a), in person or by a legal representative, at any reasonable time, within ten days after receipt by the Board of the written demand. Notwithstanding the foregoing, each Member shall be entitled to receive information required by the Act to be provided to such Member to the extent such information is written in a final report or record of the Company and known to the Chief Executive Officer or, if none, the Board and determined by the Board, in its reasonable discretion, to be materially relevant to a Member's proper exercise of its rights and duties, or in the case of a demand or request for information, the Board or Chief Executive Officer shall have determined in its reasonable discretion that such demand is reasonable and proper under the circumstances.

(b) The Company shall maintain a copy of this Agreement that reflects all transfers of Units on successive amendments of Schedule A; *provided, however,* that no transfer will be reflected unless it is made in compliance with Article VII. The Company is entitled to treat any Person in whose name Units are recorded on Schedule A as the absolute owner of the Units, provided the Company has complied with its obligations to update Schedule A as set forth in Section 9.3.

**8.2. Tax Information**. The Company shall transmit all necessary tax information to the Members within 120 days after the close of each Fiscal Year as may be needed to permit Members to file any necessary foreign, federal, and state income tax returns.

**8.3. Tax Elections and Accounting**. The Board, in consultation with the Company's tax advisers, shall make or refrain from making any elections required or permitted to be made by the Company under the Code and shall choose the Company's tax accounting method from all available tax accounting methods. The Board may, at the time and in the manner provided in Treasury Regulations Section 1.754-1(b), cause the Company to elect pursuant to Code Section 754 to adjust the basis of the assets of the Company in the manner provided in Code Sections 734 and 743.

**8.4. Partnership Representative**.

(a) Until Vireo Health, Inc. is removed, or ceases to be a Member, it shall act as the partnership representative (the "*Partnership Representative*"), as such term is defined in Code Section 6223(a). The Partnership Representative shall designate an individual satisfying the requirements of Proposed Treasury Regulations section 301.6223-1(b)(2) and Proposed Treasury Regulations section 301.6223-1(b)(4), as each may be amended or re-designated upon finalization, to serve as the sole individual through which it will act in its capacity as the Partnership Representative. The Partnership Representative will act on behalf of the Company in connection with all examinations of the Company's affairs by tax authorities, including resulting administrative and judicial proceedings, is authorized to make the election described in Code Section 6226, and to take any actions needed to effect the election, and to take any other actions as are reasonably necessary or appropriate to maintain, to the extent reasonably feasible, the allocation of taxes (including interest and penalties, if any, with respect to such taxes) among the Members (including former Members) with respect to the income of the Company, and cost of contesting any Company adjustments, as would have been borne by each Member if the Company had been eligible to elect, and had elected, out of the partnership audit provisions of Code Sections 6221 through 6241 (the "*Partnership Audit Provisions*").

(b) The Board may remove the Partnership Representative at any time or the Partnership Representative may resign as Partnership Representative at any time, and the resignation or removal shall become effective upon the appointment of a successor Partnership Representative in the manner required by applicable Treasury Regulations; provided that Vireo Health, Inc. may not be removed by the Board without the consent of Vireo Health, Inc The successor Partnership Representative shall be determined by the Board.

(c) The Members acknowledge and agree that amendments may be required or advisable to this Agreement (i) in order to address the Partnership Audit Provisions and any regulations or other guidance of the Internal Revenue Service interpreting or applying the Partnership Audit Provisions, and (ii) in order to ensure that, in the event of a tax audit of the Company, the Members during the Company's tax year being audited (which may include former Members) bear the economic burden and benefit of any

adjustments to the Company's income, gain, loss, deduction, or credit for the tax year being audited and the cost of contesting the Company adjustments, and the Members shall cooperate in good faith to adopt and effect such amendments.

(d) The Company is authorized to make tax payments on behalf of a Member or former Member of all amounts that the Company is required to pay on behalf of such Member or former Member, and to pay any amounts to a taxing authority that the Partnership Representative reasonably determines are attributable to a Member or former Member for the relevant tax year. Each Member and former Member hereby agrees, to the extent permitted by applicable law, to reimburse the Company for any liability with respect to withholdings and other payments made on behalf of or with respect to the Member or former Member, plus reasonable costs and expenses. Each Member and former Member agrees to cooperate and provide information to the Company that, in the determination of the Partnership Representative, may be reasonably necessary in conducting or resolving any audit of the Company and satisfying any tax liabilities resulting from any adjustment.

## ARTICLE IX.
## UNITS AND CAPITAL CONTRIBUTIONS

**9.1. Initial Capital Contributions**. The Members shall be deemed to have made the Capital Contributions reflected on the books and records of the Company.

**9.2. Units**.

(a) The Members hereby agree that effective as of the Effective Date, the Members have the Units reflected in Schedule A.

(b) Each Member's interest in the Company, including the Member's interest in income, gains, losses, deductions and expenses of the Company, shall be represented by common Units (the "*Common Units*") or Profits Interest Units (defined below), which may be divided into one or more types, classes, or series, with each type, class, or series having the rights and privileges, including voting rights, if any, provided in this Agreement.

(c) Subject to Section 9.4, the Board may issue additional Units from time to time to new or existing Members. Units may be issued for any consideration permitted by law, including cash or other property received or to be received by the Company or services rendered or to be rendered to the Company.

**9.3. No Certificates for Units**. The Units of the Company shall not be certificated unless otherwise determined by the Board. The Board shall cause Schedule A hereto to be amended and updated to reflect any transfer, issuance or other change in the number of Units held by the Company's Members that is made in accordance with the terms of this Agreement.

**9.4. Profits Interests**.

(a) The Company may issue Units to new or existing Members in exchange for services performed or to be performed on behalf of the Company ("*Profits Interest Units*"). Members receiving Profits Interest Units shall make no Capital Contributions with respect to the Profits Interest Units.

(b) All Profits Interest Units shall be issued pursuant to a grant agreement (a "*Grant Agreement*") between the Company and the recipient of such Profits Interest Unit. The Grant Agreement may provide for voting, forfeiture, vesting, transfer, repurchase and any other terms applicable to the Profits Interest Units as determined by the Board in its discretion. In the event of any conflict between the provisions of this Agreement and the provisions of the Grant Agreement, the provisions of this Agreement shall control.

(c) Upon issuance of Profits Interest Units, the Board shall determine the fair market value of the Company's assets, net of any liabilities of the Company that are outstanding as of such issuance (the "*Distribution Threshold*"). The Board may, in its discretion, reduce the Distribution Threshold with respect to any Profits Interest Unit if, subsequent to the grant of such Profits Interest Unit, the fair market value of the Company's assets, net of liabilities, declines, and shall increase the Distribution Threshold with respect to any Profits Interest Unit if, subsequent to the grant of such Profits Interest Unit, additional Capital Contributions are made to the Company. The Distribution Threshold applicable to any Profits Interest Unit shall be set forth in the Grant Agreement applicable to the Profits Interest Unit.

(d) Profits Interest Units are intended to be treated as "profits interests" under IRS Revenue Procedure 93-27 and IRS Revenue Procedure 2001-43. The provisions of this Agreement shall be interpreted and applied consistently with that treatment. Allocations of Profits and Losses pursuant to Article X shall be made with respect to Profits Interest Units without regard to (i) whether the Profits Interest Units are vested or unvested, and (ii) the provisions of Section 11.3.

(e) To the extent provided for in Treasury Regulations, revenue rulings, revenue procedures and/or other IRS guidance issued after the Effective Date, the Company is hereby authorized to, and at the direction of the Board shall, elect a safe harbor under which the fair market value of any Profits Interest Units issued after the effective date of such Treasury Regulations or other guidance will be treated as equal to the liquidation value of such Profits Interest Units. If the Company makes a safe harbor election as described in the preceding sentence, each Member agrees to comply with all safe harbor requirements with respect to transfers of such Profits Interest Units while the safe harbor election remains effective. The Company shall make any allocations of items of income, gain, deduction, loss or credit (including forfeiture allocations and elections as to allocation periods) necessary or appropriate to effectuate and maintain the safe harbor election. Any such safe harbor election shall be binding on the Company and on all of its Members while such election is in effect. A safe harbor election once made may be revoked by the Board as permitted by applicable law. The Board shall file or cause the Company to file all returns, reports and other documentation as may be required to

perfect and maintain the safe harbor election. The Board may, without further action of the Members, amend this Agreement as necessary to comply with this Section 9.6(e). Each Member agrees to use commercially reasonable efforts to cooperate with the Company to perfect and maintain any safe harbor election, and to timely execute and deliver any documentation reasonably requested by the Board with respect to any safe harbor election.

**9.5. Additional Capital Contributions**. No Member shall have any obligation to make any additional Capital Contribution.

**9.6. Capital Accounts**. The Company shall maintain a separate Capital Account ("*Capital Account*") for each Member in accordance with Code Section 704 and Treasury Regulations Section 1.704-1(b)(2)(iv). The Board shall increase or decrease the Capital Accounts in accordance with the rules of such regulations including, without limitation, upon the occurrence of any of the events specified in Treasury Regulations Section 1.704-1(b)(2)(iv)(*f*). The Board's determination of Capital Accounts shall be binding upon all parties.

**9.7. Loans to the Company; No Interest on Capital**. The Members may, but are not obligated to, make loans to the Company from time to time, as authorized by the Board. Any such loans will not be treated as Capital Contributions for any purpose and will not entitle the Member to any increase in its economic rights with respect to the Company, but the Company shall be obligated to the Member for the principal amount of and any accrued interest on such loans pursuant to any agreed upon terms. All scheduled principal and interest payments with respect to any loans from a Member to the Company pursuant to this Section 9.7 shall be repaid before any distributions to any Members pursuant to Section 11.1, Section 11.2, or Section 12.2(c). No interest shall be paid on any Capital Contribution to the Company or on any balance in any Capital Account.

**9.8. No Right to Return of Contribution**. No Member has any right to the withdrawal or to the return of his, her, or its Capital Contribution, except upon the dissolution and liquidation of the Company.

**9.9. Creditor's Interest in the Company**. No creditor who makes a loan to the Company shall have or acquire at any time as a result of making the loan any direct or indirect interest in the profits, capital or property of the Company, other than any interest as a secured creditor. Notwithstanding the foregoing, this provision shall not prohibit a secured creditor from participating in the profits of operation or gross or net sales of the Company or in the gain on sale or refinancing of the Company, all as may be provided in its loan or security agreements.

## ARTICLE X.
## ALLOCATION OF PROFITS AND LOSSES

**10.1. Capital Account Allocations**.

(a) Except as otherwise provided in Section 10.2 and Section 10.3, the Profits or Losses of the Company shall be allocated among the Capital Accounts of the Members with respect to each Fiscal Year as of the end of such Fiscal Year in a manner such that the Capital Account of each Member, immediately after making such allocation is, as

nearly as possible, equal to (i) the distributions that would be made to such Member if the Company were dissolved, its affairs wound up and its assets sold for cash equal to their Book Values, all Company liabilities were satisfied (limited with respect to each nonrecourse liability to the fair market value of the assets securing such liability), and the remaining assets of the Company were distributed pursuant to Section 12.2(c) to the Members immediately after making such allocation, minus (ii) such Member's share of Minimum Gain (as determined according to Treasury Regulation Section 1.704-2(g)) and such Member's partner non-recourse debt minimum gain (as defined in Treasury Regulation Section 1.704-2(i)(3)), computed immediately before the hypothetical sale of assets and in accordance with Treasury Regulations Section 1.704-2. Unless otherwise provided in this Agreement, every item of income, gain, loss and deduction entering into the computation of Profits or Losses shall be allocated to the Members in the same proportions as the allocation of Profits or Losses for that period.

(b) The Board's determination of allocations will be binding upon all parties.

**10.2. Special Allocations**. The following special allocations will be made in the following order:

(a) If there is a net decrease during any Fiscal Year in Minimum Gain, each Member will be allocated Profits for the Fiscal Year (and, if necessary, for subsequent Fiscal Years) in the amounts and of such character as determined according to Treasury Regulations Section 1.704-2(f). This Section 10.2(a) is intended to be, and shall be interpreted as, a minimum gain chargeback provision that complies with the requirements of Treasury Regulations Section 1.704-2(f).

(b) If there is a net decrease during a Fiscal Year in partner nonrecourse debt minimum gain (as defined in Treasury Regulations Section 1.704-2(i)(3)), Profits for the Fiscal Year (and, if necessary, for subsequent Fiscal Years) will be allocated to the Members in the amounts and of such character as determined according to Treasury Regulations Section 1.704-2(i)(4).

(c) If any Member that unexpectedly receives an adjustment, allocation or distribution described in Treasury Regulations Section 1.704-1(b)(2)(ii)(*d*)(*4*), (*5*) and (*6*) has an Adjusted Capital Account Deficit as of the end of any Fiscal Year, computed after all other allocations pursuant to this Article X have been tentatively made as if this Section 10.2(c) were not in the Agreement, then Profits for the Fiscal Year will be allocated to the Member in proportion to, and to the extent of, the Adjusted Capital Account Deficit. This Section 10.2(c) is intended to be, and shall be interpreted as, a qualified income offset provision as described in Treasury Regulations Section 1.704-1(b)(2)(ii)(*d*).

(d) If any Member has an Adjusted Capital Account Deficit at the end of any Fiscal Year, then Profits for the Fiscal Year will be allocated to the Member to eliminate the deficit as quickly as possible; provided that an allocation pursuant to this Section 10.2(d) will be made only if and to the extent that the Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this

Section 10.2 have been tentatively made as if Section 10.2(c) and this Section 10.2(d) were not in the Agreement.

(e) Nonrecourse deductions (as determined according to Treasury Regulations Section 1.704-2(b)(1)) for any Fiscal Year shall be allocated first to the Members up to an amount equal, and in proportion, to the allocation of Profits to the Members for the Fiscal Year pursuant to Section 10.1, and, thereafter, to each Member, ratably among the Members in proportion to the number of outstanding Units held by each Member immediately prior to the allocation.

(f) Losses attributable to partner nonrecourse debt (as defined in Treasury Regulations Section 1.704-2(b)(4)) shall be specially allocated to the Member who bears the economic risk of loss with respect to the partner nonrecourse debt to which the Losses are attributable in accordance with Treasury Regulations Section 1.704-2(i)(1).

**10.3. Loss Limitation**. Losses allocated pursuant to Section 10.1 shall not exceed the maximum amount of Losses that can be allocated without causing any Member to have an Adjusted Capital Account Deficit at the end of any Fiscal Year. In the event some but not all of the Members would have Adjusted Capital Account Deficits as a consequence of an allocation of Losses pursuant to Section 10.1, the limitation set forth in this Section 10.3 shall be applied on a Member by Member basis and Losses not allocable to any Member as a result of the limitation shall be allocated to the other Members in accordance with the positive balances in the Member's Capital Accounts so as to allocate the maximum permissible Losses to each Member under Treasury Regulations Section 1.704-1(b)(2)(ii)(*d*).

**10.4. Curative Allocations**. The allocations set forth in Section 10.2 and Section 10.3 (the "*Regulatory Allocations*") are intended to comply with certain requirements of Sections 1.704-1(b) and 1.704-2 of the Treasury Regulations. The Regulatory Allocations may not be consistent with the manner in which the Members intend to allocate Profit and Loss of the Company or make Company distributions. Accordingly, notwithstanding the other provisions of this Article X, but subject to the Regulatory Allocations, income, gain, deduction, and loss shall be reallocated among the Members so as to eliminate the effect of the Regulatory Allocations and thereby cause the respective Capital Accounts of the Members to be in the amounts (or as close thereto as possible) they would have been if Profit and Loss (and such other items of income, gain, deduction and loss) had been allocated without reference to the Regulatory Allocations. In general, the Members anticipate that this will be accomplished by specially allocating other Profit and Loss (and such other items of income, gain, deduction and loss) among the Members so that the net amount of the Regulatory Allocations and such special allocations to each such Member is zero.

**10.5. Tax Allocations**.

(a) The income, gains, losses, deductions and credits of the Company will be allocated, for federal, state and local income tax purposes, among the Members in accordance with the allocation of such income, gains, losses, deductions and credits among the Members for computing their Capital Accounts; except that if any such allocation is not permitted by the Code or other applicable law, the Company's

subsequent income, gains, losses, deductions and credits will be allocated among the Members so as to reflect as nearly as possible the allocation in computing their Capital Accounts.

(b) Items of Company taxable income, gain, loss and deduction with respect to any property contributed to the capital of the Company shall be allocated among the Members in accordance with Code Section 704(c) so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its Book Value in accordance with such method determined by the Board.

(c) If the Book Value of any Company asset is adjusted pursuant to Section 9.7, subsequent allocations of items of taxable income, gain, loss and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Book Value in the same manner as under Code Section 704(c) in accordance with such method determined by the Board.

(d) Allocations of tax credits, tax credit recapture, and any items related thereto shall be allocated to the Members according to their interests in such items as determined by the Board taking into account the principles of Treasury Regulations Section 1.704-1(b)(4)(ii).

(e) For purposes of determining a Member's proportional share of the Company's "excess non-recourse liabilities" within the meaning of Treasury Regulations Section 1.752-3(a)(3), each Member's interest in income and gain shall be in proportion to the Units held by such Member.

(f) Allocations pursuant to this Section 10.5 are solely for purposes of federal, state and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Profits, Losses, distributions or other Company items pursuant to any provision of this Agreement.

**10.6. Varying Interests During Fiscal Year**. In the event of any changes in Units during a Fiscal Year, all Profits and Losses from operations of the Company during such Fiscal Year, using such methods of accounting for depreciation and other items as the Board determines to use for federal income tax purposes, shall be allocated to each Member based on its varying interest in the Company during such operating year in accordance with Code Section 706. The Board shall determine in accordance with Code Section 706 whether to prorate items of income and deduction according to the portion of the Fiscal Year for which a Member held Units or whether to close the books on an interim basis and divide such operating year into two or more segments.

## ARTICLE XI.
## DISTRIBUTIONS

**11.1. Operating Distributions**. Subject to any restrictions in Section 11.3, Section 11.4 and Section 11.5, the Board may distribute money or other property to the Members in proportion to their respective vested Units at such times and in such amounts as it may determine in its discretion.

**11.2. Distributions for Tax Liabilities**. Subject to any restrictions contained in any credit agreement to which the Company is a party or by which it is bound, if applicable, and Section 11.5, the Company shall make the following distributions to cover Member tax liabilities:

(a) The Company shall make distributions of money to the Members in amounts that the Board considers reasonably sufficient to enable the Members to pay state and federal income taxes on the income and gain (net of any cumulative tax benefits produced for the Members by the Company's losses, deductions, and credits) that passes through the Company to the Members under the applicable provisions of the Code and applicable state law (the "*Taxes on Pass-Through Income*").

(b) The amount distributed to the Members will be determined by the Board using a good faith approximation of the Taxes on Pass-Through Income applicable to the Members.

(c) In the event a Member's allocable share of the Company's net taxable income for any period is negative, such negative amount shall be carried forward and taken into account for all purposes of this Section 11.2 (including application of this sentence) in determining such Member's allocable share of the Company's net taxable income in each subsequent period (whether or not in the same Fiscal Year) until such negative amount is offset in full by positive net taxable income.

(d) All distributions to a Member made pursuant to this Section 11.2 will be credited against the next succeeding distribution or distributions that would otherwise have been distributed to such Member pursuant to Section 11.1 and Section 12.2.

**11.3. Profits Interest Unit Distributions**. No Member shall be entitled to receive any distributions pursuant to Section 11.1, with respect to any Profits Interest Unit unless and until the sum of the aggregate amount of distributions made by the Company in respect of all Units pursuant to Section 11.1 equals the Distribution Threshold applicable to such Profits Interest Unit. Any amount that is withheld from distributions pursuant to this Section 11.3 shall be distributed to the other Members in accordance with Section 11.1 (assuming for such purpose that the non-participating Profits Interest Units were not outstanding). The Board shall have the discretion to make any determinations required under this Section 11.3, including the extent to which a Profits Interest Unit will be excluded from participating in any distributions under Section 11.1 on account of this Section 11.3.

**11.4. No Distribution on Resignation**. No Member will be entitled to receive any distribution in connection with the Member's dissociation, resignation, retirement, or other withdrawal from the Company before the dissolution and winding up of the Company.

**11.5. Limitations on Distributions**. Notwithstanding any provision to the contrary in this Article XI:

(a) All distributions made in connection with the liquidation, winding up or Liquidity Event of the Company will be made in the manner provided in Section 12.2.

(b) No distribution will be made that would result in a violation of the Act.

## ARTICLE XII.
## DISSOLUTION AND LIQUIDATION

**12.1. Events Causing Dissolution**. The Company will be dissolved only upon the occurrence of any of the following events:

(a) The written agreement of the Board or the Members holding at least a majority of the issued and outstanding voting Units of the Company;

(b) The final decree of a court that dissolution is required under applicable law or the administrative dissolution of the Company as provided for in the Act; or

(c) Any event causing dissolution under the Act.

**12.2. Liquidation and Winding Up**. In the event the Company is dissolved pursuant to Section 12.1, the Company will be liquidated and the Managers (or other Person or Persons designated by the Managers or by a decree of court) shall wind up the affairs of the Company. The Managers or other Persons winding up the affairs of the Company shall promptly proceed to the liquidation of the Company and distribute the assets of the Company in the order of priority set forth below. In addition, upon any Liquidity Event that occurs prior to a liquidation or winding up of the Company, the proceeds received by the Company or the Members in connection with such Liquidity Event shall be distributed in the following order of priority:

(a) To the payment of all debts and liabilities of the Company in the order of priority as provided by law or agreement;

(b) To the establishment of any reserves deemed necessary by the Managers or the Person winding up the affairs of the Company for any contingent liabilities or obligations of the Company; and

(c) The balance, if any, to the Members in accordance with Section 11.1.

**12.3. No Deficit Restoration Obligation**. If any Member has a deficit balance in its Capital Account (after giving effect to all contributions, distributions and allocations for all Fiscal Years including the Fiscal Year during which the liquidation occurs), that Member has no obligation to make any Capital Contribution with respect to the deficit, and the deficit shall not be considered a debt owed to the Company or to any Person for any purpose.

## ARTICLE XIII.
## AMENDMENT

Subject to Section 8.1(b), any provision of the Articles of Organization or this Agreement may be amended or waived only by an instrument in writing signed by Members holding at least sixty (60%) of the outstanding voting Units of the Company; *provided that* any amendment that

would materially, negatively and disproportionately affect the rights of any Member relative to any other similarly situated Members shall require the consent of such Member. The provisions of this Article XIII are intended to replace any contrary voting requirement of the Act. No provision of this Agreement (other than Schedule A and Schedule B as described below) may be modified, amended, waived or terminated except as provided in the preceding sentence. No course of dealing between the parties will modify, amend, waive or terminate any provision of this Agreement or any rights or obligations of any party under or by reason of this Agreement. Notwithstanding the foregoing, the Board may amend Schedule A, without having to obtain the consent of any Member, as appropriate to reflect accurately any Transfers of Units, forfeiture of Units, issuances of new Units and admissions of new Members that are effected in accordance with this Agreement and shall amend Schedule C, without having to obtain the consent of any Member, as appropriate to reflect accurately changes to the members of the Board and the officers of the Company that are effected in accordance with this Agreement. The Board shall promptly deliver a copy of any such amendment to each Member, *provided that*, a failure of the Board to deliver a copy of any amendment to the Members shall not invalidate such amendment.

## ARTICLE XIV.
## REPRESENTATIONS AND WARRANTIES OF THE MEMBERS

**14.1. Representations and Warranties of the Members**. Each Member represents and warrants, as of the date on which that Member became a Member, to each of the other Members and the Company as follows:

(a) The Units being acquired by the Member are being purchased for the Member's own account and not with a view to, or for sale in connection with, any distribution or public offering of Units within the meaning of the Securities Act of 1933 (the "*Securities Act*"). The Member understands that the Units have not been registered under the Securities Act or any state securities laws by reason of their contemplated issuance in transactions exempt from the registration and prospectus delivery requirements of the Securities Act and that the reliance of the Company and others upon such exemptions is predicated in part by the representations and warranties of the Member contained in this Agreement.

(b) The Member (i) is familiar with the risks of the business of the Company; (ii) is financially able to bear all the risks of holding Units for an indefinite period of time; (iii) has sufficient knowledge and experience in business and financial matters to be able to evaluate the merits and risks of, and otherwise make an informed investment decision with respect to, the acquisition of the Units; (iv) has been provided (or has had access to) all information that the Member has requested from the Company, the Managers, or any promoter in connection with the acquisition of Units; (v) has been afforded the opportunity to ask questions of, and receive answers from the Company, the Managers, or any promoters concerning the terms and conditions of this Agreement and the purchase of the Units; and (vi) has been given the opportunity to obtain any additional information necessary to verify the accuracy of the information furnished by the Company. The Member has had the opportunity to seek the advice of counsel and other personal advisors and acknowledges that neither the Company, the Managers, nor any

promoter has provided the Member with advice regarding the tax, economic, or other impacts to the Member of the arrangements contemplated by this Agreement.

(c) The Member has the requisite power and authority (whether corporate or otherwise) and legal capacity to enter into, and to carry out its obligations under, this Agreement.

(d) This Agreement has been duly authorized by all necessary action on the part of the Member, has been duly executed and delivered by the Member, and constitutes a valid and binding obligation enforceable against the Member in accordance with its terms.

(e) The Member is not subject to, or obligated under, any provision of (i) any agreement or understanding, (ii) any franchise or permit, or (iii) any law or decree that would be breached or violated, or in respect of which a right of termination or acceleration or any encumbrance on any of the Member's assets would be created, by the Member's execution and performance of this Agreement or the consummation of the transactions contemplated by this Agreement, except for agreements as to which a Member has previously obtained the consent of the other party or parties thereto.

(f) The Member has obtained any authorization or consent of or waiver or exemption by, and completed any filing or registration with, any authority or other third party that is necessary on the Member's part for the consummation of the transactions contemplated by this Agreement.

(g) No Person has or will have, as a result of any act or omission by the Member any right, interest, or valid claim against the Company or any other Member for any commission, fee, or other compensation as a finder or broker, or in any similar capacity, in connection with the transactions contemplated by this Agreement.

## ARTICLE XV. MISCELLANEOUS PROVISIONS

**15.1. Information; Corporate Transparency Act Compliance**. The Members acknowledge that, from time to time, the Company may need information from any or all of such Members for various reasons, including for complying with applicable law. Each Member shall provide to the Company all information reasonably required by the Company for purposes of complying with applicable law within a reasonable amount of time from the date such Member receives such request; *provided, however*, that no Member shall be obligated to provide such information to the Company to the extent such disclosure (i) would result in the breach or violation of any contractual obligation (if a waiver of such restriction cannot reasonably be obtained) or applicable law or (ii) involves secret, confidential or proprietary information. The Members hereby agree to the following:

(a) Without limiting the foregoing, each Reporting Person agrees that (i) if such Reporting Person is a natural Person, such Reporting Person shall provide to the Company either such Reporting Person's true and correct information required by the CTA or such Reporting Person's true and correct FinCen Identifier (as defined in the CTA) or (ii) if such

Reporting Person is not a natural Person, such Reporting Person shall provide to the Company true and correct information required by the CTA for each of such Reporting Person's Indirect Owners or true and correct FinCen Identifiers for each of such Reporting Person's Indirect Owners.

(b) Each Reporting Person shall promptly, but within not more than five (5) Business Days, notify the Company of any change or inaccuracy in any information provided to the Company pursuant to Section 15.1(a) (including any change in the Reporting Person's Indirect Owners, as applicable) and shall provide any information and documentation reasonably requested by the Company to support such change or inaccuracy and to ensure and verify the Company's compliance with the CTA.

(c) Each Reporting Person shall provide the Company with all information reasonably requested by the Company in order for the Company to ensure and verify its compliance with the CTA.

(d) Each Reporting Person acknowledges and consents to the Company's disclosure to the Financial Crimes Enforcement Network of the U.S. Department of the Treasury of any information provided by such Reporting Person pursuant to this Section 15.1.

**15.2. Entire Agreement**. This Agreement and any Grant Agreement, if applicable, incorporates and embodies all of the reasonable expectations of the Members regarding their relationships with the Company and with each other with respect to the Company. This Agreement and any Grant Agreement, if applicable, contains the entire understanding between the Members with respect to the subject matter of this Agreement and supersedes any prior understandings or agreements, written or oral, relating to the subject matter of this Agreement.

**15.3. Signatures; Counterparts**. This Agreement may be executed in one or more counterparts, any one of which need not contain the signatures of more than one party, but all such counterparts taken together constitute one instrument. A facsimile, electronic, or similar reproduction by (or on behalf of) a Person of the signature of that Person is considered an original signature.

**15.4. Headings**. The headings in this Agreement are for convenience only and do not affect the meaning of this Agreement.

**15.5. Severability**. If any provision of this Agreement is held to be unenforceable, then that provision will be modified to the minimum extent necessary to make it enforceable, unless that modification is not permitted by law, in which case that provision will be disregarded. If a provision is modified or disregarded in accordance with this Section 15.5, then the rest of this Agreement will remain in effect as written. Any unenforceable provision will remain as written in any circumstance other than those in which the provision is held to be unenforceable.

**15.6. Notices**. All notices and other communications to be given or delivered under this Agreement must be in writing. Without limiting the manner by which written notice may otherwise be given, any notice will be effective if given by Electronic Transmission consented to

in writing by the Person to whom the notice is given, which consent has not been revoked in writing. Notice will be deemed to have been given:

(a) if personally delivered by hand (with written confirmation of receipt), when delivered;

(b) if sent by a nationally recognized overnight courier service (receipt requested), when received;

(c) if sent by first class mail (return receipt requested), five Business Days after being mailed;

(d) if by electronic mail directed to an electronic mail address at which the Person receiving notice has consented to receive notice, when sent;

(e) if by any other form of Electronic Transmission, when directed to the Person who is receiving notice; or

(f) when receipt is acknowledged by an affirmative act of the party receiving notice.

All notices to the Company must be addressed to its registered office or to such other address as the Company may designate. All notices to a Member must be addressed to that Member's address in the records of the Company or to such other address as that Member may designate.

**15.7. Governing Law**. All matters relating to the interpretation, construction, validity and enforcement of this Agreement and all questions arising out of or concerning either the organization of, or the investment in, the Company, or this Agreement, or the rights, duties, and responsibilities of the Company or any Member, including claims alleging fraud, misrepresentation, or similar torts, will be governed by the internal laws of the State of Minnesota, without giving effect to any choice of law provisions. Any conflict or apparent conflict between this Agreement and the Act will be resolved in favor of this Agreement, except as otherwise specifically required by the Act.

**15.8. Third-Party Benefit**. Nothing in this Agreement, express or implied, is intended to confer upon any Person other than the Members (in their capacities as such) any rights of any nature whatsoever, except that the Indemnitees will be entitled to the enforcement of Article VI, as intended third-party beneficiaries thereof, to the extent that the obligations sought to be enforced are those of the Company.

**15.9. Additional Actions and Documents**. The Company and each of the Members agree to execute and deliver any further instruments or perform any acts that are or may become necessary or appropriate to carry on a limited liability company or to effectuate the purposes of this Agreement.

**15.10. Specific Performance; Remedies Cumulative**. Each Member acknowledges and agrees that the subject matter of this Agreement is unique, that the other Members would be damaged irreparably in the event any of the provisions of this Agreement are not performed in accordance

with their specific terms or are otherwise breached, and that the remedies at law would not be adequate to compensate such other parties not in default or in breach. Accordingly, the other Members will be entitled to injunctive relief to prevent breaches of the provisions of this Agreement and to enforce specifically this Agreement in addition to any other remedy to which they may be entitled, at law or in equity. The rights and remedies under this Agreement are cumulative and are in addition to and not in substitution for any other available rights or remedies.

**15.11. No Implied Waiver**. No waiver of any provision of this Agreement will constitute a waiver of any other provision, nor will any waiver constitute a continuing waiver. Neither the failure nor the delay by a party in exercising any right under this Agreement will constitute a waiver of that right, and no partial exercise of any right, power, or privilege will preclude any other or further exercise of that or any other right, power, or privilege.

**15.12. Waiver of Partition**. Each Member irrevocably waives any and all rights that the Member may have to maintain an action for partition of any of the Company's property.

**15.13. Representation**. The parties hereto each acknowledge that Dorsey & Whitney LLP has prepared this Agreement as counsel for Vireo Health, Inc., and that Dorsey & Whitney LLP has not represented any the Company or any other Members in connection with this Agreement. The other Members further acknowledge and agree that they have had full and fair opportunity to consult their own legal and tax counsel regarding the terms of this Agreement and the transactions contemplated by this Agreement and that neither Dorsey & Whitney LLP, the Company nor any Manager or agent of the Company has provided legal or tax advice regarding this Agreement or the transactions contemplated hereby. Dorsey & Whitney LLP has not provided any tax advice to any party in connection with this Agreement.

*[Signature page follows]*

The undersigned have signed this Agreement as of the Effective Date intending to be bound by it.

**MEMBERS**:

**Vireo Health, Inc.**

By: _______________________
Name: Joshua Rosen
Title: Chief Executive Officer

___________________________
Josh Grab

____________________________
Shea Coakley

**SCHEDULE A**

| Name of Member | Control Person | Common Units | Profits Interest Units | Percentage |
|---|---|---|---|---|
| Vireo Health, Inc. | | 75,000 | N/A | 75% |
| [Joshua Grab] | N/A | N/A | 12,500 | 12.5% |
| Shea Coakley | N/A | N/A | 12,500 | 12.5% |
| **TOTAL** | | **75,000** | **25,000** | **100%** |

**SCHEDULE B**
**Schedule of Managers and Officers**

**Board of Managers:**

Vireo Health, Inc.

**Officers:**

**Executive Chairman:** Josh Rosen

**Chief Executive Officer:** Shea Coakley

**Chief Revenue Officer:** Josh Grab

**PROFITS INTEREST GRANT AGREEMENT**

This Profits Interest Grant Agreement (this "*Agreement*") sets forth the terms and conditions of the grant of a Profits Interest in HiColor, LLC, a Minnesota limited liability company (the "*Company*"), to you. By signing this Agreement (the "*Profits Interest Grant Letter*"), you hereby acknowledge and agree to be bound by the terms and conditions set forth in this Agreement. This grant of a Profits Interest to you is conditioned upon your execution of this Agreement and your execution of the Company's Amended & Restated Operating Agreement dated as of the Effective Date (as amended from time to time, the "*Operating Agreement*"). You should review this Agreement and the Operating Agreement carefully and consult your legal, financial, and tax advisors before signing this Agreement. Capitalized terms used in this Agreement and not otherwise defined shall have the meanings set forth in the Operating Agreement.

1. Grant of Profits Interest Percentage. Effective July [__], 2024 (the "*Effective Date*") you are hereby granted 12,500 Profits Interest Units (the "*Profits Interests*"). The Profits Interests are intended to constitute a profits interest as defined in Revenue Procedure 93-27, 1993-2 C.B. 343 and Revenue Procedure 2001-43, 2001-2 C.B. 191, and, to the extent applicable, Internal Revenue Service Notice 2005-43. The Profits Interests will be subject to all of the terms and conditions of the Operating Agreement, including, without limitation, the transfer restrictions and repurchase provisions set forth therein. You should note that your Profits Interests entitles you to certain distributions from the Company, as set forth in Section 5 of this Agreement. Pursuant to Sections 9.4(c) and 11.3 of the Operating Agreement, the Participation Threshold for the Profits Interests is [$●].

2. Transferability. Article VII of the Operating Agreement contains certain restrictions on transferability of Profits Interests.

3. Vesting. The Profits Interests granted pursuant to this Agreement shall, subject to your continuing service to the Company, vest on the date six months from the Effective Date. For the avoidance of doubt, until the Profits Interests vest in accordance with this Section 3, all non-vested Profits Interests shall be "Restricted Interests." Upon your termination of service to the Company, your Restricted Interests shall be surrendered to the Company without payment or consideration therefor. Notwithstanding the foregoing, any unvested portion of Profits Interests shall immediately vest upon the occurrence of a Liquidity Event, as defined in Section 4 of this Agreement.

4. Liquidity Event. For purposes of determining the acceleration of vesting in Section 4 of this Agreement, "*Liquidity Event*" shall mean and include any of the following: (a) consummation of a merger or consolidation of the Company with or into any other corporation or other entity in which holders of the Company's voting securities immediately prior to such merger or consolidation will not, directly or indirectly, continue to hold at least a majority of the outstanding voting securities of the Company; (b) a sale, lease, exchange or other transfer (in one transaction or a related series of transactions) of all or substantially all of the Company's assets to an unrelated person or entity; (c) the acquisition by any person or any group of persons, acting together in any transaction or related series of transactions, of such quantity of the Company's voting securities as causes such person, or group of persons, to own beneficially, directly or indirectly, as of the time immediately after such transaction or series of transactions, 50% or more

of the combined voting power of the voting securities of the Company other than as a result of: (i) an acquisition of securities directly from the Company or (ii) an acquisition of securities by the Company which by reducing the voting securities outstanding increases the proportionate voting power represented by the voting securities owned by any such person or group of persons to 50% or more of the combined voting power of such voting securities; or (d) the liquidation or dissolution of the Company.

5. Payment of Profits. Your Profits Interests shall entitle you to certain distributions made by the Company, as set forth in Article XI of the Operating Agreement.

6. Tax Matters. You hereby acknowledge that any applicable transfer restrictions and purchase options under the Operating Agreement may result in adverse tax consequences to you that may be avoided or mitigated by filing an election under Code §83(b), a form of which is attached as Exhibit 1. The election must be filed within the timing requirements of Code §83(b), which generally requires that the election be made within 30 days from the issuance of the Profits Interests. You should consult with your independent tax advisor(s) to determine, among other things, the tax consequences of the issuance and receipt of Profits Interests under the Operating Agreement and this Agreement, the advantages and disadvantages of filing the Code §83(b) election with respect to the Profits Interests, the value, if any, of the Profits Interests to declare on the Code §83(b) election, the proper form for making the Code §83(b) election, and the tax implications associated with forfeiture of the Profits Interest Percentage. You hereby acknowledge that (a) a Code §83(b) election shall be made in your sole and absolute discretion, and (b) if you decide to make the Code §83(b) election, that the making of the election is your sole responsibility, and not the Company's, even if you request that the Company or its representatives make this filing on your behalf.

7. No Retention Rights. Nothing in this Agreement shall confer upon you any right to continue in service for any period of specific duration or interfere with or otherwise restrict in any way your rights or rights of the Company (or parent or subsidiary retaining you), which rights are hereby expressly reserved by each, to terminate your service at any time and for any reason, with or without cause.

8. Taxes. You hereby confirm that you had an opportunity to consult with professionals of your own choosing and to obtain advice with respect to this Agreement, the Operating Agreement and the legal and tax consequences of the Profits Interests granted to you under this letter.

9. Solicitation of Employees. You hereby agree that during the period of time in which you hold Profits Interests and for a period of 12 months thereafter (the "*Restricted Period*"), you will not, either directly or indirectly, (a) solicit, induce, recruit or encourage any of the Company's, Vireo Health, Inc.'s, or any of their subsidiaries' employees, consultants or independent contractors to leave their employment with, or cease providing services to, or take away such employees, consultants or independent contractors, either for you or for any other person or entity or attempt to do any of the foregoing, or (b) otherwise interfere with or disrupt the Company's, Vireo Health, Inc.'s, or their subsidiaries' relationship with their employees, consultants or independent contractors.

10. Non-Interference with Business. You agree that during the Restricted Period, you will not, either directly or indirectly, whether for your own account or for the account of any other person, firm, corporation or other business organization, intentionally interfere with any person who is, or during the time you held Profits Interests was, a partner, supplier, vendor, collaborator, agent, customer or client of the Company, Vireo Health, Inc., or their affiliates, or solicit, induce or encourage any such person to terminate or change its relationship with the Company, Vireo Health, Inc., or their affiliates, or otherwise interfere with the Company's, Vireo Health, Inc.'s, or their affiliates' relationships with its partners, suppliers, vendors, collaborators, agents, customers and clients.

11. Non-Compete. You agree that during the Restricted Period, you will not, without the prior written consent of the Company, (a) serve as a partner, employee, consultant, officer, director, manager, agent, associate, investor, or (b) directly or indirectly, own, purchase, organize or take preparatory steps for the organization of, or (c) build, design, finance, acquire, lease, operate, manage, invest in, work or consult for or otherwise affiliate with any Competing Business. This covenant shall not prohibit you from owning less than one percent of the securities of any company that is publicly traded on a nationally recognized stock exchange. The foregoing covenant shall cover your activities in every part of the Territory in which you may conduct business during the Restricted Period. "Territory" shall mean all states of the United States of America and all other countries of the world; provided that the Company derives at least one percent (1%) of its gross revenues from the applicable state or country. "Competing Business" shall mean any business engaged in the business of the production or sale of cannabis- or hemp-derived THC products.

12. Assignment; Entire Agreement. This Agreement is personal and may not be assigned by you. This Agreement and the Operating Agreement constitute the entire agreement and understanding between you and the Company in relation to the grant of the Profits Interests to you and the terms and conditions of your ownership of the Profits Interests.

If this Agreement accurately reflects our understanding and agreement with respect to the matters contained herein, please execute this Agreement where indicated below.

Sincerely,

HiColor, LLC

________________________________
By: [Joshua Rosen]
Its: [Chief Executive Officer]

ACKNOWLEDGED AND AGREED:

Signature: ____________________________
Print Name:
Date:

# EXHIBIT 1

## SECTION 83(B) ELECTION

This statement is made under Section 83(b) of the Internal Revenue Code of 1986, as amended, pursuant to Treasury Regulations Section 1.83-2.

(1) The taxpayer who performed the services is:

Name: [Name]

Address: [Address]

Social Security No.: [SSN]

(2) The property with respect to which the election is made is [●] Common Units of HiColor, LLC.

(3) The property was transferred on [●], 2024.

(4) The taxable year for which the election is made is the calendar year 2024.

(5) The property is not transferable except under very limited circumstances.

(6) The fair market value of the property at the time of transfer (determined without regard to any restriction other than a restriction which by its terms will never lapse) is $0.00.

(7) The amount paid for the property is $0.00.

(8) A copy of this statement was furnished to HiColor, LLC, for whom taxpayer rendered the services underlying the transfer of the property.

(9) This statement is executed on _______________ 2024.

________________________________ ____________________________

Spouse (if any) Taxpayer

# INTELLECTUAL PROPERTY LICENSE AGREEMENT

This INTELLECTUAL PROPERTY LICENSE AGREEMENT (this "*Agreement*") is hereby entered into as of July [__], 2024 (the "*Effective Date*") by and between [HiTide, LLC] ("*Licensor*"), a [STATE OF ORGANIZATION] [TYPE OF ENTITY], and HiColor, LLC, a Minnesota limited liability company ("*Company*").

1) Intellectual Property License. This is a license agreement for the intellectual property described in Exhibit A attached hereto and incorporated herein by reference (the "*IP*").

2) Grant of License. Licensor hereby grants to Company a non-exclusive, non-transferable, license during the term of this Agreement to use the IP for the purposes set forth in Exhibit A. This license includes the right to make derivative works and is restricted to use only by Company employees and authorized contractors. The rights granted in this Agreement may not be transferred or sublicensed. This License may not be terminated early by Licensor except for material breaches of this Agreement by Company that remain uncured for thirty (30) days after written notice thereof, or as otherwise set forth in this Agreement. Company may terminate this Agreement at any time by providing written notice and destroying all copies of the IP, and ceasing all use of Licensor's IP. Any enhancements, modifications, derivatives, and/or alterations made to the IP by Company ("*Improvements*") shall be owned by Licensor, and Company hereby assigns all of its right, title, and interest in and to such Improvements to Licensor, including by the execution and filing of any documents reasonably requested by Licensor.

3) Delivery; Term.

a) Within a reasonable time after the Effective Date, Licensor will deliver all documentation of the IP, as applicable.

b) The term of this Agreement commences on the date hereof and continues for a period of [five] years unless it is earlier terminated pursuant to the terms of this Agreement or applicable law (the "*Initial Term*").

c) Renewal Term. Upon expiration of the Initial Term, the term of this Agreement will automatically renew for additional successive [one] year terms unless either party provides written notice of non-renewal at least sixty days prior to the end of the then-current term (each, a "*Renewal Term*"), unless any Renewal Term is earlier terminated pursuant to the terms of this Agreement or applicable law.

4) License Consideration. The consideration provided by Company to Licensor for the grant of this License is the grantback of all rights to Improvements, as noted above in Section 2.

5) Intellectual Property Rights. All right, title, and interest in and to the IP and Improvements, including any copyrights, trade secrets, database rights, and patent rights therein (and including, but not limited to, any images, photographs, animations, video, audio, music, text, other "content", "applets", "servlets", "libraries", or the like incorporated into the IP or Improvements), as well as in any accompanying documentation, and any copies of the IP and Improvements, are owned by Licensor (or its licensors, as applicable). The IP and Improvements are protected by intellectual property rights laws and international treaty provisions. This Agreement confers only the rights expressly set forth herein.

6) Additional Trademark Provisions.

a) Trademark Guidelines. Company shall comply and shall cause its relevant sublicensees to comply with any applicable trademark appearance, style, and/or usage guidelines furnished by Licensor in relation to the trademarks included in the IP, if applicable. To confirm compliance with those guidelines, upon Licensor's reasonable request, Company will furnish representative samples of materials produced by or for Company or its relevant sublicensees that use or display any such trademarks.

b) Quality Control. In order to preserve the value of the trademarks included in the IP, Company shall ensure that all products and services of Company (or its relevant sublicensees) that bear such trademarks or that are otherwise marketed, promoted, distributed, used, or sold under such trademarks ("*Trademarked Goods and Services*") meet or exceed the standards of quality associated with Licensor's own goods and services that bear or are otherwise marketed or sold under such trademarks, or such other applicable quality standards as Licensor may communicate to Company from time to time. To confirm compliance with those standards, Company will cooperate, and will require its relevant sublicensees to cooperate, with Licensor's reasonable efforts to review and evaluate the quality of Trademarked Goods and Services.

c) Goodwill. As between the parties, all goodwill arising from Company's or its sublicensees' use of the trademarks included in the IP will belong solely to Licensor. Company irrevocably assigns and agrees to assign to Licensor any such goodwill that Company or such sublicensees may acquire in relation to such trademarks.

7) **DISCLAIMER OF WARRANTY**. THE IP IS PROVIDED "AS IS." EACH PARTY HEREBY DISCLAIMS FOR ITSELF AND ITS LICENSORS, IF ANY, ALL WARRANTIES, WHETHER EXPRESS OR IMPLIED, INCLUDING ANY WARRANTIES OF NON-INFRINGEMENT, MERCHANTABILITY, OR FITNESS FOR A PARTICULAR PURPOSE.

8) **NO LIABILITY FOR DAMAGES**. IN NO EVENT SHALL EITHER PARTY OR ITS LICENSORS BE LIABLE FOR ANY DAMAGES WHATSOEVER (INCLUDING, WITHOUT LIMITATION, DAMAGES FOR LOSS OF BUSINESS PROFITS, BUSINESS INTERRUPTION, LOSS OF BUSINESS INFORMATION, CONSEQUENTIAL, EXEMPLARY, SPECIAL, INDIRECT OR PUNITIVE DAMAGES) ARISING OUT OF THE USE, NON-USE, OR INABILITY TO USE THE SOFTWARE OR IMPROVEMENTS, EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. MOREOVER, IN NO EVENT SHALL LICENSOR HAVE ANY LIABILITY ARISING OUT OF ANY CHANGE, MODIFICATION, ALTERATION, OR ENHANCEMENT TO THE IP MADE BY ANYONE OTHER THAN A LICENSOR EMPLOYEE.

9) Governing Law and Jurisdiction. This Agreement shall be governed by the laws of the State of Minnesota, excluding its principles of conflicts of laws. Each Party irrevocably and unconditionally agrees that it will not commence any action, litigation, or proceeding of any kind whatsoever against the other Party in any way arising from or relating to this Agreement, including all exhibits, schedules, attachments, and appendices attached to this Agreement, and all contemplated transactions, including contract, equity, tort, fraud, and statutory claims, in any forum other than the United States District Court for the District of Minnesota or the courts of the State of Minnesota sitting in Minneapolis, and any appellate court from any thereof. Each Party irrevocably and unconditionally submits to the exclusive jurisdiction of such courts and agrees to bring any such action, litigation or

proceeding only in the United States District Court for the District of Minnesota or the courts of the State of Minnesota sitting in Minneapolis. Each Party agrees that a final judgment in any such action, litigation, or proceeding is conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

10) Notices. All notices, requests, consents, claims, demands, waivers, and other communications under this Agreement must be in writing and addressed to the other party at its address set forth below (or to such other address that the receiving Party may designate from time to time in accordance with this Section 10). Unless otherwise agreed herein, all notices must be delivered by personal delivery, nationally recognized overnight courier, or certified or registered mail (in each case, return receipt requested, postage prepaid). Except as otherwise provided in this Agreement, a notice is effective only (a) on receipt by the receiving party, and (b) if the Party giving the Notice has complied with the requirements of this Section 10.

Licensor: [HiTide, LLC]
[____]
[____]
Attention: Chief Executive Officer
Email: [__]

Company: HiColor, LLC
[____]
[____]
Attention: [____]
Email: [____]

11) Further Assurances. Company agrees, both during and after the term of this Agreement, and without further compensation of any kind, to promptly provide Licensor and its successors and assigns with all reasonably requested cooperation and assistance in connection with establishing, confirming, perfecting, recording, and/or enforcing Licensor's or such successors' or assigns' rights with respect to the IP. Such cooperation and assistance will include, without limitation, executing additional assignments, powers of attorney, patent or copyright applications, and other documents associated with the ownership or protection of IP, giving testimony and otherwise cooperating and assist in legal proceedings pertaining to the IP, and causing Company's relevant personnel to do any of the foregoing.

12) Miscellaneous. This Agreement contains the entire agreement between the parties hereto with respect to the subject matter hereof and related transactions and supersede all prior agreements, written or oral, with respect thereto, including, any letters of intent among the parties hereto. This Agreement may not be changed, modified or amended except by signed agreement between Licensor and Company. There are no representations or warranties concerning the IP licensed herein other than those expressly contained herein.

[SIGNATURE PAGE FOLLOWS]

| | |
|---|---|
| **[HiTide, LLC]** | **HiColor, LLC** |
| By:___________________________________ | By:___________________________________ |
| Name: [_____] | Name: [Joshua Rosen] |
| Title: [_____] | Title: Chief Executive Officer |

## EXHIBIT A

**Licensed IP:**

The IP provided by Licensor to Company includes the recipes/formulations for all HiTide products, all branding/imagery associated with the HiTide brand

**Purpose**: [____]

# SUPPLY AGREEMENT

This SUPPLY AGREEMENT, dated as of July [__], 2024 (this "*Agreement*"), is entered into between Vireo Health, Inc., a Delaware corporation and its subsidiaries ("*Buyer*") and HiColor, LLC, a Minnesota limited liability company ("*Seller*", and together with Buyer, the "*Parties*", and each, a "*Party*").

**WHEREAS**, Buyer is, among other things, in the business of Operating retail cannabis dispensaries;

**WHEREAS**, Seller is, among other things, in the business of selling Hemp-derived THC products (the "*Goods*"); and

**WHEREAS**, Buyer desires to purchase from Seller, and Seller desires to sell to Buyer the Goods pursuant to the terms of this Agreement.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. Sale of Goods. Seller shall sell to Buyer and Buyer shall purchase from Seller the Goods upon the terms and conditions set forth in this Agreement.

2. Purchase Orders.

(a) Anytime and from time to time, Buyer will issue purchase orders (each, a "*Purchase Order*") to Seller which shall, among other things, specify items such as (i) the Goods to be purchased, (ii) the quantity of each of the Goods to be purchased, (iii) the delivery date (which must be a business day no less than seven days following the delivery of the applicable Purchase Order to Seller) (each, a "*Delivery Date*"), (iv) the unit Price for each of the Goods to be purchased; (v) the billing address and (vi) the delivery locations (each, a "*Delivery Location*").

(b) The Parties intend for the express terms and conditions contained in this Agreement and in any Purchase Order that are consistent with the terms and conditions of this Agreement to exclusively govern and control each of the Parties' respective rights and obligations regarding the manufacture, purchase, and sale of the Goods, and the Parties' agreement is expressly limited to such terms and conditions. Notwithstanding the foregoing, if any terms and conditions contained in a Purchase Order supplement or conflict with any terms and conditions contained in this Agreement, the applicable term or condition of this Agreement will prevail and such additional, contrary or different terms will have no force or effect. Except for such additional and contrary terms, the terms and conditions of all Purchase Orders are incorporated by reference into this Agreement for all applicable purposes hereunder.

3. Delivery Date. Seller shall deliver the Goods in the quantities and on the date(s) on the Delivery Date. Timely delivery of the Goods is of the essence. Delivery times will be measured to the time that Goods are actually received at the Delivery Location. If Seller does not comply with any of its delivery obligations under this Section 3, Buyer may, in Buyer's sole

discretion and at Seller's sole cost and expense, (a) approve a revised Delivery Date, (b) require expedited or premium shipment, or (c) cancel the applicable Purchase Order and obtain similar goods from other sources. Unless otherwise expressly agreed to by the Parties in writing, Seller may not make partial shipments of Goods to Buyer.

4. Quantity. Seller shall deliver the quantities of the Goods specified in each Purchase Order. If Seller delivers more or less than the quantity of Goods specified in such Purchase Order, Buyer may reject all or any excess Goods. Any such rejected Goods shall be returned to Seller at Seller's risk and expense. If Buyer does not reject the Goods and instead accepts the delivery of Goods at the increased or reduced quantity, the Price for the Goods shall be adjusted on a pro-rata basis.

5. Delivery Location. All Goods shall be delivered to the Delivery Location during Buyer's normal business hours or as otherwise instructed by Buyer.

6. Shipping Terms. Seller shall give written notice of shipment to Buyer when the Goods are delivered to a carrier for transportation. Seller shall provide Buyer all shipping documents, including the commercial invoice, packing list, and any other documents necessary to release the Goods to Buyer promptly after Seller delivers the Goods to the transportation carrier.

7. Title and Risk of Loss. Title passes to Buyer upon delivery of the Goods to the Delivery Location. Seller bears all risk of loss or damage to the Goods until delivery of the Goods to the Delivery Location.

8. Packaging. Seller shall properly pack, mark, and ship Goods as instructed by Buyer and otherwise in accordance with applicable law and industry standards and shall provide Buyer with shipment documentation showing the quantity of Goods in shipment, the number of cartons or containers in shipment, Seller's name, the number, and the country of origin.

9. Inspection and Rejection of Nonconforming Goods. Buyer has the right to inspect the Goods on or after the Delivery Date. Buyer, at its sole option, may inspect all or a sample of the Goods, and may reject all or any portion of the Goods if it determines the Goods are nonconforming or defective. If Buyer rejects any portion of the Goods, Buyer shall have the right, in its sole discretion, effective upon written notice to Seller, to require replacement of the rejected Goods. If Buyer requires replacement of the Goods, Seller shall, at its expense, promptly replace the nonconforming Goods and pay for all related expenses, including, but not limited to, transportation charges for the return of the defective goods and the delivery of replacement Goods. Any inspection or other action by Buyer under this Section shall not reduce or otherwise affect Seller's obligations under this Agreement, and Buyer shall have the right to conduct further inspections after Seller has carried out its remedial actions.

10. Price. Buyer shall purchase the Goods from Seller at the prices set forth in Exhibit A, as it may be modified from time to time in accordance with this Section 10 (the "*Price*"). The Price of the Goods set forth in Exhibit A shall be equal to the Seller's cost for such Goods and Seller shall, from time to time, adjust the Price reflected on Exhibit A, upon prior written notice

to Buyer, to reflect changes in Seller's cost. For the avoidance of doubt, the Seller's cost includes all packaging, storage, insurance, customs, duties and fees and applicable taxes.

11. Payment Terms. Seller shall issue an invoice to Buyer within [10] days after the completion of delivery of the Goods. Buyer shall pay all properly invoiced amounts due to Seller within [30] days after Buyer's receipt of such invoice, except for any amounts disputed by Buyer in good faith. All payments hereunder must be in US dollars and made by [METHOD OF PAYMENT]. In the event of a payment dispute, Buyer shall deliver a written statement to Seller no later than [NUMBER] days prior to the date payment is due on the disputed invoice listing all disputed items. The parties shall seek to resolve all such disputes expeditiously and in good faith. Seller shall continue performing its obligations under this Agreement notwithstanding any such dispute.]

12. Setoff. Without prejudice to any other right or remedy it may have, Buyer reserves the right to set off at any time any amount owing to it by Seller against any amount payable by Buyer to Seller under this Agreement.

13. Warranties. Seller warrants to Buyer that for a period of six months from the Delivery Date, all Goods will: (a) be free from any defects in workmanship, material, and design; (b) conform to applicable specifications and other requirements specified by Buyer; (c) be fit for their intended purpose and operate as intended; (d) be merchantable; (e) be free and clear of all liens, security interests, or other encumbrances; and (f) not infringe or misappropriate any third party's patent or other intellectual property rights. These warranties survive any delivery, inspection, acceptance, or payment of or for the Goods by Buyer. These warranties are cumulative and in addition to any other warranty provided by law or equity. Any applicable statute of limitations runs from the date of Buyer's discovery of the noncompliance of the Goods with the foregoing warranties. If Buyer gives Seller notice of noncompliance with this Section 13, Seller shall, at its own cost and expense, promptly replace or repair the defective or nonconforming Goods and pay for all related expenses, including, but not limited to, transportation charges for the return of the defective or nonconforming goods to Seller and the delivery of repaired or replacement Goods to Buyer.

14. Compliance with Law. Seller is in compliance with and shall comply with all applicable laws, regulations, and ordinances when carrying out its obligations under this Agreement. Seller has and shall maintain in effect all the licenses, permissions, authorizations, consents, and permits that it needs to carry out its obligations under this Agreement.

15. General Indemnification. Each Party shall indemnify, defend, and hold harmless the other Party and its officers, directors, employees, agents, affiliates, successors and permitted assigns (collectively, "*Indemnified Party*") against any and all losses, damages, liabilities, deficiencies, claims, actions, judgments, settlements, interest, awards, penalties, fines, costs, or expenses of whatever kind, including reasonable attorneys' fees, fees and the costs of enforcing any right to indemnification under this Agreement and the cost of pursuing any insurance providers (collectively, "*Losses*"), relating to/arising out of or resulting from any claim of a third party or such Party arising out of or occurring in connection with the negligence, willful misconduct, or breach by the other Party of this Agreement. Each Party shall not enter into any settlement without the other Party's or Indemnified Party's prior written consent.

16. Intellectual Property Indemnification. Seller shall, at its expense, defend, indemnify, and hold harmless Buyer and any Indemnified Party against any and all Losses arising out of or in connection with any claim that Buyer's or Indemnified Party's use or possession of the Goods infringes or misappropriates the patent, copyright, trade secret or other intellectual property right of any third party. In no event shall Seller enter into any settlement without Buyer's or Indemnified Party's prior written consent.

17. Term and Termination.

(a) Initial Term. The term of this Agreement commences on the date hereof and continues for a period of five years unless it is earlier terminated pursuant to the terms of this Agreement or applicable law (the "*Initial Term*").

(b) Renewal Term. Upon expiration of the Initial Term, the term of this Agreement will automatically renew for additional successive one year terms unless either Party provides written notice of non-renewal at least sixty days prior to the end of the then-current term (each, a "*Renewal Term*"), unless any Renewal Term is earlier terminated pursuant to the terms of this Agreement or applicable law.

18. Termination for Cause. Either Party may terminate this Agreement, by providing written to the other Party:

(a) if the other Party is in material breach of, or threatens to breach, any representation, warranty or covenant of the other Party under this Agreement and either the breach cannot be cured or, if the breach can be cured, it is not cured by the other Party within a commercially reasonable period of time under the circumstances, in no case exceeding sixty days following the other Party's receipt of written notice of such breach; or

(b) if the other Party (i) becomes insolvent or is generally unable to pay, or fails to pay, its debts as they become due, (ii) files or has filed against it, a petition for voluntary or involuntary bankruptcy or otherwise becomes subject, voluntarily or involuntarily, to any proceeding under any domestic or foreign bankruptcy or insolvency Law, (iii) makes or seeks to make a general assignment for the benefit of its creditors, or (iv) applies for or has appointed a receiver, trustee, custodian or similar agent appointed by order of any court of competent jurisdiction to take charge of or sell any material portion of its property or business.

19. Confidential Information. All non-public, confidential, or proprietary information of the other Party, including, but not limited to, specifications, samples, patterns, designs, plans, drawings, documents, data, business operations, customer lists, pricing, discounts, or rebates, disclosed by one Party to the other Party, whether disclosed orally or disclosed or accessed in written, electronic or other form or media, and whether or not marked, designated, or otherwise identified as "confidential," in connection with this Agreement is confidential, solely for the use of performing this Agreement and may not be disclosed or copied unless authorized by the disclosing Party in writing. Upon the disclosing Party's request, the other Party shall promptly return all documents and other materials received from the other Party. Each Party shall be

entitled to injunctive relief for any violation of this Section 19. This Section shall not apply to information that is: (a) in the public domain; (b) known to the Seller at the time of disclosure; or (c) rightfully obtained by the Seller on a non-confidential basis from a third party.

20. Entire Agreement. This Agreement, including and together with any related exhibits, schedules, attachments, and appendices, constitutes the sole and entire agreement of the Parties with respect to the subject matter contained herein and supersedes all prior and contemporaneous understandings, agreements, representations, and warranties, both written and oral, regarding such subject matter.

21. Survival. Subject to the limitations and other provisions of this Agreement: (a) the representations and warranties of the Parties contained herein shall survive the expiration or earlier termination of this Agreement; and (b) Sections 15, 16, 19, 21, 22, 23, 30, 31, and 32 of this Agreement, as well as any other provision that, in order to give proper effect to its intent, should survive such expiration or termination, shall survive the expiration or earlier termination of this Agreement.

22. Notices. All notices, requests, consents, claims, demands, waivers, and other communications under this Agreement must be in writing and addressed to the other Party at its address set forth below (or to such other address that the receiving Party may designate from time to time in accordance with this Section 22). Unless otherwise agreed herein, all notices must be delivered by personal delivery, nationally recognized overnight courier, or certified or registered mail (in each case, return receipt requested, postage prepaid). Except as otherwise provided in this Agreement, a notice is effective only (a) on receipt by the receiving Party, and (b) if the Party giving the notice has complied with the requirements of this Section 22.

| | |
|---|---|
| Notice to Buyer: | HiColor, LLC |
| | [___] |
| | [___] |
| | Attention: [___] |
| | Email: [___] |
| | [SELLER ADDRESS] |
| Notice to Seller: | [___] |
| | [___] |
| | Attention: [___] |
| | Email: [___] |

23. Severability. If any term or provision of this Agreement is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon a determination that any term or provision is invalid, illegal, or unenforceable, the court may modify this Agreement to effect the original intent of the Parties as closely as possible in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

24. Amendments. No amendment to, or modification of, or rescission, termination, or discharge of this Agreement is effective unless it is in writing and signed by an authorized representative of each Party.

25. Waiver. No waiver by any Party of any of the provisions of this Agreement shall be effective unless explicitly set forth in writing and signed by the Party so waiving. Except as otherwise set forth in this Agreement, no failure to exercise, or delay in exercising, any rights, remedy, power, or privilege arising from this Agreement shall operate or be construed as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege.

26. Cumulative Remedies. All rights and remedies provided in this Agreement are cumulative and not exclusive, and the exercise by either Party of any right or remedy does not preclude the exercise of any other rights or remedies that may now or subsequently be available at law, in equity, by statute, in any other agreement between the Parties, or otherwise.

27. Assignment. Neither party may assign, transfer, delegate, or subcontract any of its rights or obligations under this Agreement without the prior written consent of Buyer. Any purported assignment or delegation in violation of this Section shall be null and void. No assignment or delegation shall relieve the Seller of any of its obligations hereunder. Buyer may at any time assign, transfer, or subcontract any or all of its rights or obligations under this Agreement without Seller’s prior written consent.

28. Successors and Assigns. This Agreement is binding on and inures to the benefit of the Parties to this Agreement and their respective permitted successors and permitted assigns.

29. No Third-Party Beneficiaries. This Agreement benefits solely the Parties to this Agreement and their respective permitted successors and assigns, and nothing in this Agreement, express or implied, confers on any other person any legal or equitable right, benefit, or remedy of any nature whatsoever under or by reason of this Agreement.

30. Choice of Law. This Agreement, including all exhibits, schedules, attachments, and appendices attached to this Agreement and thereto, and all matters arising out of or relating to this Agreement, are governed by, and construed in accordance with, the laws of the State of Minnesota, United States of America, without regard to the conflict of laws provisions thereof to the extent such principles or rules would require or permit the application of the laws of any jurisdiction other than those of the State of Minnesota.

31. Choice of Forum. Each Party irrevocably and unconditionally agrees that it will not commence any action, litigation, or proceeding of any kind whatsoever against the other Party in any way arising from or relating to this Agreement, including all exhibits, schedules, attachments, and appendices attached to this Agreement, and all contemplated transactions, including contract, equity, tort, fraud, and statutory claims, in any forum other than the United States District Court for the District of Minnesota or the courts of the State of Minnesota sitting in Minneapolis, and any appellate court from any thereof. Each Party irrevocably and unconditionally submits to the exclusive jurisdiction of such courts and agrees to bring any such action, litigation or proceeding only in the United States District Court for the District of Minnesota or the courts of the State of Minnesota sitting in Minneapolis. Each Party agrees that a final judgment in any such action, litigation, or proceeding is conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

**32. WAIVER OF JURY TRIAL. EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY THAT MAY ARISE UNDER THIS AGREEMENT, INCLUDING EXHIBITS, SCHEDULES, ATTACHMENTS, AND APPENDICES ATTACHED TO THIS AGREEMENT, IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND, THEREFORE, EACH SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT, INCLUDING ANY EXHIBITS, SCHEDULES, ATTACHMENTS, OR APPENDICES ATTACHED TO THIS AGREEMENT, OR THE TRANSACTIONS CONTEMPLATED HEREBY.**

33. Counterparts. This Agreement may be executed in counterparts, each of which is deemed an original, but all of which together are deemed to be one and the same agreement. Notwithstanding anything to the contrary in Section 22, a signed copy of this Agreement delivered by facsimile, email, or other means of electronic transmission is deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

34. Relationship of the Parties. The relationship between the parties is that of independent contractors. Nothing contained in this Agreement shall be construed as creating any agency, partnership, franchise, business opportunity, joint venture, or other form of joint enterprise, employment, or fiduciary relationship between the Parties, and neither Party shall have authority to contract for or bind the other Party in any manner whatsoever. No relationship of exclusivity shall be construed from this Agreement.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

**BUYER:**

**Vireo Health, Inc.**

By______________________

Name: Josh Rosen

Title: Chief Executive Officer

**SELLER:**

**HiColor, LLC**

By______________________

Name: [Shea Coakley]

Title: [Chief Executive Officer]

# EXHIBIT A

| Description of Goods | Price |
| --- | --- |
| | |
| | |
| | |
| | |